# EXHIBIT "A"

## BLITMAN SARATOGA LLC
## AMENDED AND RESTATED
## OPERATING AGREEMENT

**THIS OPERATING AGREEMENT** is entered into as of the 1ST day of January, 2016 by and between **BLITMAN SARATOGA LLC**, with an address c/o 118 North Bedford Road, Suite 102, Mount Kisco, New York 10549, **HOWARD N. BLITMAN**, with an address c/o 118 North Bedford Road, Suite 102, Mount Kisco, New York 10549 ("Blitman"); **GARY PERESIPER** with an address c/o 118 North Bedford Road, Suite 102, Mount Kisco, New York 10549 ("Peresiper"), **SCOTT VARLEY** with an address at 13 Joshua Rd. Saratoga Springs, NY 12866 ("Varley") and **GOREN BROTHERS**, a New York General Partnership ("GOREN"), with an address at c/o Mitchell Bredefeld, CPA, 163 Washington Valley Road, Suite 103, Warren, NJ 07059 (collectively the "Parties").

**WHEREAS**, effective on even date herewith Peresiper has acquired all of the interest of Ronald York in the Company and immediately thereafter Peresiper and Blitman have each sold to Varley a 7.5% Membership Interest in the Company, and the Parties, which constitute all of the Members in the Company desire to amend and restate the Operating Agreement in its entirety as set forth herein.

**NOW, THEREFORE**, for good and valuable consideration, the Parties, intending legally to be bound, agree as follows:

## ARTICLE I
## DEFINED TERMS

The following capitalized terms shall have the meaning specified in this Article I. Other terms are defined in the text of this Agreement; and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

"Adjusted Capital Account Deficit" means, with respect to any Economic Interest Holder, the deficit balance, if any, in the Economic Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

A.      the deficit shall be decreased by any amounts which the Economic Interest Holder is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

1

B.      the deficit shall be increased by the items described in Regulation Sections 1.704-1(b)(2)(ii)-(d)(4), (5), and (6).

"Affiliate" means with respect to any Member, any Person which is owned or controlled, directly or indirectly, by a Member or group of Members.

"Agreement" means this Operating Agreement, as amended from time to time.

"Appraised Value" shall mean with respect to any property or asset or with respect to any Member's Percentage Interest in the Company, the dollar value of such item determined (i) by the mutual agreement of all Members in the case of a contribution or distribution of property to/from the Company, (ii) by mutual agreement of the buying and selling Members in the case of a purchase of a Membership Interest or Economic Interest or (iii) if the Appraised Value cannot be mutually agreed upon as provided in (i) or (ii), as the case may be, within thirty (30) days after one Member first proposes in writing to the others that Appraised Value be determined, by two (2) independent Appraisers (the appraisals prepared by such Appraisers hereinafter referred to as the "First Appraisals"), one selected by the selling party or the party receiving or making a distribution or contribution of property to the Company and the second Appraiser selected by the other Members in the case of a contribution or distribution of property or purchase of a Membership Interest or Economic Interest (the parties who selected the Appraisers in accordance herewith are hereinafter referred to as the "Selecting Party"), and the average of these two appraisals shall determine the Appraised Value, so long as the First Appraisals shall not vary by more than twenty percent (20%). In the event either Selecting Party does not obtain its First Appraisal within thirty (30) days following the date a copy of the other First Appraisal has been delivered, then the First Appraisal so delivered shall be deemed to be the Appraised Value. If the dollar value between the two First Appraisals exceeds twenty percent (20%) of the higher appraisal, and the Selecting Parties do not agree on a settlement of the discrepancy within ten (10) days after receipt of the appraisals, then a third Appraiser shall be selected by the Selecting Parties (or if they cannot agree on an Appraiser within 10 days, then the Appraiser shall be selected by the first two Appraisers) and, except as provided in the succeeding sentence, the appraisal determined by such third Appraiser shall constitute a final determination of the Appraised Value of the property or asset (including a Membership Interest or Economic Interest in the Company) and shall be binding upon all parties. Notwithstanding the preceding sentence, if the appraisal by the third Appraiser is lower than the lowest of the First Appraisals or higher than the highest of the First Appraisals, then the Appraised Value shall be the lower or higher First Appraisal, as the case may be. The cost of each appraisal shall be paid by the party selecting the Appraiser and the cost of the third Appraisal, if necessary, shall be paid equally by the party selecting the first two Appraisers.

2

"Capital Account" means the account to be maintained by the Company for each Economic Interest Holder in accordance with the following provisions:

    (i)    an Economic Interest Holder's Capital Account shall be credited with the Economic Interest Holder's Capital Contributions, the amount of any Company liabilities assumed by the Economic Interest Holder (or which are secured by Company property distributed to the Economic Interest Holder); and the Economic Interest Holder's distributive share of Profit; and

    (ii)    an Economic Interest Holder's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Economic Interest Holder, the amount of any liabilities of the Economic Interest Holder assumed by the Company (or which are secured by property contributed by the Economic Interest Holder to the Company), and the Economic Interest Holder's distributive share of Loss.

