# BEAVER POND VILLAGE HOMEOWNERS' ASSOCIATION, INC. PURCHASE AGREEMENT

**AGREEMENT** made and dated ＿January 27＿, 20_19_, between Blitman Saratoga LLC, a New York limited liability company having a place of business located at 222 Bloomingdale Road, Suite 404, White Plains, New York 10605, hereinafter called the "Seller" or "Sponsor", and ＿STEPHEN e SUSAN DORSEY＿ residing at ＿7 TIFFANY PLACE, SARATOGA SPR. ny＿, hereinafter called the "Purchaser".

**WHEREAS,** the Seller desires to offer for sale single-family homes to be situated on the land owned by it located in the City of Saratoga Springs, County of Saratoga, State of New York, and the Purchaser is desirous of purchasing a home therein (the "Project"),

**NOW, THEREFORE,** in consideration of the mutual promises and undertakings herinafter set forth, the parties hereto mutually agree as follows:

**1. Sale of Home**. The Seller agrees to sell and convey, and the Purchaser agrees to purchase: All that certain plot, piece or parcel of land, the buildings and improvements thereon erected or to be erected, situate, lying and being in the City of Saratoga Springs, County of Saratoga and State of New York, known as Lot No. ＿16＿ on a Map entitled "Beaver Pond Village," filed in the Saratoga County Clerk's Office on December 5, 2011 as Map 2011206, as the same may be amended hereafter, including any amendments, changes and modifications to lot lines and shifting of boundaries (the "Lot" or the "Premises"). The home to be constructed on the Premises (the "Home") shall conform substantially in appearance to Model Type ＿ROSEWOOD II＿ as per plans and specifications on exhibit by the Seller in the Seller's sales office.

**2. Initial Purchase Price**. The initial purchase price is $＿548,000＿ (the "Initial Purchase Price") payable as follows:

(a) $＿54,800＿ (10% of the Initial Purchase Price) on the signing of this Agreement (the "Down Payment"), receipt of which is hereby acknowledged; UPON ATTORNEY'S APPROVAL

(b) $＿54,800＿ (10% of the Initial Purchase Price) within five (5) business days after notice of the building permit is delivered to the Purchaser (the "Additional Down Payment" which, with the Down Payment, shall collectively be referred to as the "Down Payment"), **TIME BEING OF THE ESSENCE** relative to the Additional Down Payment.

(c) $＿438,400＿ (80% of the Initial Purchase Price) by unendorsed certified check or cashier's check, drawn on a New York Bank, payable directly to the order of Seller or Seller's designee, due at Closing of title (as hereinafter defined).

Any payment made by personal check is accepted by the Seller subject to collection. If any check tendered is not honored, the Purchaser shall provide a certified check or cashier's check payable as directed by the Seller within seventy-two (72) hours after demand for replacement thereof.

Notwithstanding the foregoing, if for any reason whatsoever any personal check given by the Purchaser for the Down Payment hereunder is dishonored, the Seller shall have the right to cancel this Agreement. The Seller's election to cancel shall not be deemed a waiver by the Seller of its right to pursue other remedies.

ALL PAYMENTS AT CLOSING PURSUANT TO THIS AGREEMENT ARE TO BE MADE BY GOOD UNENDORSED CERTIFIED CHECK OR CASHIER'S CHECK MADE PAYABLE DIRECTLY TO THE ORDER OF THE SELLER OR AS DIRECTED BY SELLER AND DRAWN ON A BANK WHICH IS A

·SD

1

MEMBER OF THE NEW YORK CLEARING HOUSE. UNCERTIFIED CHECKS OF A FUNDING
COMPANY OR ATTORNEYS' ESCROW ACCOUNT WILL NOT BE ACCEPTED BY THE SELLER ON
ACCOUNT OF PROCEEDS DUE FROM THE PURCHASER.

Title to all items of personal property shall be delivered free and clear of all liens and encumbrances, except the
lien of the mortgage applied for by Purchaser herein, if any.

All sums paid on account of this Agreement are hereby made liens upon said Premises, but such liens shall not
continue after default by the Purchaser under this Agreement.

3. **Mortgage Contingency.** This Agreement is subject to and conditioned upon issuance of a written
commitment (the "Commitment") for a conventional (fixed or adjustable rate) mortgage loan encumbering the
Premises for a term not to exceed thirty (30) years, at the prevailing rate of interest, in an amount as applied for
by the Purchaser, not to exceed $428,400 — (the "Loan"). The Purchaser further agrees to apply to
two (2) lending institutions, if necessary, to obtain said loan (the "Lender"). The Purchaser shall, within five (5)
business days from the date of the acceptance of this Agreement by the Seller, diligently, truthfully and in good
faith apply for the Loan and shall furnish and execute all documents required, and shall pay all costs and
expenses required by the Lender to process the application and issue the Commitment. Failure to make
application to the Lender within five (5) business days shall be deemed a waiver of this contingency by the
Purchaser. The Purchaser shall also pay all applicable fees connected therewith such as origination fees, fees for
credit reports, the cost of appraisal and inspection fees, private mortgage insurance where applicable, mortgage
tax (provided that any credit received as result of mortgage tax previously paid in connection with the building
loan mortgage will inure to the Seller and will be paid by the Purchaser to the Seller at Closing), title insurance,
bank attorneys' fees for preparation of the documents necessary for the mortgage loan, including the building
loan if said loan is being extended and/or consolidated with the Purchaser's mortgage, all recording fees and all
other bank or governmental charges assessed on the loan.

(a) The Purchaser shall, at the Seller's request, furnish Seller with a copy of its application for the Loan and
with the name and address of the Lender. Purchaser shall promptly notify the Seller in writing after receipt of
either the Commitment or written denial of the application for the Loan, enclosing a copy of the Commitment or
denial letter with the notice.

(b) In the event the Purchaser has not received the Commitment within forty-five (45) days from the date of
the acceptance of this Agreement by the Seller, then either party hereto may elect to cancel this Agreement
within five (5) business days thereafter and, provided the Purchaser shall have complied with all of the
provisions hereof, the Down Payment made hereunder shall be returned to the Purchaser, and all rights and
obligations between the parties shall cease and terminate, except for those herein which expressly survive
termination of this Agreement. If the Purchaser does not cancel as set forth, this contingency shall thereafter be
deemed waived. Notwithstanding the foregoing, the Seller may, in its sole discretion, extend the Purchaser's
time to obtain the Commitment for a period not to exceed thirty (30) days, and the Purchaser's notice of
cancellation shall not be deemed effective until the expiration of such additional time. In the event the Seller
elects to extend the Purchaser's time to obtain the Commitment, then the Purchaser shall continue to diligently
pursue the issuance of the Commitment within such additional time.

(c) The Purchaser represents that it has no judgments outstanding or proceedings pending against it in any
Court, nor has it ever been adjudicated as bankrupt. Purchaser has inquired and is familiar with the
requirements to obtain the Commitment and believes it has sufficient income and assets to qualify for same.
The Purchaser agrees that it will not negatively alter its financial condition prior to Closing.

(d) Upon issuance of the Commitment, the provisions of paragraph shall be deemed satisfied and of no
further force and effect, even if the Commitment shall expire prior to Closing. In the event the Commitment
contains a provision that it is conditioned upon the sale of any real estate or other assets owned by the Purchaser,
then such condition in the Commitment shall not be grounds for the Purchaser to cancel this Agreement, and to
that extent the Commitment shall be deemed unconditional.

SSD

$\int m \wp^2$

## 4. Closing of Title and Delivery of Deed.

(a) "Closing" shall mean the settlement of the parties' obligations to each other under this Agreement, including, but not limited to, Seller's delivery of the deed and possession of the Premises to the Purchaser, and Purchaser's payment of the balance of the Total Purchase Price, Total Purchase Price to include the Initial Purchase Price and the costs of upgrades. Closing shall take place at the office of Seller's attorneys, Mazzotta & Vagianelis, P.C., at 9 Washington Square, Albany, New York 12205 on or about 180 days from building permit, or at another date and time designated by the Seller or its attorneys upon seven (7) days' written notice mailed to the Purchaser at its address hereinabove set forth with a copy of a temporary or permanent Certificate of Occupancy. Alternatively, Closing may take place at the location required by the Purchaser's lender.

(b) The Seller shall be entitled to a reasonable adjournment in the closing of title as set forth in Paragraphs 7 and 21 of this Agreement or as otherwise provided herein. If the Purchaser is not willing or able to close title at the date and time fixed pursuant to this Agreement, any adjournment exceeding seven (7) business days granted at the request of the Purchaser shall be upon the condition that the Purchaser shall (i) pay interest to the Seller at closing on the balance of the Total Purchase Price computed from the date originally fixed for closing to the actual date of closing at a rate equal to four (4%) percent over the prime rate as published in the Wall Street Journal as of the date of closing, and (ii) all adjustments including, but not limited to, real estate taxes, Association Assessments, water, electric, sewer and gas shall be made as of the date originally fixed for closing. Nothing herein contained shall be construed to require the Seller to grant any adjournment. In the event the Home or its environs are not fully completed and Final Inspection Sheet items as defined below exist, such Final Inspection Sheet items shall not be a basis for a delay of Closing by Purchaser provided a Temporary Certificate of Occupancy or a Certificate of Occupancy has been issued by the municipality. Issuance of a Temporary Certificate of Occupancy or a Certificate of Occupancy shall signify that a Home is substantially complete and habitable. Purchaser shall have the right to a final walk through of the Premises no sooner than five (5) business days prior to closing.

(c) In the event the Seller and the Purchaser convene to close title and the Purchaser requires an adjournment of closing due to the Purchaser's failure to comply with any terms or conditions of this Agreement or of its mortgage commitment or for any reason beyond the control of the Seller, or the Purchaser or its attorney fails to attend a scheduled closing or causes a closing to be adjourned without having obtained an adjournment as hereinabove provided, then, in addition to any amount due as set forth above for an adjournment, the Purchaser shall pay to the Seller's attorney the sum of $500.00 Dollars as its fee for attendance at any such closing.

## 5. Closing Costs and Adjustments.

(a) The Purchaser agrees to pay at Closing the applicable New York State Real Estate Transfer Tax, all recording fees, a survey fee of $850.00, any application fee(s) for water and sewer new service connection, if such is established by resolution of the City Council, City of Saratoga Springs, a meter installation charge of $350.00, and the Purchaser's prorated Homeowners' Association fee.

(b) In the event the Purchaser shall obtain a mortgage to finance a portion of the Total Purchase Price, the Purchaser shall also pay all applicable fees in connection therewith as stated in paragraph 3 herein.