If any Economic Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Economic Interest. If the book value of Company property is adjusted pursuant to Section 4.3.2, the Capital Account of each Economic Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Economic Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

"Capital Contribution" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.

"Cash Flow" means all cash funds of the Company (including interest received on reserves), without reduction for any non-cash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements, and replacements as determined by the Members.

3

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"Company" means **BLITMAN SARATOGA LLC.**

"Economic Interest" means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Company.

"Economic Interest Holder" means any Person who holds an Economic Interest, whether as a Member or an unadmitted assignee of a Member.

"Fair Market Value" shall mean with respect to any property or asset or with respect to any Member's or Economic Interest Holder's Percentage Interest in the Company, the dollar value of such item determined (i) by the mutual agreement of all Members in the case of a contribution or distribution of property to/from the Company, (ii) by mutual agreement of the buying and selling parties in the case of a purchase of a Membership Interest or Economic Interest or (iii) if the Fair Market Value cannot be mutually agreed upon as provided in (i) or (ii), as the case may be, then the Fair Market Value shall equal the Appraised Value, except in the case of a purchase of a Membership Interest or Economic Interest in which case the Fair Market Value shall equal the net proceeds that the selling Member or Economic Interest Holder would have received if the Company sold all of its real property for its Appraised Value and liquidated under Section 4.4 of this Agreement, except that the Company must obtain a written opinion of counsel that the liabilities and obligations for which a reserve would be established under Section 4.4.3 are reasonable and more likely than not to materialize.

"Family Member" means an individual's spouse, lineal ancestors or descendants by birth or adoption, and trusts for the exclusive benefit of any of the foregoing individuals, or any entity owned or controlled directly or indirectly by any of the foregoing.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

(i)     the Member makes an assignment for the benefit of creditors;

(ii)    the Member files a voluntary petition of bankruptcy;

(iii)   the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

4

(iv)    the Member files a petition seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

(v)    the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

(vi)    the Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (iii);

(vii)    any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

(viii)    any transfer of a Member's interest in the Company on account of a court order or otherwise by operation of law, including any transfer incident to any divorce or marital property settlement or any transfer pursuant to applicable community property, quasi-community property or similar state law.

"Law" means the New York Limited Liability Company Law, as amended from time to time.

"Majority Vote" means the affirmative vote of the Members owning a majority of the Percentages owned by all Members (i.e., the Percentage owned by an Economic Interest Holder who has not been admitted as a Member shall not be counted) eligible to vote.

"Member" means each Person signing this Agreement and any Person who subsequently is admitted as a Member of the Company. If a Person (as herein defined) is a Member immediately before the purchase or other acquisition by such Person of an Economic Interest, that Person shall have all the rights of a Member with respect to the purchased or otherwise acquired Economic Interest.

5

"Membership Interest" means all of the rights of a Member in the Company, including a Member's: (i) Economic Interest; (ii) right to inspect the Company's books and records; (iii) right to participate in the management of and vote on matters coming before the Company; and (iv) unless this Agreement or the Articles of Organization provide to the contrary, right to act as an agent of the Company.

"Minimum Gain" has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Economic Interest Holder in a manner consistent with the Regulations under Code Section 704(b).

"Percentage" means, as to a Member, the percentage set forth after the Member's name below, and as to an Economic Interest Holder who is not a Member, the Percentage of the Member whose Economic Interest has been acquired by such Economic Interest Holder, to the extent the Economic Interest Holder has succeeded to that Member's Economic Interest:

| Member Name | Percentage |
|---|---|
| BLITMAN | 17.5% |
| GOREN | 50% |
| Peresiper | 17.5% |
| Varley | 15% |

"Person" means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

"Positive Capital Account" means a Capital Account with a balance greater than zero.

"Profit" and "Loss" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(i)     all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss; and

(ii)     any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be added to the taxable income or loss; and

6

(iii)    any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss; and

(iv)    gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes; and

(v)    in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi)    notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.3 hereof shall not be taken into account in computing Profit or Loss.

"Promissory Note" shall mean a promissory note in form similar to that as may be used by commercial lending institutions in the State of New York which shall provide for sixty (60) equal monthly payments of principal and interest computed using a twenty (20) year amortization with a balloon payment due on the fifth (5th) year anniversary, the first of which installments shall be due and payable one (1) month after the date of the execution of the Note. Interest shall be at a fixed rate equal to the prime rate of interest posted in the Wall Street Journal (or successor newspaper) determined on the date of closing. The Note may be prepaid in whole or in part at any time without penalty. The Note shall be personally guaranteed by all of the remaining Members and shall be secured by a mortgage on the real property owned by the Company as long as such mortgage does not constitute a default under any existing mortgage secured by such property.