(c) The Purchaser shall pay at Closing all applicable real estate taxes and other usual and normal closing charges and any Association Assessments assessed during the month that title closes or established as a reserve shall be adjusted as of the closing date, based upon the last bill rendered for such taxes or charges. With respect to any period for which taxes are not or will not be separately billed with respect to the Premises, taxes shall be allocated to such Premises as follows: The amount of such Undivided Tax Bill allocable to each lot shall be determined by allocating the portion of such bill attributable to land in equal shares among the lots covered by such bill (disregarding the common areas for such purpose), and by allocating the portion of such bill attributable to buildings, if any, among the lots covered by such bill in accordance with the tax assessor's determination of the respective values of the buildings on the affected lots.

$$\mathcal{SS}_D$$

(d) The Purchaser shall pay the fee of his own attorney and $1,250.00 to the Seller's counsel representing a fee for services in connection with preparing the deed and coordinating the Closing. The Purchaser shall also pay an additional amount to the Seller's attorney of $250.00, if the Purchaser's lender requires that Closing take place outside Albany, Schenectady, Rensselaer or Saratoga County.

(e) The Purchaser shall pay the premium and other costs for a fee title insurance policy, if Purchaser desires such coverage.

(f) Any errors or omissions in computing apportionments or any other sums payable under this Paragraph which are communicated to the other party within one (1) year after Closing shall be corrected and payment made to the proper party promptly after such communication.

The provisions of this Paragraph shall survive Closing.

**6. Deed and Subject To.** At Closing, Seller shall deliver to Purchaser a Bargain and Sale Deed with Covenant Against Grantors Acts, duly executed and acknowledged by the Seller, in proper statutory form for recording, so as to convey to the Purchaser fee simple title to the Premises, free and clear of all liens and encumbrances, except as herein stated, and shall also contain the covenant required by subdivision 5 of Section 13 of the New York Lien Law. The Purchaser shall accept such title as any reputable title insurance company, which is a member of the New York Board of Title Underwriters, will accept and insure in accordance with its standard form of fee title insurance policy, subject only to those matters set forth herein. Title to the premises is sold and shall be conveyed subject to:

(a) Ordinances, laws and regulations of competent municipal or other governmental authorities.

(b) Easements given or to be given to municipalities, special districts, electric, light, gas, telephone and other public utility companies or the Association for the erection and maintenance of improvements, and for drainage and sewer purposes, provided any such easements made after the date of this Contract do not render title uninsurable.

(c) Easements for conservation, landscaping, screening, buffers, scenic purposes, planting and snow removal.

(d) Unpaid taxes and liens, not yet due and payable, subject to apportionment as described in Paragraph 5 of this Agreement.

(e) State of facts, notes and easements on the Subdivision map, as described in Paragraph 1 of this Agreement, as it may be amended, provided that neither the size nor the approximate location of the Lot covered by this Agreement may be changed without the Purchaser's consent (which consent shall not be unreasonably refused in the case of minor changes necessitated by conditions encountered during construction).

(f) Rights of others to the free and unobstructed flow of any brooks or watercourses on the Project property.

(g) Encroachments of driveway, lawn, landscaping, walls, fences, walks, trim, if any, onto adjacent residences or of adjoining residences onto this Property as may exist as of closing.

(h) Health Department Covenants.

(i) Subject to any easements made pursuant to rights reserved by Seller or the Association under the Declaration.

(j) Any additional easements, rights of way, covenants, agreements and consents that may be required by any utility company, municipality and/or otherwise required for the construction of the Project, provided same do not render title uninsurable.

(k) Any state of facts an accurate survey of the Premises would show provided same do not render title uninsurable.

(l) Declaration of Protective Covenants, Conditions, Restrictions, Easements, Charges and Liens of the Association dated December 19, 2011 and recorded April 4, 2012 in the Saratoga County Clerk's Office as Instrument #2012013160.

(m) Amendment to Declaration of Protective Covenants, Conditions, Restrictions, Charges and Liens of the Association dated February 28, 2013 and recorded March 6, 2013 in the Saratoga County Clerk's Office as Instrument #2013010158.

(n) Supplemental Declaration of Protective Covenants, Conditions, Restrictions, Charges and Liens of the Association dated March 11, 2014 and recorded March 26, 2014 in the Saratoga County Clerk's Office as Instrument #2014008390.

(o) Second Supplemental Declaration of Protective Covenants, Conditions, Restrictions, Charges and Liens of the Association dated November 16, 2015 and recorded November 20, 2015 in the Saratoga County Clerk's Office as Instrument #2015034936.

(p) Third Supplemental Declaration of Protective Covenants, Conditions, Restrictions, Charges and Liens of the Association dated May 24, 2017 and recorded June 6, 2017 in the Saratoga County Clerk's Office as Instrument #2017017358.

(q) Fourth Supplemental Declaration of Protective Covenants, Conditions, Restrictions, Charges and Liens of the Association dated December 21, 2017 and recorded January 8, 2018 in the Saratoga County Clerk's Office as Instrument #2018000658.

(r) Fifth Supplemental Declaration of Protective Covenants, Conditions, Restrictions, Charges and Liens of the Association dated January ___, 2019 and recorded January ___, 2019 in the Saratoga County Clerk's Office as Instrument #_____. **IF NOT YET RECORDED, COPY TO BE PROVIDED PURCHASERS HEREWITH.**

**7. Title Report.** The Purchaser shall proceed, at its expense, to have title to the Premises examined by Sneeringer Monahan Provost Redgrave Title Agency, Inc. (contact Timothy J. Provost, 518-885-8700), or any title insurance company of Purchaser's choice, and shall deliver a full copy of the title report to the Seller's counsel as soon as the same is received, but in no event later then sixty (60) days prior to the date of Closing, with a notice of any liens, encumbrances or other defects of title which Seller is obligated to remove hereunder, and as to which the Purchaser is unwilling to accept title subject to.

In the event that on the date of Closing, the Seller's title to the Premises is subject to liens, encumbrances or objections, other than those subject to which Purchaser is obligated to accept title hereunder, and if the Purchaser is unwilling to waive the same and to close this transaction without abatement of the purchase price or allowance of any kind, after Seller has first complied with its obligations under this paragraph, the Seller shall have the right, at the Seller's sole election, to either (a) take such action as the Seller deems advisable to remove, remedy or comply with such liens, encumbrances, or objections or (b) cancel this Agreement.

In the event that the Seller elects to take action to remove, remedy or comply with such liens, encumbrances, or objections, the Seller shall be entitled to an adjournment of the Closing for a period not to exceed ninety (90) days. If the Seller has not succeeded in removing, remedying or complying with such liens, encumbrances, or objections within ninety (90) calendar days, the Seller shall give the Purchaser written notice that it has not so succeeded and the Purchaser shall have fifteen (15) calendar days from the mailing of such written notice to purchase the Lot, subject to such liens, encumbrances, objections, etc., with a credit against the Total Purchase Price equivalent to the cost to remove, remedy or comply with, such liens, encumbrances or objections, as reasonably estimated by the Seller and the Purchaser's title insurer. If the Purchaser is unwilling to so close this transaction, then this Agreement shall be deemed to be cancelled.

SSD

In the event of the cancellation of this Agreement under any of the circumstances provided in this paragraph, this Agreement shall cease, terminate and come to an end, and neither party hereto shall have any rights, obligations or liabilities against or to the other, except that the Purchaser shall be entitled to the refund of the Down Payments made hereunder by the Purchaser. Nothing herein contained shall obligate the Seller to bring any action or proceeding or otherwise incur any expense in order to render title to the Premises marketable.

**8. Beaver Pond Village Homeowner's Association, Inc. (the "Association").** The Seller has exhibited and delivered to the Purchaser prior to accepting any Down Payment, and the Purchaser has read and agrees to be bound by, the Declaration of Protective Covenants, Conditions, Restrictions, Easements, Charges and Liens of the Association, By-Laws of the Association, and Offering Plan of the Association with the Exhibits attached thereto, as the same may from time to time be amended, all of which are incorporated by reference and made a part of this Agreement with the same force and effect as if set forth in full herein. With the purchase of the Home, the Purchaser acknowledges that the Purchaser will automatically become a member of the Association and subject to its rules and regulations and liable for its assessments, and that the Total Purchase Price of the Home includes the cost of membership in the Association.

**9. Breach of Purchase Agreement by Purchaser.** Should the Purchaser be in default under any of the terms of this Agreement, which monetary default remains uncured for ten (10) calendar days or non-monetary default remains uncured for thirty (30) days after written notice of such default from the Seller, the Seller may, at its option, upon notice to the Purchaser, retain all or any part of the monies paid on account hereunder (including without limitation any amounts paid on account of upgrades consisting of extra's, additional charge selections, and any options ordered), as liquidated damages, in which event the parties shall be discharged of all further liability hereunder. The provisions shall apply whether or not construction has commenced and regardless of any sale of the Premises subsequent to the Purchaser's default.

**10. Subordination of Purchase Agreement to Building Loan Mortgage.** The Purchaser agrees that all terms and provisions of this Agreement are and shall be subject and subordinate to the lien of any building loan mortgage heretofore or hereafter made, and any advances heretofore or hereafter made thereon, and any payments or expenses already made or incurred, or which may hereafter be made or incurred, pursuant to the terms thereof, to the full extent thereof, without the execution of any further legal documents by the Purchaser. This subordination shall apply whether such advances are voluntary or involuntary, and whether made in accordance with the building loan schedule of payments, or accelerated thereunder by virtue of the lender's right to make advances before they become due in accordance with the schedule of payments. The Seller shall satisfy all such mortgages or obtain a release of the Premises from the lien of such mortgage, at or prior to Closing, except for the individual mortgage covering the mortgage loan taken out by the Purchaser, if any, whether same be by extension, assumption, consolidation or otherwise.

**11. Risk of Loss.** The risk of loss or damage to the Premises by fire or any other cause until the delivery of the deed is assumed by the Seller.

**12. Lack of Labor/Materials; Seller's Right to Cancel.** The parties hereto do hereby agree that the Seller may cancel this Agreement by forwarding its check in the full amount paid by the Purchaser hereunder, together with a notice in writing, addressed to the Purchaser at Purchaser's address hereinabove set forth in the event of the occurrence of either of the following:

(a) that any governmental bureau, department or subdivision thereto shall impose restrictions on the manufacture, sale, distribution and/or use of materials from its regular suppliers or from using same in the construction and/or completion of the Home; or

(b) that the Seller is unable to obtain materials from its usual sources due to strikes, lockouts, war (declared or undeclared), military operations, oil embargoes and requirements or national emergencies, or the installation of public utilities is restricted or curtailed.

SSO

**13. Possession by Purchaser Prior to Closing.** It is expressly understood and agreed that the Purchaser shall in no event take possession of the Premises prior to the time of delivery of the deed and full compliance by the Purchaser with the terms of this Agreement, nor shall the Purchaser enter the Home or have his contractors, inspectors, or agents enter the home to perform work or for any other reason prior to closing without the written authorization of the Seller and accompanied by a representative of the Seller. The Seller shall have the right to remove all unauthorized work and charge the Purchaser for such removal. If the Purchaser does not pay the Seller the cost of such removal within fourteen (14) days of notice, such refusal shall constitute a default of this Agreement by the Purchaser. Should the Purchaser violate this provision and take possession of the Premises prior to Closing without the written permission of Seller, the Purchaser consents that the Seller shall have the right to remove him from the Premises as a squatter and intruder by summary proceedings and Purchaser shall be liable for all Seller's costs in relation to such proceeding, including reasonable attorneys' fees. Upon the Purchaser's unauthorized possession, the Purchaser shall be deemed in default hereunder at the option of the Seller, and upon such election, all amounts paid hereunder shall belong to the Seller as liquidated damages and this Agreement shall be deemed canceled. It is further understood and agreed that the Seller will not be responsible for damage or loss to any property belonging to the Purchaser whether same is delivered to the Premises on or after the Closing of title herein.