"Regulation" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"Transfer" means—when used as a noun—any sale, hypothecation, pledge, assignment, attachment, or other transfer—and, when used as a verb—means to sell, hypothecate, pledge, assign, or otherwise transfer.

7

"Voluntary Withdrawal" means a Member's disassociation with the Company by means other than a Transfer or an Involuntary Withdrawal.

## ARTICLE II
## FORMATION AND NAME:
## OFFICE; PURPOSE; TERM

2.1.  Organization.  The parties have caused Articles of Organization to be prepared, executed, and filed with the New York Department of State.

2.2.  Name of the Company.  The name of the Company shall be **BLITMAN SARATOGA LLC.**  The Company may do business under that name and under any other name or names upon which the Members agree. If the Company does business under a name other than that set forth in its Articles of Organization, then the Company shall file a certificate as required by General Business Law §130.

2.3.  Purpose.  The Company is formed for the purchase, development and lease and/or sale of that certain real property on Geyser Road in Saratoga County in the State of New York constituting approximately 149 acres (the "Property") and for any lawful business purpose or purposes.

2.4.  Term.  The term of the Company shall continue until terminated pursuant to Article VII of this Agreement.

## ARTICLE III
## MEMBERS; CAPITAL; CAPITAL ACCOUNTS

3.1  intentionally deleted

3.2.  Liability of Members.  No Member shall have any personal liability for any obligation of the Company solely by reason of being a Member in the Company.

3.3.  No Interest on Capital Contributions.  Economic Interest Holders shall not be paid interest on their Capital Contributions.

3.4.  Return of Capital Contributions.  Except as otherwise provided in this Agreement, no Economic Interest Holder shall have the right to receive any return of any Capital Contribution.

8

3.5.    Form of Return of Capital.  If an Economic Interest Holder is entitled to receive a return of a Capital Contribution, the Company may distribute cash, notes, property, or a combination thereof to the Economic Interest Holder in return of the Capital Contribution.

3.6.    Capital Accounts.  A separate Capital Account shall be maintained for each Economic Interest Holder.

3.7    No Third Party Rights.  The right of the Company or the Members to require any additional contributions under the term of this Agreement shall not be construed as conferring any rights or benefits to or upon any Person not a party to this Agreement.

3.8.    Subsequent Capital Contributions.  It is intended that any additional funds required for the purposes of the Company, including costs of construction, shall be supplied by loans from institutional lenders (and to the extent possible, without personal liability of any Economic Interest Holders) and from the retained earnings of the Company.  To the extent that such funds are not reasonably available from those sources, the Economic Interest Holder agrees to advance such funds to the Company as required, simultaneously, and in proportion to their Percentages (the "Capital Call Obligation").  Capital funds shall be deemed required if the Company has insufficient funds to meet any liability currently due or to become due within thirty (30) days.  The Capital Call Obligation for each Economic Interest Holder shall be due to the Company within ten (10) days after the Economic Interest Holder has received written notice (the "Capital Call Due Date") from another Member or the Company indicating that the Company will have insufficient funds to meet any liability due or to become due within thirty (30) days, which notice shall briefly outline the nature of the cash short fall.  If an Economic Interest Holder (the "Defaulting Party") fails to make his Capital Call Obligation by the Capital Call Due Date, the other Economic Interest Holder(s) (a "Non-Defaulting Party") may, but are not obligated to, contribute to the Company the amount otherwise required to be contributed by the Defaulting Party.  The funds advanced by an Economic Interest Holder shall constitute a loan (the "Deficiency Loan") to the Defaulting Party by the Non-Defaulting Party.  The Deficiency Loan shall bear interest at a rate per annum equal to the lesser of twelve percent (12%) per annum or the highest rate permitted by applicable law.  To the extent any portion of the Deficiency Loan remains outstanding at the time the Defaulting Party would otherwise be entitled to receive a distribution of cash from the Company pursuant to Article IV hereof, the distribution to which the Defaulting Party would otherwise be entitled shall instead be paid to the Non-Defaulting Party (pro-rata if more than one Economic Interest Holder under the Deficiency

9

Loan) to the extent required to discharge the Deficiency Loan plus accrued and unpaid interest thereon.