**14. Seller's Failure to Convey.** Except in case of its own, willful default, the Seller's liability under this Agreement for failure to complete and/or deliver title for any reason, shall be limited to the return of the Down Payment paid hereunder, and upon the return of said Down Payment, this Agreement shall be null and void and the parties hereto released from any and all liability hereunder. In any event, the Seller shall not be required to bring any action or proceeding or otherwise incur any unreasonable expense to render the title to the Premises marketable or to cure any objection to title.

**15. Acceptance of Deed; Full Compliance by Seller; Waiver of Jury Trial.** Notwithstanding anything to the contrary herein contained, it is specifically understood and agreed by the parties hereto that the acceptance of the delivery of the deed at Closing shall constitute full compliance by the Seller with the terms of this Agreement, and none of the terms hereof, except as otherwise herein expressly provided, shall survive the delivery and acceptance of the deed. The parties hereto do hereby agree that trial by jury in any action, proceeding or counterclaim arising out of or from this Agreement is hereby waived.

**16. Municipal Certificates.** At Closing the Seller will deliver either a temporary or permanent Certificate of Occupancy covering the Home (the "C.O.").

**17. Construction of Home by Seller.**

(a) The Seller agrees, at its own cost and expense, to erect and complete the aforementioned Home in accordance with the requirements as to materials and workmanship of the Building Department of the City of Saratoga Springs (the "Building Department"), and further agrees that when complete, same will be in substantial accordance with the plans as filed with the Building Department. The issuance of a temporary or permanent Certificate of Occupancy shall mean that the Home is substantially complete. In the event a permanent Certificate of Occupancy is not issued as of the date of Closing of a Home, Seller will obtain the permanent Certificate of Occupancy within two (2) years of the Closing. In addition, Seller will obtain the permanent Certificate of Occupancy prior to the expiration of any temporary Certificate of Occupancy, unless the temporary Certificate of Occupancy is extended.

(b) The Seller shall construct and complete the Home in substantial compliance with the Plans and Specifications of the Model Type selected, attached hereto and incorporated herein. The Seller reserves the right, however, to locate and orient the Home on the Lot, to construct a mirror image of the house, to provide exterior color choices for the Home, and to determine grades and elevations of the Home to fit the general pattern of the development in the Project, to meet municipal requirements and to conform to topographical and other site conditions. Based on specific site conditions, Seller reserves the right to alter the size and number of windows and doors, and size and configurations of any basement area. Seller also reserves the right to make variations, modifications, and substitutions to the Home Plans and Specifications by substituting materials, equipment, and fixtures provided they are of equal or similar quality and design to those set forth in the Plans

$550$

and Specifications. All portions of the Premises which are disturbed in the course of construction shall be graded and seeded by the Seller. The Seller shall determine placement and nature of retaining walls and site specific grading, as needed. Certain items of outside work, i.e. grading, seeding and/or driveway surfacing may not be completed prior to Closing. The Seller agrees to complete such items after Closing as soon as practical and weather permitting. The Purchaser agrees that there will be no escrow of any part of the Total Purchase Price with respect to any incomplete items of construction or the Seller's performance. The issuance of a temporary or permanent Certificate of Occupancy shall constitute presumptive evidence that the Home has been substantially completed in accordance with this Agreement and relevant laws and regulations pertaining to issuance of the C.O.

(c) Prior to Closing, the parties shall inspect the Premises together and create a Final Inspection Sheet detailing the unfinished items which the Seller shall complete within a reasonable time after Closing. Outstanding Final Inspection Sheet items shall not be a basis for a delay of Closing provided a C.O. has been issued. The Seller shall not be obligated to withhold or retain monies in escrow with respect to Final Inspection Sheet items to be completed by the Seller after Closing unless requested by the Purchaser's lending institution and said request is satisfactory to the Seller.

(d) The Purchaser shall permit the Seller, its agents, servants and/or employees to enter upon the Premises and shall provide reasonable access thereto subsequent to Closing to complete any incomplete items. In the event the Seller is required to make any repair or complete any item of work to be performed by the Seller after Closing, the limit of the Seller's liability shall be to make said repair and/or to complete such item.

The provisions of this Paragraph shall survive the delivery of the deed.

**18. Changes in Materials, Etc.** Notwithstanding and in accordance with paragraph 17, the Seller reserves the right to:

(a) make changes and/or substitutions of materials or construction for items as originally set forth in the Plans and Specifications of the Model Type home, as the case may be, provided any such changes are of substantially equal or better value and quality;

(b) limit the exterior color and design choices available, and location, of homes and the landscaping and grading of all plots, to fit into the general pattern of the Project and other improvements therein;

(c) determine the elevation and location of all foundations, walks, driveways, garage door entries, and streets;

(d) fix the location of a house (including setbacks) within lot lines;

(e) determine whether trees or shrubs currently on the premises are to be removed;

(f) determine the ultimate number of homes and house type mix to be constructed in the Project;

(g) add or remove retaining walls on the lots or common areas where required by grade conditions;

(h) determine the location of electric, gas and water meters, electric transformers, condensers, heat pump units and hose bibs, and HVAC pump units;

(i) vary the number of steps into a home from the front, rear and garage due to topographical conditions; and

(j) make any other changes required by the City of Saratoga Springs or any other governmental authority.

The Seller agrees to notify the Purchaser of any changes, modifications, deviations, additions or deletions that may be beyond the scope of the enumerated reservation of rights set forth above which are determined by

SSD

8

the Seller, in its sole discretion, to be considered material. A material change requiring notification to the Purchaser shall include the substitution of lots in the event topographical or other conditions on the Lot selected are not conducive to construction of a particular model type on that Lot. If a change, modification, deviation, addition or deletion affects the facts and circumstances contained in the original Association offering plan, including any amendment thereto, the Seller shall cease sales and submit a filed amendment to the offering plan.

## 19. Options and Extras.

(a) The Seller has provided the Purchaser with color and option selection materials reflecting decisions required of the Purchaser regarding the construction of the Home. The Purchaser agrees to make all color and option selections from choices offered by the Seller on or before the dates set forth by the Seller. The Seller will advise the Purchaser of the date(s) by which specific selections must be made. If the Purchaser fails to make any selection on or before the designated date applicable to such selection, the Seller may, but need not, make such selection at any time thereafter from such choices as had been offered by the Seller without additional charge. All selections made by the Purchaser and/or the Seller shall be deemed final. The Purchaser understands and agrees that any delay in making selections beyond the applicable selection date may result in a delay of the Closing. Accordingly, in the event that the Closing shall have been delayed as a result of the Purchaser's failure to timely make a selection, the provisions of paragraph 4(b) regarding payments for adjournments shall then apply for the period of such delay. The Seller shall have the right to limit exterior options so as to avoid houses too similar adjacent to each other and to maintain an overall harmonious design of the Project.

(b) The Seller may, but shall not be obligated to, furnish and/or perform any extras, upgrades, framing changes, foundation changes, additions or other changes to the Plans or Specifications as requested by the Purchaser. If the Purchaser hereafter makes a selection or requests a change that requires payment of additional costs and if the Seller agrees to make such changes or install such extras, a written agreement or change order shall amend this Agreement and shall specifically set forth such upgrades, changes and extras with associated additional costs (the "Change Order") and shall be executed by the parties. Payment of one hundred (100%) percent of such additional costs may be required by the Seller at time of execution of the Change Order, which sums shall be paid directly to the Seller for its use in providing such upgrade, change or extra. Change Orders are subject to an additional, nonrefundable administrative fee of $500.00 Dollars, which shall be paid directly to the Seller at the time the Change Order is executed by the parties. The Seller does not guarantee that any selections, upgrades, options or extras now or hereafter offered will continue to be offered. In addition, choices which are now offered without charge may become subject to an additional charge and those choices subject to an additional charge may become subject to an increased charge at any time in the future at the sole discretion of the Seller and without notice to the Purchaser. Failure by the Purchaser to comply with required payments pursuant to any Change Order shall be considered a material breach of this Agreement and default hereunder, entitling the Seller, at the Seller's discretion, to terminate the Agreement and to retain Down Payments paid on account of this Agreement, plus the cost of any upgrades or extras, as liquidated damages.

(c) If the Seller fails to comply with any executed Change Order, the Seller's only obligation shall be to refund any payments made by the Purchaser on account of Change Order and the Purchaser shall have no further recourse.

**20. Execution of Required Documents, Etc.** The Purchaser agrees to deliver to the Seller all documents, and to perform all acts required by the Seller, to carry out the provisions of all applicable laws and regulations. This paragraph shall survive delivery of the deed.

**21. Delay in Closing; Purchaser's Option to Cancel.** In the event the Seller shall be unable to complete the Home on or before twelve (12 months) after the proposed Closing date set forth herein for any reason other than delays due to strikes, acts of God, wars, lockouts, acts of nature, delays in issuing necessary permits, acts of governmental bodies, military operations, national emergencies, installation of public utilities, governmental restrictions preventing the Seller from obtaining necessary supplies and/or materials, damage from fire, severe weather conditions, or other delays beyond the Seller's control, in which event the period shall be extended to eighteen (18) months, and provided the Purchaser shall not be in default hereunder, the Purchaser shall have the option to cancel this Agreement, and to have the Down Payment advanced by him returned to the Purchaser

SSD

9

with interest, to the extent any was earned. The Seller must receive the Purchaser's written notice of his intention to exercise such option to cancel no later than ten (10) days after the twelve (12) months or eighteen (18) months, whichever is applicable, from the Closing date set forth herein. Failure to so notify the Seller shall be deemed a waiver of this provision, and the Purchaser shall continue to be bound by the terms of this. Agreement.

**22. Assignability.** The parties agree that the stipulations and agreements herein contained shall be binding upon them, and their respective heirs, executors, administrators and/or assigns. The Purchaser agrees that he shall not indirectly or directly record or assign this Agreement or any of his rights hereunder without the written consent of the Seller. In the event the Seller, in its discretion, permits an assignment of this Agreement, it may elect to impose an assignment fee of ten (10%) percent of the Total Purchase Price and the assignment shall be subject to all provisions of this Agreement. In no way should this be construed as a requirement that the Seller must consent to any assignment, and the Seller reserves the right to refuse to permit an assignment of this Agreement.