B.    (1) Upon the occurrence of an Event of Default (as defined herein), the Non-Defaulting Party(ies) shall have the right to (i) cause the determination of Fair Market Value of the Defaulting Party's Membership Interest or Economic Interest, as the case may be (the Interest of the Defaulting Party hereinafter the "Interest") in the Company and purchase the Defaulting Party's Interest at a price equal to seventy-five percent (75%) of the Fair Market Value of such interest (the "Purchase Price") or (ii) at the option of the Non-Defaulting Party(ies) terminate this Agreement by giving written notice to the Defaulting Party whereupon the Company shall be dissolved on such terms and conditions as the Non-Defaulting Party deems appropriate. The Economic Interest Holders agree that they have entered into this Agreement on the understanding that each Economic Interest Holder shall be responsible for contributing his pro rata share of any additional funds needed for the Project. The failure of any Economic Interest Holder to make such required contributions results in damages to the Non-Defaulting Party(ies) that are impossible to measure. Therefore, the Economic Interest Holders agree that the reduction in the purchase price for the Defaulting Party's Interest in the Company constitutes the Economic Interest Holder' best estimate of any such damages and is not a penalty. The rights of the Non-Defaulting Party shall be exercised, if at all, within one hundred twenty (120) days after the determination of the Fair Market Value of the Defaulting Party's Interest. The fees of any and all Appraisers used to determine Fair Market Value shall be borne by the Defaulting Party. The failure of either of the Non-Defaulting Parties to insist upon strict performance of any of the terms of this Agreement shall not constitute a waiver of any such breach or any other terms of this Agreement. No breach shall be waived and no duty to perform shall be altered or modified except by written instrument. One or more waivers or failures by a Non-Defaulting Party to exercise its rights hereunder shall not constitute a waiver of a subsequent or continuing breach of the same covenant. The rights of a Non-Defaulting Party(ies) shall not be deemed an exclusive remedy, but all other rights and remedies, legal and equitable, shall be available to a Non-Defaulting Party(ies).

(2)    An "Event of Default" shall occur with respect to a Defaulting Party if either (i) a Deficiency Loan has not been repaid within three (3) months of the date the amount was contributed by the Non-Defaulting Party, or (ii) in the case where the Non-Defaulting Party(ies) has not elected to contribute on behalf of the Defaulting Party, the Defaulting Party still has not met its Capital Call Obligation within three (3) months following the original Capital Call Due Date.

(3)    In the event the Non-Defaulting Party(ies) chooses to purchase said interest, the Defaulting Party shall transfer its Interest in the Company to the Non-Defaulting Party, and the Non-Defaulting Party shall execute a Promissory Note in the amount of the Purchase Price, payable to the Defaulting Party. The Promissory Note shall be secured by the Company interest acquired and shall be personally guaranteed by the purchasing Economic Interest Holder (and if not an individual, also its principals). If more than one Non-Defaulting Party elects to purchase, then unless they agree to the contrary, they shall each have the right to purchase their proportionate share of such interest.

(4)    All real property transfer tax payable on the sale of a Defaulting Party's Interest in accordance with this Section shall be paid by the Defaulting Party. In addition, if the Defaulting Party's Interest is acquired by a Non-Defaulting Party in accordance with this Section, the Non-Defaulting Party shall use its best efforts to obtain the release of the Defaulting Party from all obligations of the Company. If a Non-Defaulting Party cannot obtain said release, a Non-Defaulting Party shall defend, indemnify and hold the Defaulting Party harmless from all of said Company liability.

C.    Notwithstanding anything contained in this Agreement to the contrary, if a Defaulting Party has not made its Capital Call Obligation (or repaid the Deficiency Loan, as the case may be) within ninety (90) days after the Capital Call Due Date, that Defaulting Party shall lose all voting rights with respect to all matters involving the Company until such time as the Capital Call Obligation has been made (or the Deficiency Loan has been completely repaid, as the case may be to the Non-Defaulting Party, including interest).

3.9  Goren Indemnification Obligation.  The Parties agree that neither Goren nor any of the general partners of Goren shall be obligated to guarantee any lender financing to the Company. However, Goren hereby agrees that it is obligated to reimburse Blitman and Peresiper for 50% of any amounts that either of them pays as a result of any personal guarantee given by either of them in connection with any obligation of the Company. Accordingly, Goren hereby agrees to indemnify and hold Blitman and Peresiper harmless for 50% of all costs, liabilities and expenses, including reasonable attorney's fees, incurred in connection with payments made by them under any personal guarantee of Company debt. The obligation hereunder shall survive the termination of this Agreement.

## ARTICLE IV
## PROFIT, LOSS AND DISTRIBUTIONS

11

4.1.    <u>Distributions of Cash Flow</u>. Cash Flow of the Company shall be distributed to the Economic Interest Holders in proportion to their Percentages at such times that are mutually agreeable to the Parties. Notwithstanding anything contained in this Agreement to the contrary, unless all Members and Economic Interest Holders unanimously consent, in writing, to the contrary, to the extent that Cash Flow is available, the Company shall, within ninety (90) days following the end of each taxable year, distribute to each Member an amount of cash at least equal to the total income passed through to such Member and Economic Interest Holder as a result of their ownership interest in the Company multiplied by the highest combined Federal and New York State personal income tax rate (determined without taking into account any disallowances of itemized deductions, personal exemptions and the like to the extent they are based on income limitations). Such combined Federal and New York State tax rate shall be determined by the Company's certified public accountant, and such determination shall be binding on all parties absent a showing of bad faith.