**23. LIMITED WARRANTY. THE SELLER HEREIN MAKES NO HOUSING MERCHANT IMPLIED WARRANTY OR ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, IN CONNECTION WITH THE PURCHASE AGREEMENT OR HOME COVERED HEREBY AND ALL SUCH WARRANTIES ARE EXCLUDED, EXCEPT AS PROVIDED IN THE LIMITED WARRANTY ANNEXED HERETO AS EXHIBIT "A". THE TERMS OF THE LIMITED WARRANTY ARE HEREBY INCORPORATED INTO THIS PURCHASE AGREEMENT AND THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE FACE HEREOF. THE PURCHASER HEREBY ACKNOWLEDGES THAT A WRITTEN COPY OF THE TERMS OF THE ANNEXED LIMITED WARRANTY HAS BEEN PROVIDED BY THE SELLER TO THE PURCHASER FOR THE PURCHASER'S EXAMINATION AND THAT A REASONABLE PERIOD OF TIME FOR ITS EXAMINATION BY THE PURCHASER HAS BEEN AFFORDED TO THE PURCHASER PRIOR TO THE TIME OF THE PURCHASER'S EXECUTION OF THIS PURCHASE AGREEMENT. THE PURCHASER UNDERSTANDS AND ACCEPTS THE ANNEXED WARRANTY TO THE PURCHASE AGREEEMENT IN LIEU OF ANY OTHER EXPRESS OR IMPLIED WARRANTIES IN CONNECTION WITH THIS TRANSACTION. THE ANNEXED WARRANTY WILL BE FULLY EFFECTIVE WITHOUT THE EXECUTION OF ANY OTHER DOCUMENT BY EITHER THE PURCHASER OR THE SELLER ON THE DATE THAT THE PURCHASER OR ITS FAMILY SHALL FIRST OCCUPY THE HOME WHICH IS THE SUBJECT OF THIS AGREEMENT AS A RESIDENTIAL HOME OR THE DATE THAT THE DEED TO SUCH HOME IS DELIVERED TO THE PURCHASER, WHICHEVER OCCURS FIRST. IN ADDITION TO THE ANNEXED LIMITED WARRANTY, THE PURCHASER WILL RECEIVE ANY MAUNUFACTURER'S WARRANTIES APPLICABLE TO THE APPLIANCES INSTALLED BY THE SELLER IN THE HOME.**

The provisions of this Paragraph shall survive the delivery of the deed.

**24. Escrow/Trust Fund.** The Seller shall comply with the escrow and trust fund requirements of New York General Business Law Sections 352-e(2-b) and 352-h and Section 22.3(k) of the Department of Law's Regulations, and all Down Payment funds paid by the Purchaser shall be handled in accordance with these statutes and regulations. All Down Payments made by Purchaser prior to closing of this transaction shall be held pursuant to a written Escrow Agreement entered into between the Sponsor, the Purchaser, and the Escrow Agent, attached hereto as a Rider to the Purchase Agreement (Exhibit "B"). The Down Payments shall be held in a segregated account entitled "Beaver Pond Village Escrow Account" at M & T Bank, 327 Great Oaks Boulevard, Albany, New York 12203. Down Payments in excess of $250,000.00 will not be federally insured in excess of the $250,000.00. Down Payments may only be released by the signature of John N. Vagianelis, Esq., a member of the law firm of Mazzotta & Vagianelis, P.C., 9 Washington Square, Albany, New York 12205, the Escrow Agent for the Seller. The Down Payments will be placed in an interest-bearing account within five (5) business days after the Agreement is signed by all necessary parties, and, unless the Purchaser defaults, interest will be credited to the Purchaser at the Closing. The interest rate to be earned will be the prevailing rate for these types of accounts. Sponsor shall bear any administrative cost for maintenance of the Escrow Account.

Within ten (10) business days after the Escrow Agreement is signed by all necessary parties, the Escrow Agent shall notify the purchaser in writing that such funds have been deposited into the attorney Escrow Account and will provide the Purchaser with the account number and initial interest rate. If the Purchaser does not receive notice of such deposit within fifteen (15) days after tender of the Down Payment, the Purchaser may cancel the purchase and rescind within ninety (90) days after tender of the Down Payment. Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, New York 10271.

**25. Surety Bond.** Subsequent to approval by the Attorney General, the Sponsor may post a surety bond issued by an insurance company licensed to write insurance in the State of New York, securing repayment of funds, in the event the Purchaser is entitled to such amount under the terms of this Agreement. The Sponsor shall cause the surety to mail or personally deliver the surety bond to the Purchaser before the funds are released to the Sponsor from the Escrow Account. Such funds shall subsequently be released by the Escrow Agent to the Sponsor. For any funds already deposited prior to approval by the Attorney General of use of surety bonds, a written consent of each affected Purchaser shall be obtained acknowledging subsequent amendment to the Plan calling for potential release of funds and consent thereto and if no consent is given, continuation of escrow of funds.

**26. Broker.** Each party represents that it dealt with no broker in connection with this transaction other than the Seller's sales office and/or Keller Williams. The Seller is responsible for paying any broker commission upon the closing of title pursuant to separate agreement. The Purchaser agrees to indemnify the Seller and hold the Seller harmless for any claims, costs, and expenses, including reasonable attorneys' fees, brought for brokerage fees based upon the Purchaser's acts or asserted by any other broker claiming to have dealt with Purchaser. The provisions of this Paragraph shall survive delivery of the deed.

**27. Prohibition against Advertising of Home for Sale.** The placing of an advertisement for the sale of the Premises by Purchaser in any newspaper or other publication or media or listing the Home with any real estate broker prior to Closing will constitute a material breach of this Agreement and default hereunder, entitling the Seller to terminate the Agreement and to retain Down Payments paid on account of this Agreement, plus the cost of any upgrades or extras, as liquidated damages.

**28. Completion of Construction.** The Purchaser shall accept title (without abatement in or credit against the purchase price or provision for Escrow) notwithstanding that construction of (a) other homes, (b) landscaped areas, (c) utilities other than to service the Premises, (d) other portions of the common areas, or (e) roadway top course have not been completed. The Purchaser acknowledges that the Project may be improved with new roads, utilities and new home construction after the Closing. The Purchaser agrees that the aforementioned construction and any nuisances, noise, dust or disruption in services that are caused thereby shall not be deemed by the Purchaser as a breach of the Purchaser's rights to quiet enjoyment of the Premises. The provisions of this Paragraph shall survive the delivery of the deed.

**29. Site Inspection.** The Purchaser shall not visit the Lot, Home or surrounding Project construction sites unless specifically agreed to by the Seller and accompanied by a duly authorized representative of the Seller. Any such unauthorized visits by the Purchaser are subject to a charge by the Seller of $500.00 per unauthorized visit, which the Purchaser agrees to pay the Seller within ten (10) days of billing thereof. The Purchaser acknowledges that unauthorized visits present a dangerous circumstance and could incur liability to the Seller, its agents and/or contractors. The Purchaser hereby releases and agrees to indemnify, defend and hold the Seller, its agents and contractors harmless for all claims and liabilities incurred by the Seller resulting from the presence of the Purchaser, the Purchaser's family members or invitees on the Premises or the Project during the term of this Agreement. Failure by the Purchaser to comply with requirements of this paragraph shall be considered a material breach of this Agreement and default hereunder, entitling the Seller, at the Seller's discretion, to terminate the Agreement and to retain Down Payments paid on account of this Agreement, plus the cost of any upgrades or extras, as liquidated damages

**30. Signs.** The Purchaser for himself, his successors, distributees and/or assigns, does hereby covenant and agree that for a period of four (4) years after the date of the Closing of title hereunder, the Purchaser will not

SSO

11

place any sign or signs, except a house number, upon the Premises herein described or any part thereof, without the prior written consent of the Seller. These signs include, but are not limited to, "For Sale" signage. This paragraph shall survive the delivery of the deed.

**31. Purchasers as Agents for Each Other.** If two or more persons are named as the Purchaser herein, any one of them is hereby made agent for the other in all matters of any and every kind or nature affecting the Premises, herein or this Agreement.

**32. Purchaser Interference.** The Purchaser acknowledges that it may not interfere with the Seller's ability to construct Purchaser's Home or other homes or facilities, including interference with work performed on site by Seller's staff in connection with the construction of Purchaser's Home or any other home in the Project, attempts to hire any of Seller's staff or contractors, and attempts to bring contractors, material men, subcontractors or workers onto the site for the Purchaser's residence prior to Closing of title to the Home, unless otherwise agreed to in writing by the Seller.

**33. Notices.** Unless otherwise provided for herein, any notice required to be given or given hereunder shall be given by depositing such notice in a post-paid wrapper, certified mail, return receipt requested, in an official depository under the exclusive care and custody of the United States Postal Service, or by Express Mail, Federal Express, other overnight delivery service or messenger service (with proper receipt therefor), or facsimile transmission, addressed to the party at the address hereinabove set forth, with a copy of any such notice by regular mail to the attorney for such party as follows:

IF TO SELLER:                Blitman Saratoga LLC
                             222 Bloomingdale Road, Suite 404
                             White Plains, New York 10605
                             Attn: Robin Winter

                             Mazzotta & Vagianelis, P.C.
                             9 Washington Square
                             Albany, New York 12205
                             Attn: John F. Hayko, Esq.

IF TO ESCROW AGENT:          Mazzotta & Vagianelis, P.C.
                             9 Washington Square
                             Albany, New York 12205
                             Attn: John N. Vagianelis, Esq.

IF TO PURCHASER:

Any notice may be given by the attorney for a party and shall have the same force as if given by the party. Either party may, by notice, change the address at which notices are to be given hereunder.

**34. Site Work.** The following provisions of this Paragraph shall survive delivery of the deed

(a) The Seller shall install, at its sole cost and expense, sewers, streets and curb cuts adjacent to the Premises as required by the municipality.

(b) The Purchaser shall not install a circular driveway or make any other installations, improvements or changes to the existing drainage pipes or structures, sidewalks, streets, driveways, driveway curbs or aprons until such time as the streets and any other public improvements are dedicated to the appropriate governmental

SS,

12

authorities, and all bonds posted thereof have been released. In the event the Purchaser makes any such unauthorized alterations after Closing, the Purchaser agrees to restore same to comply with applicable municipal specifications within ten (10) calendar days of the Seller's written demand therefor.

(c) If the Closing shall occur between November 1 and May 1, the Premises may be delivered with incomplete grading, landscaping, if any, and a temporary driveway. In such event, the Seller shall provide the Purchaser with a letter ensuring that the grading, landscaping, if any, and driveway shall be completed as conditions permits.

(d) If the Premises or any other parcels on the same side of the street shall not have been fully graded at Closing, then the Seller, its agents, servants or employees shall have the right to enter upon the Premises for a period of two (2) years thereafter to complete grading and any other work deemed necessary, and, in connection therewith, to remove any excess top soil or fill. The Seller reserves title to any excess topsoil or fill created by such grading and the Purchaser consents to the removal thereof by the Seller during such period. The Seller shall repair damage to landscaping, if any, caused by such grading.