4.2.    <u>Allocation of Profit or Loss</u>. After giving effect to the special allocations set forth in Section 4.3, for any taxable year of the Company, Profit or Loss shall be allocated to the Economic Interest Holders in proportion to their Percentages. Except as otherwise provided in this Agreement, all items of Company taxable income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Economic Interest Holders in the same proportions as they share Profits and Losses, as the case may be, for the year.

4.3.    <u>Regulatory Allocations</u>.

4.3.1.    <u>Minimum Gain Chargeback</u>. Except as set forth in Regulation Section 1.704-2(f)(2), (3), and (4), if, during any taxable year, there is a net decrease in Minimum Gain, each Economic Interest Holder, prior to any other allocation pursuant to this Article IV, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Economic Interest Holder's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g). Allocations of gross income and gain pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject to non-recourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year. It is the intent of the parties hereto that any allocation pursuant to this Section shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(f).

12

4.3.2. <u>Contributed Property and Book-ups</u>. In accordance with Code Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-l(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Economic Interest Holders so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder.

4.3.3. <u>Qualified Income Offset</u>. No Economic Interest Holder shall be allocated Losses or deductions if the allocation causes the Economic Interest Holder to have an Adjusted Capital Account Deficit. If an Economic Interest Holder receives (1) an allocation of Loss or deduction (or item thereof) or (2) any distribution, which causes the Economic Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Economic Interest Holder, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible. This paragraph is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

4.4. <u>Liquidation and Dissolution</u>. The net proceeds of liquidation and dissolution of the Company, and from the sale of substantially all of the Company's property, shall be distributed as follows:

4.4.1. first to the payment of all expenses of the Company incident to such sale or dissolution;

4.4.2. next, to the payment of debts and liabilities of the Company then due and outstanding (including repayment of all debts due to any Economic Interest Holder or Member);

4.4.3. to the establishment of any reserves which the Members deem necessary by Majority Vote for liabilities or obligations of the Company; and then

13

4.4.4. the balance to the Economic Interest Holders whose Capital Account exceeds his Percentage times the sum of all Capital Accounts, but only to the extent of such excess (the "Excess Capital"). If the proceeds are insufficient to eliminate the Excess Capital of all Economic Interest Holders, then to all Economic Interest Holders with Excess Capital, in the same percentage that the Excess Capital of such Economic Interest Holder bears to the total Excess Capital of all such Economic Interest Holders;

4.4.5. the balance, if any, to the Economic Interest Holders in proportion to their positive Capital Account balances;

4.4.6. No Economic Interest Holder shall be obligated to restore a negative Capital Account.

4.5. <u>General</u>.

4.5.1. Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Members by Majority Vote.

4.5.2. If any assets of the Company are distributed in kind to the Economic Interest Holders, those assets shall be valued on the basis of their fair market value, and any Economic Interest Holder entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Economic Interest Holders so entitled. Unless the Members otherwise agree by Majority Vote, the fair market value of the assets shall be their Fair Market Value. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 4.2 and shall be properly credited or charged to the Capital Accounts of the Economic Interest Holders prior to the distribution of the assets in liquidation pursuant to Section 4.4.

4.5.3. The Members are hereby authorized, upon the advice of the Company's tax counsel, to amend this Article IV to comply with the Code and the Regulations promulgated under Code Section 704(b); provided, however, that no amendment shall materially affect distributions to an Economic Interest Holder without the Economic Interest Holder's prior written consent.

**ARTICLE V**
**MANAGEMENT: RIGHTS,**
**POWERS, AND DUTIES**

14

5.1.   Management.   The Members hereby appoint Blitman as the Member responsible to manage the affairs of the Company (the "Managing Member"). The Managing Member shall have full, exclusive, and complete discretion, power, and authority to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including but not limited to decisions relating to the acquisition, development, financing (construction and permanent), leasing, and sale of Company assets.  The Managing Member shall have the full power to execute and deliver, for and on behalf of the Company, any and all documents and instruments which may be necessary or desirable to carry on the business of the Company. No person dealing with the Managing Member need inquire into the validity or propriety of any document or instrument executed in the name of the Company by the Managing Member, or as to the authority of the Managing Member in executing the same. Without limiting the foregoing, any person or entity dealing with the Company or the Managing Member or any Member may rely upon a certificate signed by the Managing Member as to: (i) the identity of the Managing Member or any Member; (ii) the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Managing Member or any Member or are in any other manner germane to the affairs of the Company; and (iii) the persons who or entities which are authorized to execute and deliver any instrument or document of or on behalf of the Company. The Company shall indemnify and hold the Managing Member harmless from any actions taken by the Managing Member in such capacity absent a showing of bad faith.  The Members may, by a vote of the Members owning two-third's or more of the Percentages held by all Members, remove the Managing Member and, if they so elect, appoint a new Managing Member.  The Managing Member may delegate some of the authority granted hereunder to one or more persons.