(e) It is understood and agreed that the Seller makes no representation or warranty with regard to the number, nature, quality or condition of trees and shrubbery now on the Premises, and the Seller expressly reserves the right in its sole discretion to remove any existing trees and shrubbery now on the Premises. The Seller shall not furnish, nor be obligated for, any tree surgery, treatment or care of trees and shall not be obligated to remove any trees. The Seller shall not furnish, nor be obligated to furnish, retaining walls, dry wells or tree wells unless required by the municipality. The Seller shall have the sole and exclusive right to determine the final grade of the Lot and the location of the Home on the Premises. Notwithstanding the foregoing, the Purchaser expressly acknowledges that the Seller shall only be responsible for clearing trees and/or shrubbery from the Premises. In addition, the Purchaser expressly acknowledges that the location and number of dry wells or other drainage devices on the Premises shall be determined at the sole discretion of the Seller, in compliance with the requirements of the City of Saratoga Springs.

**35. Location of Electrical Service Box.** While the Seller will endeavor to locate the electrical service box in an inconspicuous location, the Seller reserves the right to locate said electrical box in any location it deems proper and in accordance with the specifications of the utility company having jurisdiction thereof.

**36. No Oral Changes.** This Agreement cannot be changed or any provision waived orally. Any changes or additional provisions or waivers must be set forth in a rider attached hereto or in a separate written agreement executed by both parties.

**37. Captions and Headings.** The captions and headings used in this Agreement are intended for convenience and reference only and shall not imply or convey any additional meanings to the contents of their respective provisions.

**38. Applicable Law/Severability.** This Agreement shall be interpreted and enforced in accordance with the laws of the State of New York. If any provisions of this Agreement shall be unenforceable or invalid, the same shall not affect the remaining provisions of this Agreement, and to this end, the provisions of this Agreement are intended to be and are severable.

**39. Attorney's Approval Clause.** In the event the Purchaser chooses to engage the services of an attorney regarding this transaction, then this Agreement shall be contingent upon the Purchaser obtaining approval of this Agreement by that attorney as to all matters contained herein. In any event, this contingency shall be deemed waived unless the Purchaser's attorney notifies the Seller c/o Mazzotta & Vagianelis, P.C., attn: John F. Hayko, Esq., of the attorney's disapproval of this Agreement no later than seven (7) business days from the date of execution of this Agreement by the last party affixing his signature thereto. Said notice shall set forth the reasons for said disapproval. This Agreement shall be deemed cancelled, null and void and all Down Payments shall be returned to the Purchaser unless the Seller agrees in writing to the proposed changes set forth in said notice in which case this Agreement together with said changes, shall remain in full force and effect. Any notice provided pursuant to this paragraph shall be sent by certified or registered mail, return receipt requested,

postmarked no later than the above date and addressed to the Seller, c/o Mazzotta & Vagianelis, P.C., 9 Washington Square, Albany, New York 12205, attn: John F. Hayko, Esq. For purposes of expediting the execution of any amendments hereto, the Seller and the Purchaser grant limited powers of attorney for their respective attorneys to execute said amendments on their behalf with the same force and effect as if each has signed said amendments hereto.

**40. Delivery of Purchase of Agreement.** The transmittal of this proposed Agreement shall not be deemed an offer to sell, and this Agreement shall not be binding on the Seller until it is accepted by endorsement hereon by the Seller, and a fully signed copy thereof shall have been delivered or mailed to the Purchaser. If this Agreement shall not be accepted by the Seller within fifteen (15) days after it was signed by the Purchaser by the delivery or mailing to the Purchaser of such endorsed and fully signed copy, this Agreement shall be deemed to be rejected by the Seller and canceled and the Purchaser's deposit shall be promptly refunded within ten (10) calendar days thereafter provided the Purchaser returns the Offering Plan to the Seller in good condition.

**41. Interpretation.** Any singular word or term herein shall also read as in the plural, and the masculine shall be read in the feminine or neuter whenever the sense of this Agreement may so require.

**42. Radon Gas.** Radon gas is a naturally occurring radioactive gas which may accumulate in sufficient quantities within a home over time to constitute a health risk to its occupants. The Seller will not be conducting radon testing with respect to the Home and specifically disclaims any and all representations and warranties as to the absence of radon gas or radon producing conditions in connection with the Home. The Seller will make the Home available prior to Closing at a mutually convenient time for the purpose of radon testing at the Purchaser's expense and if as a result of that testing, remediation is necessary, then the Seller will perform such remediation prior to Closing at its expense so as to reduce the level of Radon Gas to four (4) pico curies per liter.

**43. Marketing.** The Purchaser authorizes the Seller to take photographs of the exterior of the Home and publish them after the Closing for the purpose of assisting the Seller to market its homes to other purchasers.

**44. FIRPTA Representation of Sponsor.** Seller represents that it is not a "foreign person" as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("IRC") Section 1445, as amended and the regulations promulgated thereunder (collectively "FIRPTA"). The provisions of this paragraph shall be deemed repeated at Closing and shall survive the Closing.

**45. Merger.** Unless otherwise stated herein, the terms of this Purchase Agreement shall merge with the deed.

**Note: Floor plans, specifications and renderings of the chosen Model Type are on exhibit at the Seller's sales office. The floor plans, specifications and renderings as displayed in the Seller's sales office are artist's conceptions and are not intended to be the actual depiction of the walls, windows, walkways, driveways, landscaping or decks. All dimensions and door locations and sizes may vary from those depicted on the Plans. Artist's renderings, specifications and plans are for illustration purposes only and may reflect included and/or optional items.**

**All floor plans, renderings and elevations are protected by Federal Copyright Laws. Any unauthorized use or publication of the plans is prohibited.**

**THIS AGREEMENT STATES THE ENTIRE UNDERSTANDING OF THE PARTIES AND THE SELLER SHALL NOT BE BOUND BY ANY ORAL REPRESENTATIONS AND/OR AGREEMENTS MADE BY THE SELLER, ITS AGENTS OR REPRESENTATIVES.**

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

**SIGNATURES TO FOLLOW**

BLITMAN SARATOGA LLC

Dated: 1/31/19     By: _____
                          Authorized Representative

Dated: 1/27/19     _____
                Purchaser

                 _____
                Purchaser

## EXHIBIT "A"

RIDER TO PURCHASE AGREEMENT DATED ~~JANUARY 27~~ 201~~9~~, BY AND BETWEEN BLITMAN
SARATOGA LLC, AS SELLER, AND ~~STEPHEN & SUSAN DORSEY~~, AS PURCHASER.

### LIMITED WARRANTY

| | |
|---|---|
| **NAME OF PURCHASER(S):** | STEPHEN + SUSAN DORSEY |
| **ADDRESS OF PURCHASER(S):** | 17 TIFFANY PLACE  SARATOGA SPRINGS, NY 12866 |
| **DESIGNATION OF HOME WARRANTED:** | 6 KATIE LANE.  SARATOGA SPRINGS, NY 12866 |
| **NAME OF SELLER** | Blitman Saratoga LLC |
| **ADDRESS OF SELLER:** | 222 Bloomingdale Road  Suite 404  White Plains, New York 10605 |
| **EFFECTIVE DATE OF THIS LIMITED WARRANTY:** | The date that the Purchaser or Purchaser's family shall first occupy the Home warranted, or the date of delivery of the deed to such Home to the Purchaser, whichever occurs first. |
| **SELLER'S LIMIT OF TOTAL LIABILITY:** | Seventy-five (75%) percent of the Total Purchase Price of the Home set forth in the Purchase Agreement to which this Limited Warranty is annexed as a rider, less any insurance proceeds received by the Purchaser. |

**THIS LIMITED WARRANTY EXCLUDES AND PRECLUDES ALL CONSEQUENTIAL, INCIDENTAL, SPECIAL AND INDIRECT DAMAGES.**

**THIS LIMITED WARRANTY IS IN LIEU OF AND REPLACES ALL OTHER WARRANTIES ON THE CONSTRUCTION AND SALE OF THE HOME AND ITS COMPONENTS , BOTH EXPRESS AND IMPLIED (INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE). THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE FACE HEREOF. THE PURPOSE OF THIS LIMITED WARRANTY IS TO IDENTIFY THE SELLER'S RESPONSIBILITIES FOR CONSTRUCTION DEFECTS OF A LATENT OR HIDDEN NATURE THAT COULD NOT HAVE BEEN FOUND OR DISCLOSED ON FINAL INSPECTION OF THE HOME.**



**1. To Whom Given.** This Limited Warranty is given to the Purchaser named on page 1 of this Limited Warranty while the Purchaser owns the Home. *IT DOES NOT EXTEND TO SUBSEQUENT OWNERS, HEIRS, TENANTS OR MORTGAGEES IN POSSESSION OF THE HOME, ANYONE WHO MAY SUCCEED TO THE RIGHTS OF THE PURCHASER, OR ANY OTHER PERSONS.*

**2. By Whom Made.** This Limited Warranty is made exclusively by the Seller whose name and address appear on page 1 of this Limited Warranty.

**3. Final Inspection of the Home.**

(a) Before the Purchaser moves into the Home or accepts the deed, the Seller will schedule an appointment for final inspection of the Home with the Purchaser. The purpose of this final inspection is to discover any defects of a visible, obvious or patent nature, or any other unfinished work.

(b) All defects found on final inspection of the Home will be itemized on a Final Inspection Sheet which will be signed by the Purchaser and the Seller before occupancy of the Home or delivery of the deed.

**4. Warranty Coverage and Periods.** The Warranty Period for all of the following coverage begins on the Effective Date of this Limited Warranty shown on Page 1 of this Limited Warranty.

**FIRST YEAR BASIC COVERAGE:** For one (1) year from the Effective Date of this Limited Warranty, the Home will be free from latent defects that constitute defective workmanship, defective material and or defective design furnished by the Seller, his agents, subcontractors or design professionals.

(a) The Seller under this coverage is not responsible for any defects in any work or materials ordered directly by the Purchaser for the Seller's subcontractors or suppliers or subcontractors or for incidental or consequential damages resulting from such work or materials.

(b) This Warranty does not apply to any manufactured item such as appliances, fixtures, fixtures equipment or any other item which is covered by a manufacturer's warranty, nor does it cover systems Defects that are caused by failure of any such manufactured item. Appliances and items of equipment not covered by this limited warranty, include but are not limited to: air conditioning units, attic fans, boilers, burglar alarms, carbon monoxide detectors, ceiling fans, central vacuum systems, chimes, dishwashers, dryers, electric meters, electronic air cleaners, exhaust fans, fire alarms, fire protection sprinkler systems, furnaces, freezers, furnaces garage door openers, garbage disposals, gas meters, gas of electric grills, heat exchangers, heat pumps, humidifiers, intercoms, oil tanks, motion lights, range hoods, ranges, refrigerators, sewage pumps, smoke detectors, solar collectors, space heaters, sump pumps, thermostats, trash compactors, washers, water pumps, water softeners, water heaters, whirlpool baths, and whole house fans.