5.2.   Meetings of and Voting by Members.

5.2.1. Annual meetings of the Members are not required.  However, a special meeting of the Members may be called at any time by any Member.  Meetings of Members shall be held at the Company's principal place of business.  Not less than ten (10) nor more than sixty (60) days before each meeting, the Person calling the meeting shall give written notice of the meeting to each Member entitled to vote at the meeting.  The notice shall state the place, date, hour, and purpose of the meeting.  Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy without objecting to the lack of notice. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding not less than a majority (over 50 percent) of the Percentages

15

then held by Members constitutes a quorum. A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney in fact.

5.2.2. Except as otherwise provided in this Agreement, the affirmative vote of Members holding a majority (over 50 percent) or more of the Percentages then held by Members shall be required to approve any matter coming before the Members; provided however, in the event there is a Managing Member, then the Managing Member's decision shall control.

5.2.3. In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the consent of Members holding such Percentages then held by Members as would be required for Members to take action under this operating agreement. If such consent is not unanimous, prompt notice shall be given to those Members who have not consented in writing but who would have been entitled to vote thereon had such action been taken at a meeting.

5.3.    Personal Service. No Member shall be required to perform services for the Company solely by virtue of being a Member. Unless approved by the Members, no Member shall be entitled to compensation for services performed for the Company. However, upon substantiation of the amount and purpose thereof, the Members shall be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company.

5.4.    Duties of Parties; Management Fee.

5.4.1. The Members shall devote such time to the business and affairs of the Company as is necessary to carry out the Members' duties set forth in this Agreement.

5.4.2. Except as otherwise expressly provided in Section 5.4.3, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member to conduct any other business or activity whatsoever, and no Member shall be accountable to the Company or to any other Member with respect to that business or activity even if the business or activity competes with the Company's business. The organization of the Company shall be without prejudice to the Members' respective rights to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom.

5.4.3. Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their Affiliates. In any of those cases, those dealings and undertakings shall be at arm's

16

length and on commercially reasonable terms. The Parties hereby acknowledge and agree that Blitman Development Corp., an affiliate of Blitman and Peresiper, will receive a management fee from the Company equal to 4% of all costs of construction in connection with the property owned by the Company.

5.5.    Liability and Indemnification.

5.5.1. A Member shall not be liable, responsible, or accountable, in damages or otherwise, to any other Member or to the Company for any act performed by the Member with respect to Company matters, except for fraud, bad faith, gross negligence, or a breach of this Agreement which is not cured within a reasonable time after notice of such breach.

5.5.2. The Company shall indemnify each Member for any act performed by the Member with respect to Company matters, except for fraud, bad faith, gross negligence, or an intentional breach of this Agreement.

## ARTICLE VI
## TRANSFER OF INTERESTS AND
## WITHDRAWAL OF MEMBERS

6.1.    Transfers.

6.1.1. No Person may Transfer all or any portion of or any interest or rights in the Person's Membership Interest other than as provided in this Agreement without the consent of the other Members.

6.1.2. Each Member hereby acknowledges the reasonableness of the prohibition contained in this Section 6.1 in view of the purposes of the Company and the relationship of the Members. The Transfer of any Membership Interests or Economic Interests in violation of the prohibition contained in this Section 6.1 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom Membership Interests are attempted to be transferred in violation of this Section shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, act as an agent of the Company, receive distributions from the Company, or have any other rights in or with respect to the Membership Interest.

6.1.3. Notwithstanding anything contained in this Agreement to the contrary, the transferee of all or any portion of or any interest or rights in any Membership Interest in accordance with this Agreement shall not be entitled to become a Member or exercise any

17

rights of a Member. The transferee shall be entitled to receive, to the extent transferred, only the distributions and allocations of Profits and Losses to which the transferor would be entitled; and the transferee shall not be admitted as a Member unless the Remaining Members by Majority Vote consent.

6.1.4. No Member shall have the right or power to Voluntarily Withdraw from the Company, except as otherwise provided by this Agreement. Any withdrawal in violation of this Agreement shall entitle the Company to damages for breach, which may be offset against the amounts otherwise distributable to such Member.

6.1.5.

A.    Notwithstanding anything set forth in this Agreement to the contrary, any Member or Economic Interest Holder may at any time, and from time to time, Transfer all, or any portion of, that person's Economic Interest to any Family Member (a "Permitted Transferee"), provided, however, the Permitted Transferee shall not be entitled to become a Member or exercise any rights of a Member unless the remaining Members by Majority Vote consent. The term Permitted Transferee" shall also include the heirs of a deceased Member or Economic Interest Holder.

B.    In order to effectuate the purpose of this Article, each Person agrees that to the extent such Person's Membership Interest or Economic Interest is at any time held by a partnership, corporation, trust or other entity, such Person will seek to transfer such interest only through a direct transfer of such interest therein in the manner contemplated by this Article and that no transfer or other disposition of any stock or partnership or other beneficial interest in any such entity which holds the interest in the Company, except to (i) another Person who owned an interest in that same entity as of the date of this Agreement or (ii) to any Family Member (a "Permitted Transferee"), will be affected without prior written consent of a Majority Vote of the Members.