**TWO (2) YEAR MAJOR SYSTEM COVERAGE:** For two (2) years from the Effective Date of this Limited Warranty, the Plumbing, Electrical, Heating, Cooling and Ventilation Systems of the Home which have been installed by the Seller are warranted to be free from latent defects resulting from defective installation by the Seller in accordance with the standards of the industry. The Seller will not be liable for the replacement of major appliances such as HVAC units, kitchen appliances, water heaters or other devices which are covered by a manufacturer's warranty except where caused by defective workmanship in the first year of coverage.

(a) The Plumbing System refers to the gas (natural or LP) supply lines and fittings; water supply, waste and vent pipes and their fittings; septic tanks and their drain fields; water, gas and sewer service piping, and their extensions to the tie-in of a public utility connection, or on-site well and sewage disposal system.

(b) The Electrical System refers to all wiring, electrical boxes, switches, outlets and connections up to the public utility connection.

(c) The Heating, Cooling and Ventilation System refers to all duct work, steam, water and refrigerant lines, registers, radiation elements and dampers.

*SSO*

2

(d) Except by reason of a defect in installation by the Seller, this major system coverage does not include defects in appliances, fixtures and items of equipment.

(e) The Seller under this coverage is not responsible for any defects in any work or materials ordered directly by the Purchaser from the Seller's subcontractors or suppliers or other outside suppliers or subcontractors or for incidental or consequential damages resulting from such work or materials.

**SIX (6) YEAR MATERIAL STRUCTURAL DEFECT COVERAGE:** For six (6) years from the Effective Date of this Limited Warranty, the Home will be free from latent Material Structural Defects that result from defective workmanship, defective material and or defective design furnished by the Seller, his agents, subcontractors or design professionals.

(a) A Material Structural Defect is a defect resulting in actual physical damage to the following load-bearing portions which affects their load-bearing functions to the extent that the Home becomes unsafe, unsanitary or otherwise unlivable: foundation systems and footings, beams, girders, lintels, columns, walls and partitions, floor systems, and roof framing systems.

(b) Damage to the following non-load bearing portions of the Home are not covered by the six-year coverage: roofing and sheathing; drywall and plaster; exterior siding; brick, stone and stucco veneer; floor covering material; wall tile and other wall coverings; non-load bearing walls and partitions; concrete floors in attached garages and basements that are built separately from foundation walls or other structural elements of the Home; electrical, plumbing, heating, cooling and ventilation systems; appliances, fixtures and items of equipment; paint; doors and windows; trim; cabinets; hardware; and insulation.

(c) The Seller under this coverage is not responsible for any defects in any work or materials ordered directly by the Purchaser from the Seller's subcontractors or suppliers or other outside suppliers or subcontractors or for incidental or consequential damages resulting from such work or materials.

In all coverages under this Paragraph, workmanship, materials, design and installation will be considered to be defective if they fail to meet or exceed the relevant standards and specifications of the applicable building code of the municipality in which the Home is located, in effect on the date that the building permit for the Home was issued, as supplemented by the annexed locally accepted building standards and practices.

**ALL TIME PERIODS FOR THESE COVERAGES ARE OF THE ESSENCE AND WILL NOT BE EXTENDED.**

**5.   Exclusions from All Coverages.** The following are not covered by this Limited Warranty:

(a) defects in detached garages and carports; swimming pools and other recreational facilities, if any; driveways; walkways; patios; boundry walls; retaining walls; bulkheads; fences; landscaping (including sodding, seeding, shrubs, trees and plantings); and any other improvements not a part of the Home itself;

(b) raised butt joints, ridging, nailpops in drywall partitions and ceilings; scuffing on kitchen cabinet or vanity surfaces; variations of wood grain or staining of kitchen cabinets or vanities; shading variations of the exterior siding staining (on the face surface or grooves), and on fascias from staining; doors and windows sticking because of weather; adjustment of bi-fold doors; broken or cracked glass; broken or cracked ceramic/marble tile; chips, scratches, marks, breaks, or other blemishes in windows, sliding doors, screens, electric fixtures and globes, woodwork and doors; dented appliances; broken screens; minor chips (nicks) to ceramic floors and countertops; and squeaking of sub-flooring or floor covering;

(c) defects in any work or materials ordered directly by the Purchaser from the Seller's subcontractors or suppliers or other outside suppliers or subcontractors and for incidental or consequential damages resulting from such work or materials;

550

3

(d) damage caused by the failure by the Purchaser or anyone other than the Seller, its employees, agents or subcontractors, to comply with the warranty requirements of manufacturers or suppliers of appliances, fixtures or items of equipment;

(e) damage caused by the misuse, abuse or interference by the Purchaser or anyone other than the Seller or its employees, agents and subcontractors with the Seller's original construction or installations;

(f) additional damage caused by the failure of the Purchaser to give notice to the Seller of any defects of damage in a timely manner as provided in this Limited Warranty;

(g) damage caused by any changes in grade by anyone other than the Seller, its employees, agents or subcontractors, and damage caused by changes in grade made by the Seller's agents and subcontractors if such work was ordered directly by the Purchaser;

(h) damage caused by the changes, alterations or additions made to the Home by anyone other than the Seller or its employees, agents or subcontractors after the effective date of this Limited Warranty;

(i) damage caused by changes, alterations or additions made to the home by the Seller's agents and subcontractors if such work was ordered directly by the Purchaser after the effective date of this Limited Warranty;

(j) damage caused by dampness or condensation due to the failure of the Purchaser to maintain adequate ventilation;

(k) loss or damage caused by or resulting from accidents, riot and civil commotion, fire, explosion, smoke water escape, falling objects, aircraft, vehicles, acts of God, lightning, windstorm, hail, flood, mud slide, earthquake, volcanic eruption, wind-driven water, soil movement and changes in the underground water table;

(l) loss or damage caused by seepage of water unless such loss or damage is in direct result of a construction defect;

(m) any damage which the Purchaser has not taken timely action to minimize;

(n) normal wear and tear and normal deterioration;

(o) insect, vermin and/or rodent damage and infestation, or damage caused by other animal or pests;

(p) bodily injury, death, or damage to personal property;

(q) costs of shelter, transportation, food, moving, storage or other expenses related to relocation during repair or replacement;

(r) consequential, incidental, special and indirect damages;

(s) any claim not filed in a manner set forth in paragraph 7 of this Limited Warranty;

(t) damage which arises while the Home is being used for nonresidential purposes; and

(u) damage due to abnormal loading on floors which exceeds design loads as mandated by the applicable building code or building standards.

**6. What Seller Will Do in the Event of a Defect Covered by this Limited Warranty.** If a defect occurs in an item covered by this Limited Warranty, the Seller will repair, replace, or pay the Purchaser the reasonable cost of repairing or replacing the defective item(s) within sixty (60) days after the Seller's inspection or testing discloses the problem, subject to weather conditions, acts of God, availability of materials, and other events

SSD

beyond the Seller's control. The choice among repair, replacement or payment is solely that of the Seller. In making any repairs or replacements, the Seller shall have the right to select the method and materials to be used in performing such repairs or replacements.

The Seller's liability under this Limited Warranty is limited in the aggregate to the amount listed on page 1 of this Limited Warranty.

Repair of damage to the load-bearing portions of the Home will be limited to that which is necessary to restore their load-bearing function. Repair of other Material Structural Defects will be limited to repair of those defects, which made the Home unsafe, unsanitary or otherwise unlivable.

## 7. Step by Step Claims Procedures.

(a) Written notice of any warranty claim must be made on the attached "Notice of Warranty Claim" form and must be received by the Seller no later than the tenth (10th) day after the expiration of the applicable warranty period. Such notice must be sent by the Purchaser to the Seller by certified or express mail, return receipt requested. If this form shall not properly be completed and received by the Seller by that deadline, the Seller will have no duty to respond to any complaint or demand contained in such form, and any or all claims may be rejected. **COMPLETION AND DELIVERY OF SUCH NOTICE OF WARRANTY CLAIM IN A TIMELY MANNER IS NECESSARY TO PROTECT THE RIGHTS OF THE PURCHASER UNDER THIS LIMITED WARRANTY.**

(b) No steps taken by the Seller, the Purchaser or any other person to inspect, test or correct defects will extend any time period under this Limited Warranty. No steps taken by the Seller in response to an improperly completed or untimely notice of a warranty claim will give rise to any liability of the Seller to the Purchaser in connection with such claim.

(c) In response to a Notice of Warranty Claim, or any other complaint or request of the Purchaser, the Seller and the Seller's agents will have the right to inspect and test the portion of the Home to which the claim, complaint or request relates. The Purchaser and occupants of the Home must provide reasonable access to the Seller and the Seller's agents during normal business hours, Monday through Friday, to complete inspection, testing and repair or replacement. Failure by the Purchaser to provide such access shall invalidate this Limited Warranty with respect to the defect(s) set forth on the Notice of Warranty Claim.

(d) The Seller will complete inspection and testing within a reasonable time under the circumstances after receipt of a timely and properly completed Notice of Warranty Claim. Upon completion of inspection and testing, the Seller will determine whether to accept or reject the claim. If the Seller rejects the claim, the Seller will give written notice of that decision to the Purchaser at the address shown on the Notice of Claim Form. If the Seller accepts the claim, the Seller will take corrective action within a reasonable time under the circumstances. The Seller will use good faith efforts to process and handle claims in a timely manner, but all time periods for repair or replacement of defects necessary are subject to weather conditions, availability of materials, and other events beyond the Seller's control.

## 8. Legal Actions.

(a) No claim under this Limited Warranty may be commenced or asserted against the Seller in any lawsuit unless a properly completed Notice of Warranty Claim has been received by the Seller in the time period set forth in Paragraph 7 of this Limited Warranty.

(b) No lawsuit against the Seller under this Limited Warranty may be commenced more than thirty (30) days after the expiration date of the applicable warranty coverage, or thirty (30) days after the Seller has given written notice of its rejection of the Purchaser's claim with respect to such claim, or thirty (30) days after the Seller has substantially completed corrective action for a defect with respect to such defect, as any or all of the same are applicable.

SSD

**9. Miscellaneous Provisions.**

(a) To the extent any coverage under this Limited Warranty applies to common elements of a condominium, such coverage shall be deemed given to the Board of Managers of the condominium.

(b) This Limited Warranty may not be amended in any way without the Seller's prior written consent in each instance.

(c) If any provision of this Limited Warranty will not be enforced by an appropriate court, the determination will not affect the enforceability of the remaining provisions.

(d) Use of one gender in this Limited Warranty includes the other gender, and use of the plural includes the singular, as may be appropriate.

(e) This Limited Warranty shall be governed in accordance with the laws of the State of New York.

## NOTICE OF WARRANTY CLAIM

Dear Purchaser:

To ask the Seller to correct a defect in your Home that you think is covered by the Seller's Limited Warranty, you must complete this form and deliver it to the Seller. This is necessary to protect your rights to warranty performance under the Limited Warranty.