6.2.    Involuntary Withdrawal. Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawn Member shall thereupon become an Economic Interest Holder but shall not become a Member. The successor Economic Interest Holder shall have all the rights of an Economic Interest Holder, but shall not, under Law Section 509, be entitled to receive in liquidation of the Economic Interest, the fair market value of the Member's Economic Interest as of the date the Member involuntarily withdrew from the Company.

18

6.3.    Optional Buy-Out in Event of Involuntary Withdrawal.

6.3.1.  Upon an Involuntary Withdrawal,  the withdrawn Member shall be deemed to offer for sale (the "Withdrawal Offer") to the Company all of the Membership Interests and Economic Interests owned of record and beneficially by the withdrawn Member (the "Withdrawal Interest").

6.3.2.  The Withdrawal Offer shall be and remain irrevocable for a period (the "Withdrawal Offer Period") ending at 11:59 P.M., local time at the Company's principal office on the sixtieth (60th) day following the date the Withdrawal Purchase Price has been determined in accordance with this Section 6.3. At any time during the Withdrawal Offer Period, the Company may accept the Withdrawal Offer by notifying the withdrawn Member (the "Withdrawal Notice") of its acceptance. The withdrawn Member shall not be deemed a Member for the purpose of the vote on whether the Company shall accept the Withdrawal Offer.

6.3.3.  If the Company accepts the Withdrawal Offer, the Withdrawal Notice shall fix a closing date (the "Withdrawal Closing Date") for the purchase which shall not be earlier than ten (10) or later than ninety (90) days after the expiration of the Withdrawal Offer Period.

6.3.4.  If the Company accepts the Withdrawal Offer, the Company shall purchase the Withdrawal Interest for a price equal to the Fair Market Value of such Interest (the "Withdrawal Purchase Price").  On the Withdrawal Closing Date, the Withdrawal Purchase Price shall be paid in cash or by Promissory Note, or part cash and Promissory Note, all at the Company's option.

6.3.5.  If the Company fails to accept the Withdrawal Offer, then the withdrawn Member or the withdrawn Member's successor, as the case may be, upon the expiration of the Withdrawal Offer Period, thereafter shall be treated as the unadmitted assignee of a Member (i.e. only an Economic Interest Holder).

6.4.    Withdrawal of a Member.   Any time after the fourth (4th) anniversary of this Agreement, any Member (the "Withdrawing Member") may deliver written notice (the "Notice to Withdraw") to the Company and the other Member (the "Remaining Member") indicating his desire to sell its Membership Interest. The Company and the Withdrawing Member shall then have a period of thirty (30) days (the "Negotiation Period") following the date of the Notice to Withdraw to agree on a purchase price of the Withdrawing Member's Membership Interest.  In the event the Company (or the Remaining Member) and the

19

Withdrawing Member are unable to agree on a purchase price for the Membership Interest by the expiration of the Negotiation Period, then the purchase price of the Withdrawing Member's Membership Interest shall equal the amount that the Withdrawing Member would have received if the Company sold all of its assets for their Appraised Value and liquidated pursuant to Section 4.4.; provided, however, in computing such amount no reserve shall be established pursuant to 4.4.3. unless the Company obtains the written opinion of the Company's legal counsel that the liability for which a reserve is being established is more likely than not going to result.  Once the purchase price of the Withdrawing Member's Membership Interest has been determined (either during the 30 day Negotiation Period or pursuant to the preceding sentence), the Company and the Remaining Members shall then have the option for a period of ten (10) days following the determination of the purchase price to elect, in writing, to purchase the Withdrawing Member's Membership Interest. If the Company does not elect to purchase all of the Withdrawing Member's Membership Interest, as provided herein, then unless the Remaining Member and the Withdrawing Member agree to the contrary, all the Members shall be deemed to have voted to liquidate the Company and the Company shall sell all of its assets in a commercially reasonable manner and liquidate pursuant to Section 4.4. If the Company does elect to purchase the Withdrawing Member's Membership Interest, the closing shall take place within sixty (60) days after the option was exercised.  The purchase price shall be paid upon such terms as the parties may agree and in default of such agreement, by the Company's execution and delivery of a Promissory Note for the Purchaser Price, which Promissory Note shall be personally guaranteed by the Remaining Member.

6.5    Varley as Sales Representative.    The company acknowledges that Varley has been hired as the listing broker for the houses to be sold by the Company. The Company hereby agrees that as long as Varley is a Member in the Company and Varley sells at least 10 homes during each calendar year, the Company will not terminate his contract as listing broker for the Company.

## ARTICLE VII
## DISSOLUTION, LIQUIDATION, AND
## TERMINATION OF THE COMPANY

7.1.    Events of Dissolution.  The Company shall be dissolved upon the happening of any of the following events (a "Liquidating Event"):

7.1.1.  upon the written agreement of the Members holding two-thirds or more of the Percentages then held by Members; or

7.1.2.  sale of all of the Company assets; or

7.1.3.  only as otherwise provided in this Agreement.