The information you will need to fill out the form will be on page 1 of the Limited Warranty. If you do not know the answers to any questions, however, write "Don't Know." Please do not leave any items blank.

Your Name: _____

Mailing Address: _____

Telephone No.: _____

Home No.: _____ Effective Date of Warranty: _____

Describe the defect(s) which you think are covered by the Limited Warranty. Be sure to include when each defect first occurred or when you first noticed it. Use additional sheets, as necessary, to fully describe the problem:

_____

_____

_____

_____

_____

_____          _____
Date                                Owner

_____          _____
Date                                Owner

This completed and signed form must be sent to the Seller at its address listed on the first page of the Limited Warranty by certified or express mail, return receipt requested.

SSD
7

## EXHIBIT "B"

## ESCROW AGREEMENT

**AGREEMENT** made this 27 day of January , 20 19, by and among STEPHEN & SUSAN DORSEY ("PURCHASER"), BLITMAN SARATOGA LLC ("SPONSOR"), as Sponsor of the BEAVER POND VILLAGE HOMEOWNERS' ASSOCIATION, INC.'s offering plan ("Plan"), and MAZZOTTA & VAGIANELIS, P.C. ("ESCROW AGENT").

**WHEREAS**, SPONSOR has filed the Plan and any amendments thereto with the Attorney General to offer for sale homeowners' association ownership interests at the premises located at Geyser Road, City of Saratoga Springs, County of Saratoga, State of New York, subject to the terms and conditions set forth in the Plan; and

**WHEREAS**, ESCROW AGENT is authorized to act as an escrow agent hereunder in accordance with New York General Business Law ("GBL") Sections 352-e(2-b), 352-h and the New York Department of Law's regulations promulgated thereunder; and

**WHEREAS**, SPONSOR and PURCHASER desire that ESCROW AGENT act as escrow agent for deposits, down payments, and advances (referred to herein as "Deposit") pursuant to the terms of this Agreement.

**NOW, THEREFORE**, in consideration of the covenants and conditions contained herein and other good and valuable consideration, the parties hereby agree as follows:

## 1.   ESTABLISHMENT OF THE ESCROW ACCOUNT.

1.1.   ESCROW AGENT has established an escrow account for the purpose of holding the Deposit made by PURCHASER pursuant to that certain purchase agreement for the purchase and sale of ownership interests (the "Purchase Agreement") at M & T Bank located at 327 Great Oaks Boulevard, Albany, New York 12203, a bank authorized to do business in the State of New York which account is covered by Federal bank deposit insurance. The escrow account is entitled Beaver Pond Village Escrow Account ("Escrow Account").

1.2   ESCROW AGENT has designated the following attorney to serve as signatory: John N. Vagianelis. All designated signatories are admitted to practice law in the State of New York. All of the signatories on the Escrow Account have an address of Mazzotta & Vagianelis, P.C., 9 Washington Square, Albany, New York 12205, and a telephone number of 518-452-0941.

1.3   ESCROW AGENT and all authorized signatories hereby submit to the jurisdiction of the State of New York and its Courts for any cause of action arising out of this Agreement or otherwise concerning the maintenance of or release of the Deposit from escrow.

1.4   Neither ESCROW AGENT nor any authorized signatories on the Escrow Account are the Sponsor, Selling Agent, Managing Agent (as those terms are defined in the Plan), or any principal thereof, or have any beneficial interest in any of the foregoing.

1.5   The Escrow Account is not an IOLA account established pursuant to Judiciary Law Section 497.

_SSD_

_SmP_

## 2.   DEPOSITS INTO THE ESCROW ACCOUNT.

2.1   All Deposits received from PURCHASER prior to closing, whether in the form of checks, drafts, money orders, wire transfers, or other instruments which identify the payor, shall be placed into the Escrow Account. Deposits in to the escrow account in excess of $250,000 will not be federally insured in excess of $250,000. All instruments to be placed into the Escrow Account shall be made payable directly to the order of Mazzotta & Vagianelis, P.C., as ESCROW AGENT, pursuant to the terms set forth in the Plan. Any instrument payable to, or endorsed other than as required hereby, and which cannot be deposited into such Escrow Account, shall be returned to PURCHASER promptly, but in no event more than five (5) business days following receipt of such instrument by ESCROW AGENT. In the event of such return of the Deposit, the instrument shall be deemed not to have been delivered to ESCROW AGENT pursuant to the terms of this Agreement.

2.2   Within five (5) business days after the Escrow Agreement is signed by all necessary parties and has been tendered to ESCROW AGENT along with the Deposit, ESCROW AGENT shall place the Deposit into the Escrow Account. No fees of any kind shall be deducted from the account principal or any interest earned thereon. SPONSOR shall bear any administrative cost for maintenance of the account. Within ten (10) business days after the Escrow Agreement is signed by all necessary parties and the Deposit is placed in the Escrow Account, ESCROW AGENT shall provide written notice to PURCHASER and SPONSOR confirming the Deposit. Such notice shall set forth the Bank, the account number, and the initial interest rate earned thereon. If the PURCHASER does not receive notice within fifteen (15) business days after tender of the Deposit, the PURCHASER may cancel the purchase and rescind within ninety (90) days after tender of the Deposit. Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, N.Y. 10271. Rescission shall not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely placed in the Escrow Account in accordance with the New York State Department of Law's regulations concerning the Deposit and requisite notice was timely mailed to the Purchaser.

## 3.   RELEASE OF FUNDS.

3.1   Under no circumstances shall SPONSOR seek or accept release of the Deposit of a defaulting PURCHASER to SPONSOR until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan shall not relieve SPONSOR or ESCROW AGENT of any obligation to PURCHASER as set forth in GBL §§ 352-e(2-b) and 352-h.

3.2   ESCROW AGENT shall release the Deposit to PURCHASER or SPONSOR as directed:

3.2.1   pursuant to terms and conditions set forth in the Purchase Agreement and this Agreement, upon closing of title to the ownership interest;

3.2.2   in a subsequent writing signed by both SPONSOR and PURCHASER; or

3.2.3   by a final, non-appealable order or judgment of a court.

3.3   If Escrow Agent is not directed to release the Deposit pursuant to paragraph 3.2 above, and Escrow Agent receives a request by either SPONSOR or PURCHASER to release the Deposit, then ESCROW AGENT must give both the PURCHASER and SPONSOR prior written notice of not

fewer than thirty (30) days before releasing the Deposit. If Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and Escrow Agent shall provide further written notice to both PURCHASER and SPONSOR informing them of said release. If ESCROW AGENT receives a written notice from either PURCHASER or SPONSOR objecting to the release of the Deposit within said thirty (30) day period, ESCROW AGENT shall continue to hold the Deposit until otherwise directed pursuant to paragraph 3.2 above. Notwithstanding the foregoing, ESCROW AGENT shall have the right at any time to deposit the Deposit contained in the Escrow Account with the Clerk of the county where the interest is located and shall give written notice to both SPONSOR and PURCHASER of such deposit.

3.4   SPONSOR shall not object to the release of the Deposit to:

3.4.1  PURCHASER, if PURCHASER timely rescinds in accordance with an   offer of rescission contained in the Plan or an Amendment to the Plan; or

3.4.2  PURCHASER, after an Amendment abandoning the Plan is accepted for   filing by the New York State Department of Law.

## 4.   ALTERNATIVES TO ESCROW ACCOUNT.

4.1   A bond, letter of credit or other security may be substituted for the Escrow Account only after the Department of Law approves in writing the use of such alternate form of security pursuant to its regulations.

## 5.   RECORDKEEPING.

5.1   ESCROW AGENT shall maintain all records concerning the Escrow Account for seven (7) years after release of the Deposit.

5.2   Upon the dissolution of the law firm which was ESCROW AGENT, the former partners or members of the firm shall make appropriate arrangements for the maintenance of these records by one of the partners or members of the firm or by the successor firm and shall notify the New York State Department of Law of such transfer.

5.3   ESCROW AGENT shall make available to the Attorney General, upon request, all books and records of ESCROW AGENT relating to the funds deposited and disbursed hereunder.

## 6.   GENERAL OBLIGATIONS OF ESCROW AGENT.

6.1   ESCROW AGENT shall maintain the Escrow Account under its direct supervision and control.

6.2   A fiduciary relationship shall exist between ESCROW AGENT and PURCHASER, and ESCROW AGENT acknowledges its fiduciary and statutory obligations pursuant to GBL§§ 352-e(2-b) and 352-h.

6.3   ESCROW AGENT may rely upon any paper or document which may be submitted to it in connection with its duties under this Escrow Agreement and which is believed by ESCROW AGENT to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

## 7.    RESPONSIBILITIES OF SPONSOR.

7.1    SPONSOR agrees that it shall not interfere with ESCROW AGENT'S performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-h and the New York State Department of Law's regulations.

7.2    SPONSOR shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from PURCHASER and deliver such form to ESCROW AGENT together with the Deposit and Purchase Agreement.

## 8.    TERMINATION OF AGREEMENT.

8.1    This Agreement shall remain in effect unless and until it is canceled by either:

8.1.1    Written notice given by SPONSOR to ESCROW AGENT of cancellation of designation of ESCROW AGENT to act in said capacity, which cancellation shall take effect only upon the filing of an amendment to the Plan with the Department of Law providing for a successor escrow agent that meets the requirements set forth in applicable regulations of the New York State Department of Law.  PURCHASER shall be deemed to have consented to such cancellation;

8.1.2    The resignation of ESCROW AGENT, which shall not take effect until ESCROW AGENT is replaced by a successor escrow agent that meets the requirements set forth in applicable regulations of the New York State Department of Law, and notice is given to PURCHASER of the identity of the successor escrow agent, the Bank in the State of New York where the Deposit is being held, and the account number therefor.

8.2    Upon termination of the duties of ESCROW AGENT as described in paragraph 8.1.1 or 8.1.2 above, ESCROW AGENT shall deliver the Deposit held by ESCROW AGENT and the Purchase Agreement and any other documents maintained by ESCROW AGENT relating to the Deposit to the successor escrow agent.

## 9.    SUCCESSORS AND ASSIGNS.

This Agreement shall be binding upon SPONSOR, PURCHASER, and ESCROW AGENT and their respective successors and assigns.

## 10.    GOVERNING LAW.

This Agreement shall be construed in accordance with and governed by the laws of the State of New York.

## 11.    ESCROW AGENT'S COMPENSATION.

Prior to release of the Deposit, ESCROW AGENT'S fees and disbursements shall neither be paid by SPONSOR from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

## 12.    SEVERABILITY.

SSD

11

If any provision of this Agreement or the application thereof to any person or circumstance is determined to be invalid or unenforceable, the remaining provisions of this Agreement or the application of such provision to other persons or to other circumstances shall not be affected thereby and shall be valid and enforceable to the fullest extent permitted by law.