The Members hereby agree that, notwithstanding any provision of the Law, the Company shall not dissolve prior to the occurrence of a Liquidating Event. If it is determined by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Liquidating Event, then each of the Members and the Economic Interest Holders shall be deemed to have recontributed the Company's property to the Company and hereby agree to continue the business of the Company without a winding up or a liquidation. In such event, and to the extent required, the Members shall file the appropriate certificates with the New York Department of State for the purposes of continuing on the business of the Company in a limited liability company pursuant to the terms of this Agreement.

7.2.    Procedure for Winding Up and Distribution. If the Company is dissolved, the remaining Members shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Members and Economic Interest Holders who are creditors, in satisfaction of the liabilities of the Company, and then to the Members and Economic Interest Holders in accordance with Section 4.4 of this Agreement.

7.3.    Filing of Articles of Dissolution. If the Company is dissolved, the Members shall promptly file Articles of Dissolution with the New York Department of State. If there are no remaining Members, the Articles shall be filed by the last Person to be a Member; if there are no remaining Members, or a Person who last was a Member, the Articles shall be filed by the legal or personal representatives of the Person who last was a Member.

## ARTICLE VIII
## BOOKS, RECORDS, ACCOUNTING,
## AND TAX ELECTIONS

8.1.    Bank Accounts. All funds of the Company shall be deposited in a bank account or accounts opened in the Company's name. The Members shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

8.2.    Books and Records. The Members shall keep or cause to be kept complete and accurate books and records of the Company as required under Section 1102 of the Law as well as supporting documentation of transactions with respect to the conduct of the Company's business. The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours.

8.3.    Annual Accounting Period. The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Members,

21

subject to the requirements and limitations of the Code.

8.4.    _Tax Matters Member_.  The Members shall designate a Member to be the Company's tax matters Member ("Tax Matters Member").  The Tax Matters Member shall have all powers and responsibilities provided in Code Section 6221, _et seq_.  The Tax Matters Member shall keep all Members informed of all notices from government taxing authorities which may come to the attention of the Tax Matters Member.  The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Tax Matters Member in performing those duties.  A Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company.  The Tax Matters Member shall not compromise any dispute with the Internal Revenue Service without the approval of the Members.

## ARTICLE IX
## GENERAL PROVISIONS

9.1.    _Assurances_.  Each Member shall execute all certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Members deem appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

9.2.    _Notifications_.  Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested by overnight courier or by facsimile transmission. A notice must be addressed to a Member at the Member's last known address on the records of the Company.  A notice to the Company must be addressed to the Company's principal office.  A notice delivered personally will be deemed given when delivered based on affidavit of service.  A notice that is sent by mail will be deemed given three (3) business days after it is mailed.  Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.  A notice sent by facsimile is deemed given on date sent, as long as sender has confirmation that it was received by the other party.

9.3.    _Specific Performance_.  The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury.  Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not

performed, would constitute a breach.

9.4.    Complete Agreement. This Agreement constitutes the complete and exclusive statement of the agreement among the Members with respect to the subject matter thereof. It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all the Members.

9.5.    Applicable Law. All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of New York.

9.6.    Article and Section Titles. The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

9.7.    Binding Provisions. This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

9.8.    Exclusive Jurisdiction and Venue. Any suit involving any dispute or matter arising under this Agreement may only be brought in a United States District Court located in the State of New York or any New York State Court having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

9.9.    Terms. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the Person may in the context require.

9.10.    Separability of Provisions. Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

9.11.    Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart. Pdf and facsimile signatures shall constitute originals.

9.12.    Waiver of Partition. Each Member and Economic Interest Holder waives during the term of the Company any right that he/she may have to maintain any action for

partition with respect to the Company's property or assets.

9.13. Gender. Whenever necessary or appropriate, the masculine, feminine and neuter genders shall include the others, the singular shall include the plural and the plural shall include the singular.

[Next page is signature page]

24

**IN WITNESS WHEREOF**, the parties have executed this agreement as of the day and year first set forth above.

**BLITMAN SARATOGA LLC,**
a New York Limited Liability Company

By: _____
   Name: Howard Blitman
   Title: Managing Member

**GOREN BROTHERS,**
a General Partnership

By: _____
   General Partner

_____
Gary Peresiper

_____
Howard N. Blitman

_____
Scott Varley

25

**IN WITNESS WHEREOF**, the parties have executed this agreement as of the day and year first set forth above.

**BLITMAN SARATOGA LLC,**
a New York Limited Liability Company

By: _____
Name: Howard Blitman
Title: Managing Member

**GOREN BROTHERS,**
a General Partnership

By: _____
General Partner

_____
Gary Peresiper

_____
Howard N. Blitman

_____
Scott Varley

25