## 13.   INDEMNIFICATION.

SPONSOR agrees to defend, indemnify, and hold ESCROW AGENT harmless from and against all costs, claims, expenses, and damages incurred in connection with or arising out of this Agreement or the performance or non-performance of ESCROW AGENT'S duties under this Agreement, except with respect to actions or omissions taken or suffered by ESCROW AGENT in bad faith or in willful disregard of this Agreement or involving gross negligence of ESCROW AGENT. This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by ESCROW AGENT to itself.

## 14.   ENTIRE AGREEMENT.

This Agreement, read together with GBL §§ 352-e(2-b) and 352-h and the New York State Department of Law's regulations, constitutes the entire agreement between the parties with respect to the subject matter hereof.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

SIGNATURES TO FOLLOW

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the day and year first written above.

SSO

12

M:\6345\16466-East Ave Saratoga-Beaver Pond\Beaver Pond Purchase Agreement\Purchase Agreement.revised 1.15.2019.doc

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the day and year first written above.

PURCHASER(S):

X _Stephen M. Doney_

X _Susan Serve Dm_

By: _____

     Name: _____

     Title: _____


SPONSOR:
BLITMAN/SARATOGA LLC

By: _____
Name:
Title:    Authorized Representative


ESCROW AGENT:
MAZZOTTA & VAGIANELIS, P.C.

By: _____
Name: John N. Vagianelis, Esq.
Title:    Authorized Signatory

_AmD_

FIFTH SUPPLEMENTAL DECLARATION OF PROTECTIVE COVENANTS,
CONDITIONS, RESTRICTIONS, EASEMENTS, CHARGES AND LIENS

OF

BEAVER POND VILLAGE HOMEOWNERS' ASSOCIATION, INC.

Geyser Road
City of Saratoga Springs
Saratoga County, New York

Beaver Pond Village Homeowners' Association, Inc.
City of Saratoga Springs, County of Saratoga, New York

**THIS Fifth Supplemental Declaration of Protective Covenants, Conditions, Restrictions, Easements, Charges and Liens** of the Beaver Pond Village Homeowners' Association, Inc. (the "Association") made this ___ day of January, 2019 supplements the Declaration of Protective Covenants, Conditions, Restrictions, Easements, Charges and Liens of Beaver Pond Village Homeowners' Association, Inc., dated December 19, 2011 and recorded April 12, 2012 in the Saratoga County Clerk's Office as Instrument Number 2012013160 (the "Declaration"), the Amendment to the Declaration of Protective Covenants, Conditions, Restrictions, Easements, Charges and Liens of Beaver Pond Village Homeowners' Association, Inc., dated February 28, 2013 and recorded March 6, 2013 in the Saratoga County Clerk's Office as Instrument Number 2013010158 (the "Amendment"), the Supplemental Declaration of Protective Covenants, Conditions, Restrictions, Easements, Charges and Liens of Beaver Pond Village Homeowners' Association, Inc., dated March 11, 2014 and recorded March 26, 2014 in the Saratoga County Clerk's Office as Instrument Number 2014211897016 (the "Supplemental Declaration"), the Second Supplemental Declaration of Protective Covenants, Conditions, Restrictions, Easements, Charges and Liens of Beaver Pond Village Homeowners' Association, Inc., dated November 16, 2015 and recorded November 20, 2015 in the Saratoga County Clerk's Office as Instrument Number 2015034936 (the "Second Supplemental Declaration") and the Third Declaration of Protective Covenants, Conditions, Restrictions, Easements, Charges and Liens of Beaver Pond Village Homeowners' Association, Inc., dated May 24, 2017 and recorded June 6, 2017 in the Saratoga County Clerk's Office as Instrument Number 2017017358 (the "Third Supplemental Declaration") and the Fourth Declaration of Protective Covenants, Conditions, Restrictions, Easements, Charges and Liens of Beaver Pond Village Homeowners' Association, Inc. dated December 21, 2017 and recorded January 8, 2018 in the Saratoga County Clerk's Office as Instrument Number 2018000658 (the "Fourth Supplemental Declaration").

**WHEREAS,** as of the date of this instrument, BLITMAN SARATOGA LLC, ("Sponsor"), and SARATOGA EAST AVENUE ASSOCIATES, LLC (Original Sponsor) are the sole owners of all of the building lots contained in Beaver Pond Village "Section VI" and "Section VII" referenced in Schedule "B" attached to the Declaration and incorporated herein. At the time of execution of this Fifth Supplemental Declaration, no homes in said Schedule "B", "Sections VI" and "Section VII" have been sold; and

**WHEREAS,** pursuant to Article II, Section 2.02(b)(1) of the Declaration, the Sponsor may extend the provisions of the Declaration and any Amendment thereto, from time to time, to all or any portion of land more particularly described in Schedule "B" to the Declaration, without obtaining the approval of the Members of the Association or any other Person, by recording in the Saratoga County Clerk's Office one or more Supplemental Declarations, with respect to the additional land; and

**WHEREAS,** the Sponsor desires to extend the provisions of the Declaration and any Amendment(s) thereto to apply to all the land in Schedule "B" of the Declaration comprised of: (1) any and all building lots in Section VI, to wit: Lots 64-70 and Lot 84, as shown on the Map

550

entitled "Subdivision Plan, Section VI, BEAVER POND VILLAGE CITY OF SARATOGA SPRINGS", dated February 23, 2018, prepared by Boswell Engineering and filed in the Saratoga County Clerk's Office on December 27, 2018 as Instrument Number M2018303, and (2) any and all building lots in Section VII, to wit: Lots 75-83 as shown on the Map entitled "Subdivision Plan, Section VII, BEAVER POND VILLAGE CITY OF SARATOGA SPRINGS", dated February 23, 2018, prepared by Boswell Engineering and filed in the Saratoga County Clerk's Office on December 27, 2018 as Instrument Number M2018304; and

**WHEREAS,** SARATOGA EAST AVENUE ASSOCIATES, LLC joins in this Fifth Supplemental Declaration in order to memorialize its consent to the extension of the provisions of the Declaration and any Amendment(s) thereto to Section VI, Lot 84 and Section VII, Lots 79-83 inclusive, title to which Lots was reserved and retained by SARATOGA EAST AVENUE ASSOCIATES, LLC in Deed to Sponsor dated April 4, 2012 and recorded in the Office of the Saratoga County Clerk on April 12, 2012 as Instrument No. 2012013161;

**NOW, THEREFORE,** the Declaration, any Amendment and any Supplemental Declaration thereto shall be supplemented by extending the provisions of the Declaration and any Amendment thereto to all the land more particularly described above and upon such extension, the Owners of such lands shall automatically become Owners subject to, and entitled to the benefits of, the Declaration and any Amendments thereto, the By-Laws and the Rules and Regulations including, without limitation, the obligation to pay Assessments for their proportionate share of the expenses of the Association in accordance with Article II, Section 2.02(c) of the Declaration.

**IN WITNESS WHEREOF,** those signing hereinbelow have caused this Fifth Supplemental Declaration to be executed the day and year first above written.

BLITMAN SARATOGA LLC, Sponsor

_____

Howard N. Blitman
Authorized Representative

SARATOGA EAST AVENUE ASSOCIATES, LLC

_____

Scott P. Varley, Member and
Authorized Representative

STATE OF NEW YORK                 )
                                  ) ss.:
COUNTY OF WESTCHESTER             )

On this _____ day of January in the year 2019, before me, the undersigned, a Notary Public in and for said State, personally appeared HOWARD N. BLITMAN, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed in the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public - State of New York
My Commission Expires:

STATE OF NEW YORK                 )
                                  ) ss.:
COUNTY OF _____         )

On this _____ day of January in the year 2019, before me, the undersigned, a Notary Public in and for said State, personally appeared SCOTT P. VARLEY, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed in the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public - State of New York
My Commission Expires:

*SS*

**Addendum to New York State Disclosure Form for Buyer and Seller**

## DISCLOSURE OF OWNERSHIP INTEREST

New York State law requires a licensed real estate broker, before the licensed real estate broker sells property in which he owns an interest, to make such interest known to the purchaser.

Pursuant to New York State law, it is therefore disclosed that Scott Varley, a New York State licensed associate real estate broker with The Scott Varley Team Keller Williams, is a member of Blitman Saratoga LLC, the Sponsor and Seller of the lots for sale in the Beaver Pond Subdivision.

This form was provided to me by _Michelle DeCotteau_ of The Scott Varley Team Keller Williams.

Signature of Buyer:                    Signature of Seller:

X _____               *Blitman Saratoga LLC*

X _____               *By: Yolen H. Wait*

Date: _1/27/19_                        Date: _1/31/19_

### AMENDMENT TO PURCHASE AGREEMENT
### DATED JANUARY 27, 2019
### BETWEEN
### BLITMAN SARATOGA, LLC ("SELLER") AND
### STEPHEN M. AND SUSAN S. DORSEY ("PURCHASERS")

**WHEREAS**, Seller and Purchasers are parties to a contract for the purchase and sale ("Contract") of Lot 76 Beaver Pond Village Subdivision (6 Katie Lane), in the City of Saratoga Springs, County of Saratoga and State of New York (the "Premises"), and

**WHEREAS**, Seller and Purchasers have agreed to substitute another building lot within the Beaver Pond Village Subdivision for the construction of the new dwelling to be erected for the Purchasers in lieu of the Premises;

**NOW, THEREFORE**, the parties hereto hereby agree to amend Paragraph 1 of the Contract to read as follows:

**1. Sale of Home.** The Seller agrees to sell and convey, and the Purchaser agrees to purchase: All that certain plot, piece or parcel of land, the buildings and improvements thereon erected or to be erected, situate, lying and being in the City of Saratoga Springs, County of Saratoga and State of New York, known as Lot No. 77 on a Map entitled "Beaver Pond Village," filed in the Saratoga County Clerk's Office on December 5, 2011 as Map 2011206, as the same may be amended hereafter, including any amendments, changes and modifications to lot lines and shifting of boundaries (the "Lot" or the "Premises"). The home to be constructed on the Premises (the "Home") shall conform substantially in appearance to Model Type ROSEWOOD II, as per plans and specifications on exhibit by the Seller in the Seller's sales office.

Any and all references to "Lot 76" and/or "6 Katie Lane" or "the (P)remises" in the Purchase Agreement or in any materials annexed or appended to the Purchase Agreement, including, but not limited to, the Seller's Limited Warranty and Change Orders (if any) shall be amended to read, where and as appropriate: "**Lot 77**" and/or "**8 Katie Lane**".

The remaining terms and provisions of the Purchase Agreement and materials annexed or appended thereto, as same may have been modified by attorney's approval letter dated February 13, 2019 (signed by attorneys for both Seller and Purchasers) are hereby restated as if fully set forth herein.

This amendment may be signed in counterparts.

**BLITMAN SARATOGA, LLC, Seller**

By: _____ Date: 2/20/19

Title: Robin H. Winter

_____    2/19/19
Stephen M. Dorsey, Purchaser    Date

_____    2/19/19
Susan S. Dorsey, Purchaser    Date