UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

In re:                                                  Chapter 11

Blitman Saratoga LLC,                                   Case No. 20-23177 (SHL)

                             Debtor.
---------------------------------------------------------x

## DEBTOR'S DISCLOSURE STATEMENT

The Debtor herein, Blitman Saratoga LLC (the "Debtor"), submits this Disclosure Statement pursuant to 11 U.S.C. §1125 (the "Disclosure Statement") in support of the Debtor's accompanying Revised Chapter 11 Plan of Reorganization (as it may be further amended or supplemented, the "Plan")[1] (ECF Nos. 165 and 166). The Disclosure Statement is being submitted to all known holders of Claims against, or Interests in, the Debtor in order to adequately disclose information deemed to be material, important and necessary for creditors to make a reasonably informed decision whether to accept or reject the Plan. Insofar as the general unsecured creditors are concerned, the Plan provides a fifty (50%) percent distribution to holders of allowed Class 2 general unsecured claims from an existing confirmation fund of $600,000 which is being held in escrow by the Debtor's counsel as disbursing agent.

## I.    INTRODUCTION

The Debtor is a real estate development company which filed for Chapter 11 relief in November 2020 with the goal of completing a residential development project known as "Beaver Pond Village" in Saratoga Springs, NY (the "Project"). At the time of the bankruptcy filing, the Debtor had built and sold 56 homes and was a party to eight (8) pending purchase and sale agreements for the remaining homes under construction. Additionally, the Debtor retained

---

[1] Capitalized and defined terms used in the Plan shall have the same meanings for purposes of this Disclosure Statement.

residual rights to sell the model home, plus owned thirteen (13) vacant lots that can be sold or developed.

By November 2020, however, construction on the Project had come to a standstill.  The Debtor had exhausted its borrowing eligibility under various pre-petition loans with Ballston Spa National Bank ("BSNB").  Efforts to buyout the BSND loans were unsuccessful in the wake of a falling-out between financial investors and management (primarily the Goren family) who lost confidence in the leadership of Howard Blitman, and his daughter, Robin Winter (the "Blitman Family").  The decision was made by the Goren family to seek Chapter 11 relief in contemplation of utilizing DIP financing to be provided by Saratoga Funding LLC, an affiliated company headed by James Goren (the "DIP Lender"), to reignite the Project.

In bankruptcy, the Debtor obtained interim and final authorization to borrow up to the sum of $3,100,000 (the "DIP Loan"). The DIP Loan was used to refinance the pre-petition secured debts owed BSNB in the total sum of $1,893,438.92 via an assignment of all secured claims and guarantees to the DIP Lender.  Additionally, the DIP Loan provided additional working capital to resume construction in despite the great challenges presented by the ongoing Covid-19 pandemic.

During the Chapter 11 case, the Debtor managed to complete and close on four (4) homes and sold the model home.  From the sale of the homes at 47 Jane Street and 49 Jane Street, the Debtor established the Confirmation Fund of $600,000 earmarked to fund the immediate cash obligations under the Plan on the Effective Date, including a proposed 50% *pro rata* cash dividend to the holders of allowed Class 2 claims of vendors, service providers and contractors. The Plan also contemplates a "roll-up" of all debts and obligations owed to the DIP Lender as

the Class 1 Secured Creditor to be paid on a post-confirmation basis from the sale of the Remaining Homes and Vacant Lots.

In recent months, issues with the City of Saratoga Springs ("City") have gained prominence relating to outstanding infrastructure required for the Project. The infrastructure requirements relate mainly to paving the streets with a top coating, and installing streetlights and sidewalks, plus related landscaping for Phases I-V of the Project. From the sale of 55 Jane Street, the Debtor has also established a separate escrow in the sum of $375,000 to address infrastructure requirements. The Debtor is working with local officials to finalize a timeline for completion of infrastructure relating to Phases I-V.

## II.    THE CONFIRMATION PROCESS

### A.    The Scope of this Disclosure Statement and Committee Support

This Disclosure Statement has been prepared by the Debtor in consultation with its attorneys, Goldberg Weprin Finkel Goldstein LLP. As noted above, the purpose of this Disclosure Statement is to provide creditors and other parties-in-interest with relevant information regarding the Debtor's current financial affairs to allow creditors to make an informed decision on whether to vote in favor of the Plan.

The Disclosure Statement has been approved by the Bankruptcy Court as containing adequate information within the meaning of 11 U.S.C. §1125. The Bankruptcy Court's approval of the Disclosure Statement, however, does not constitute an endorsement of the Plan. Instead, creditors are urged to review the Plan in its entirety before voting. Creditors may consult with the undersigned as counsel for the Debtor, Thomas Keaney as the managing member of the Debtor, or Frank Brennan as counsel for the Official Committee of Unsecured Creditors (the "Committee"), with any questions. The Committee supports the Plan and joins with the Debtor

in urging acceptance of the Plan by all impaired classes of creditors. Mr. Brennan's firm, Nolan Heller Kaufman LLP were retained as the Committee's counsel pursuant to Order dated June 1, 2021.

## B.    The Confirmation Hearing

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan on May/June ___, 2023 at 10:00 a.m., prevailing New York Time. The hearing will be conducted by the Honorable Sean Lane, at the United States Bankruptcy Court in White Plains, New York via the Court's eCourt Appearance through the Court's website at:

https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.

At the hearing, the Bankruptcy Court will determine whether the requirements of Section 1129(a) or (b) of the Bankruptcy Code have been satisfied in order to permit confirmation and Bankruptcy Court approval of the Plan. Bankruptcy Court approval and confirmation of the Plan makes the Plan binding upon the Debtor and all of the Debtor's creditors and other parties-in-interest.

The Bankruptcy Court has entered an Order (the "Scheduling Order") scheduling the confirmation hearing and directing that objections, if any, shall be served upon counsel to the Debtor, Goldberg Weprin Finkel Goldstein LLP, 1501 Broadway, 22nd Floor, New York, New York 10036, Attn: Kevin J. Nash, knash@gwfglaw.com; counsel to the Official Committee of Unsecured Creditors, Nolan Heller Kauffman LLP, 80 State Street, 11th Floor, Albany, NY 12207, Attn: Francis J. Brennan, Esq., fbrennan@nolanandheller.com; and the Office of the United States Trustee, New York, NY, Greg Zipes, Esq., greg.zipes@usdoj.gov. The Scheduling Order accompanies the Plan and Disclosure Statement, and creditors are advised to review the dates and deadlines contained therein for voting and objections.

### C.    Voting

For the Plan to be accepted on a consensual basis, all impaired classes of creditors must vote to accept the Plan or be deemed to accept the Plan as a matter of law.  Acceptance of the Plan is based upon the actual votes cast by each class of creditors holding at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims of those creditors in the particular class who actually vote on the Plan.  Even if the Plan is not approved by all voting classes of impaired claims, the Debtor can still confirm the Plan under the cramdown provisions of 11 U.S.C. §1129(b).

In this case, Class 1, the secured DIP Claim of Saratoga Funding LLC as the DIP Lender is impaired.  Additionally, the Class 2 claims of all unsecured creditors consisting of contractors, vendors and suppliers is also impaired and eligible to vote on the Plan.  A ballot for acceptance or rejection of the Plan accompanies the Plan.  The Ballot and should be completed by each creditor and returned before the voting deadline by either overnight mail or email to Goldberg Weprin Finkel Goldstein LLP, Attn: Kevin J. Nash, 125 Park Avenue, 12th Floor, New York, New York 10017.  Facsimile: (212) 422-6836.  E-mail: KNash@GWFGlaw.com.  In order to be counted, a ballot must be actually received on or before _____, 2023 at 5:00 pm. (the "Voting Deadline").  Only timely submitted ballots will be counted towards confirmation of the Plan.

### D.    Nature of the Representations

1.    NO REPRESENTATION CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS CONTRARY TO THE DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY CREDITORS.  THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT ALTHOUGH GREAT EFFORTS HAVE BEEN MADE BY THE DEBTOR AND ITS COUNSEL TO PROVIDE CREDITORS WITH ACCURATE AND UPDATED INFORMATION.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN.  WHILE THE DEBTOR BELIEVES THAT THE SUMMARY IS FAIR AND ACCURATE, SUCH SUMMARY IS QUALIFIED TO THE EXTENT THAT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN.  **IF ANY**

INCONSISTENCIES EXIST BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL.

## III.     RELEVANT BACKGROUND INFORMATION

**A.     Significant Events Leading to Chapter 11 Filing and Resumption of State Court Litigations**

As indicated above, the commencement of the Chapter 11 case was precipitated by the Debtor's lack of cash liquidity.  Historically, the Debtor was a party to two separate credit facilities with BSNB.  By November 2020, the credit facilities had reached their limits.  While BSNB loan obligations were principally guaranteed by James Goren and Howard Blitman, James Goren's efforts to obtain Howard Blitman's agreement to contribute equally on a 50-50 basis to the payment of the BSNB loans were unsuccessful.  This impasse led to the commencement of the Chapter 11 case on November 6, 2020.  Investor discord ultimately also led to the filing of the two State Court lawsuits in Suffolk County, captioned Blitman Saratoga et al. v. Robin Winter, et al. (Index No. 611885/2020) and Goren Brothers Limited Partnership, et al. v. Robin Winter, et al. (Index No. 601642/2021) (collectively the "State Court Litigations").

The Plan recognizes the pendency of the State Court Litigations as the vehicle and forum to resolve any and all insider disputes.  Following confirmation of the Plan, the State Court Litigations involving the Debtor's investors and their affiliates shall resume promptly after the Effective Date under the Plan, outside of bankruptcy, without any further restrictions imposed by the bankruptcy proceedings.  The State Court Litigations shall also include claims by the DIP Lender against the Estate of Howard Blitman to recover under his guarantee of the BSNB debt.  For purposes of the Plan, all filed claims of all insiders (*i.e.*, both the Goren Family and the Blitman Family) shall not receive a distribution in bankruptcy. Instead, all claims of Insiders shall be litigated to conclusion as applicable in connection with the State Court Litigations.

**B.**     **Major Post-Petition Events**

**DIP Financing**  The Initial focus of the Chapter 11 case was to obtain Bankruptcy Court approval of the proposed $3.1 million DIP Loan.  Without such approval, the Chapter 11 case would have been "DOA – dead on arrival".  A detailed motion and supporting application was filed on November 19, 2022 (ECF No. 6).  The Court entered an interim order on December 8, 2020 over the objection of Howard Blitman and entered a final order on February 5, 2021.  The DIP Lender closed with BSNB on the refinance and has funded the balance of the DIP Loan for construction.  As of the date hereof, the DIP Lender is owed a total debt of at least $2,650,000 as of the end of last year, including a principal balance of $2,456,873.59 plus accrued interest.

**C.**     **Sale of Homes**

During the course of the Chapter 11 case, the Debtor completed the sales of the following homes:

a.     Model home at 4 Pamela Court sold to Robert McGhee for $725,000, less payment of $145,000 to purchase the land from Scott Varley.

b.     59 Jane Street sold to Frank Colone for $586,910, less credits and prepayments ($145,175).

c.     47 Jane Street sold to the Bennice family for $473,328, including extras.

d.     49 Jane Street sold to the Colella family for $691,000, less Eastin family settlement ($113,650).

e.     57 Jane Street sold to the Guiffre family for $538,000, less credits ($11,000).

The net proceeds realized from the initial sales of the homes were used to pay down the DIP Loans.  However, with respect to the later sales, the DIP Lender agreed to defer payments so as to enable the Debtor to establish the Confirmation Fund of $600,000 and Infrastructure Reserve of $375,000, for a total of $975,000 of deferred payments.

D.    **Residual Homes**

Currently, the Debtor is working on completing the remaining homes in Phase VI and VII located at 8 Katie Lane (50% complete), 6 Katie Lane (40% complete), 9 Jane Street (30% complete) and 11 Jane Street (5% complete).  The Debtor projects that the costs for completion will aggregate approximately $1.36 million (to be funded by James Goren under an additional DIP Loan).  The additional financing is defendants on pending contracts being canceled with respect to 6 Katie Lane (Lesiak) and 9 Jane Street (Lythe). The Debtor projects that the four remaining homes (defined as the Remaining Homes under the Plan) can be sold for approximately $2.8 million.  The Debtor also projects that the vacant lots can be sold for approximately $150,000 a piece for a total projected amount of approximately $1,950,000.

E.    **Infrastructure**

While the City did not formally file a proof of claim in the Chapter 11 case, the City retains various rights in connection with completion of required site work and infrastructure for the Project. Prior to bankruptcy, the Debtor established four letters of credit totaling $950,000 to secure completion of the site work for all seven phases of the Project.  The immediate infrastructure needs relate to Phases I–V in which primarily involves installation of street lighting, road paving and top coating, sidewalks and related landscaping.  The last two phases of the Project (Phase VI and VII) also require completion of certain site work, which will be done after the Remaining Homes are completed and sold.  In order to address infrastructure concerns, the Debtor previously established a second reserve account totaling $375,000 (the "Infrastructure Reserve").  The Infrastructure Reserve was funded from the proceeds of the recent sale of 57 Jane Street and is dedicated solely to pay for infrastructure costs.  The Debtor has re-engaged Boswell Engineering to oversee the site work and intends to enter into a written stipulation confirming the schedule to complete infrastructure items

relating to Phases I through V, without the need to draw down on the letters of credit. The Debtor's working schedule for completion of site work and infrastructure relating to Phases I – V, which has been reviewed by the City, is attached hereto as <u>Exhibit</u> "A". The Debtor projects that many items will be completed by May 30, 2023 within the parameters of the Infrastructure Reserve of $375,000. An updated budget for the infrastructure work is annexed hereto as <u>Exhibit</u> "B". Upon completion of the infrastructure relating to Phases I -V, the letters of credit directly related to this work shall be cancelled, while the letters of credit securing site work for the last two Phases (VI and VII) shall be renewed by the Debtors until completion of this work as well.

**F.    <u>Brokers</u>**

During the Chapter 11 case, there has been much controversy about paying brokers on the completed four sales during the Chapter 11 case given the involvement of Scott Varley, who is a minority investor in the Debtor and associated with the local real estate firm (Keller Williams) handling the sales of homes on behalf of the Debtor since inception of the Project. While the Debtor believes that payment of brokerage commissions constitutes an ordinary course of business transaction and should be approved as part of the sale process, the Blitman Estate objected to paying any commissions to any brokers, even those independent of Scott Varley. Accordingly, all commissions have been held in escrow and the Debtor shall seek authorization to pay all eligible brokers in conjunction with Confirmation of the Plan.

## IV.    THE PLAN

The Plan constitutes a binding contract between the Debtor and its creditors to address pre-petition claims and the DIP Loan. Generally speaking, a Chapter 11 plan of reorganization must (i) divide Claims and Interests into separate categories and classes, (ii) specify the treatment that each

category and class is to receive under such plan, and (iii) contain other provisions necessary to implement the reorganization of the Debtor. A Chapter 11 plan may specify that the legal, equitable, and contractual rights of the holders of Claims or Interest in certain classes are either to be altered and modified or remain unchanged. Classes of claims which are altered and modified are deemed impaired and are eligible to vote. Conversely, classes of claims which remain unchanged are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan.

**A. Classification and Treatment of Claims and Interests under the Plan**

The Claims and Interests as defined by the Plan hereunder are classified as follows:

<u>**Class 1**</u> – The Claim of the DIP Lender and assignee of BSNB.

<u>**Class 2**</u> – Allowed Claims of Non-Insider Unsecured Creditors.

<u>**Class 3**</u> – Insider Claims

<u>**Class 4**</u> – The Membership and Equity Interests in the Debtor

**B. Unclassified Claims**

Pursuant to Section 1123(a) of the Bankruptcy Code, the Plan does not classify Administrative Expense Claims, Priority Tax Claims or U.S. Trustee Fees, all of which shall be paid in full as required by 11 U.S.C. §1129(a)(9).

<u>**Administrative Expense Claims**</u>. Administrative Expense Claims consist primarily of Professional Fees and Expenses, plus the costs and expenses to complete construction and infrastructure requirements. Except for Professional Fees, the holders of Administrative Expense Claims shall either be paid in the ordinary course of business or from the funds maintained in the Infrastructure Reserve. To date, the Debtor has issued checks of approximately $40,000 from

the Infrastructure Reserve as detailed in the attached correspondence annexed hereto as <u>Exhibit</u> "C".

**Professional Fees and Expenses**.  The requests for allowance of professional fees and expenses by the Debtor's counsel and the Creditors' Committee Counsel shall be filed no later than thirty (30) days after the Effective Date and remain subject to Bankruptcy Court approval. After notice and a hearing, as applicable, the allowed Professional Fees and Expenses shall be paid from the Confirmation Fund pursuant to appropriate Orders awarding such fees and expenses.  The Debtor projects that professional fees and expenses in the Chapter 11 case will aggregate approximately $225,000 itemized as follows: (a) Goldberg Weprin Finkel Goldstein - $190,000; and (b) Nolan Heller Kaufman - $35,000.

**Priority Tax Claims**.  Any residual Priority Tax Claims relating to the Debtor shall be paid in full from the Confirmation Fund on the Effective Date or from the proceeds of the sale of the Remaining Homes and Vacant Lots.

**U.S. Trustee Fees**.  The Debtor shall pay all accrued and billed U.S. Trustee Fees, together with any interest thereon, until the Chapter 11 case is closed by entry of a Final Decree.

### C.  Classification And Treatment of Claims

The Plan classifies Claims and Interests against the Debtor consistent with the applicable provisions of the Bankruptcy Code.

**Summary**.  The categories listed below classify Claims and Interests against the Debtor for all purposes, including voting, confirmation and distribution pursuant to Sections 1122 and 1123(a)(l) of the Bankruptcy Code, as summarized below:

| Class | Designation | Impaired | Entitled to Vote |
|-------|-------------|----------|------------------|
| Class 1 | Allowed Secured Claim of the DIP Lender | Yes | Yes |
| Class 2 | Unsecured Claims | Yes | Yes |
| Class 3 | Insider Claims | N/A | N/A |
| Class 4 | Membership Interests | N/A | N/A |

### Class 1: The Allowed Claim of The DIP Lender

**Classification** – Class 1 consists of the Allowed Claim of the DIP Lender.

**Background** – The Debtor was party to various mortgage loans made and issued by BSNB aggregating the net sum of $1,893,438.92 as of the Petition Date.  The Debtor sought and obtained authorization to refinance the BSNB mortgages throughout assignment as part of the overall DIP Loan and post-petition financing package approved by the Bankruptcy Court on February 5, 2021 (ECF No. 38).  After commencement of the Chapter 11 case, the Debtor paid down certain of the DIP loans from prior sales.  Currently, the Debtor owes the DIP Lender a principal balance of $2,456,873 as of December 2022, plus accrued interest since late 2021 at the prime rate of at least $170,000 for a total debt of at least $2,620,000 through the end of 2022, with interest continuing to accrue (the "Secured Debt").

**Treatment** – On and after the Effective Date, the Debtor shall continue to sell the Remaining Homes and Vacant Lots.  The DIP Lender shall be paid from the Net Sale Proceeds until such time as all outstanding sums under the DIP Loan are paid in full together with all accrued interest, fees and expenses.

### Class 2: Unsecured Claims

**Classification** – Class 2 consists of the Allowed Unsecured Claims.

**Background** – All contractors, service providers and vendors which provided work, labor and services in connection with the Project are all being treated as Unsecured Creditors regardless of whether they previously filed mechanic's liens.

**Treatment** – The holders of allowed Class 2 Non-Insider Unsecured Claims shall receive a cash distribution equal to approximately fifty (50%) percent of their Allowed Claims from the Confirmation Fund. The *pro rata* distribution shall be paid on the Effective Date in full satisfaction and settlement of all Class 2 Non-Insider Unsecured Claims and outstanding mechanic liens. If a Class 2 Claim is subject to an objection filed on or before the Claim Objection Date, then a separate reserve shall be established with the Disbursing Agent in an amount sufficient to pay the allocable *pro rata* share of the disputed Class 2 Claim, should such Claim become an Allowed Claim pursuant to Final Order or agreement with the Debtor. The Debtor estimates that the Allowed Class 2 Claims will aggregate around $750,000 with projected total dividends of approximately $361,900 as per the schedule and annexed hereto as Exhibit "D".

**Class 3: Insider Claims**

**Classification** – Class 3 consists of all Claims of Insiders, including the proofs of claim filed by or on behalf of Howard Blitman by Robin Winter (Claims 21, 22 and 23, as duplicated by Claims 29, 30 and 31), as well as by Howard Blitman's companies, Blitman Development Corp. (Claim No. 24), Changebridge Construction Corp. (Claim No. 25) and the Claim of Goren Cousins I LLC (Claim No. 32) (collectively, the "Insider Claims").

**Treatment** – All Insider Claims are deemed subordinated to Class 2 Claims. No distributions shall be made to Insider Claims from the Confirmation Funds in connection with the Plan. Instead, Insider Claims shall be determined and addressed in connection with the State Court Litigations after the Effective Date without any limitation or restrictions.

**Class 4:  Membership Interests**

**Classification** – Class 4 consists of the Equity Interests of the pre-petition members of the Debtor, as follows:

| | |
|---|---|
| Saratoga Goren Trust | 50% |
| Howard Blitman | 15% |
| Gary Peresiper | 15% |
| Scott Varley | 15% |
| Thomas P. Keaney | 5% |

**Treatment** – The respective rights and interests of members and Class 4 Interests shall continue post-confirmation in accordance with the Debtor's Operating Agreement, except that no members shall be eligible to receive any distributions in connection with the Plan.

### D.  Provisions For Implementation Of The Plan

The Plan shall be implemented in the first instance by the prompt distribution of the Confirmation Fund on the Effective Date.  These monies shall be used to pay all allowed Administrative Expenses and Priority Claims if the Debtor's choose and then fund the 50% *pro rata* distribution to Class 2 Non-Insider Unsecured Claims.  Insofar as the Class 1 Secured Claim of the DIP Lender is concerned, all DIP Liens and mortgage shall survive confirmation of the Plan.  Following the Effective Date, the Debtor is authorized to complete construction and pursue the sale of the Remaining Homes and Vacant Lots without the need for further Bankruptcy Court approval (the "Post-Effective Date Sales").  Based upon current projections, the Debtor will likely require exit or additional DIP Financing of up to $1,360,000 (the "Additional Financing") to complete construction of the Remaining Houses, itemized as follows: (a) 6 Katie Lane - $325,000; (b) 8 Katie Lane - $275,000; (c) 9 Jane Street - $325,000; and (d) 11 Jane Street - $425,000. As a condition of Additional Financing, the Debtor intends to terminate pending contracts with respect to 9 Jane Street (Lyethe family) and 6 Katie Lane

(Lesiak family) voluntarily or pursuant to 11 U.S.C. §365 to provide greater flexibility for future construction. All of the net Sale Proceeds (after closing costs, real estate taxes and brokerage) generated from the Post-Effective Date Sales shall be paid to the DIP Lender at the closings thereon to reduce the outstanding DIP Loan until such time (if ever) as the Class 1 Secured Claim of the DIP Lender is paid in full. The Reorganized Debtor shall retain full authority and discretion to market and sell the remaining Homes and Vacant Lots as the Debtor's current management believes appropriate to maximize value.

1.    **Sale Free and Clear of All Claims, Liens, Taxes and Interests.** The Remaining Homes and Vacant Lots shall continue to be sold free and clear of all liens, claims, taxes and interests pursuant to 11 U.S.C. §§ 363(b) and (f) and 1123(a)(5), with the DIP Lien to attach to the net Sale Proceeds.

2.    **Transfer Taxes**. The sale of each of the Remaining Homes and Vacant Lots (together with related Additional Financing) constitutes the making or delivery of an instrument of transfer pursuant to or in connection with confirmation of the Plan. Therefore, the Additional Financing, as well as Post-Effective Date Sales, shall be exempt from the payment of any mortgage recording or local or state stamp, real estate transfer or other similar taxes pursuant to 11 U.S.C. §1146(a).

3.    **Disbursing Agent**.

The Confirmation Order shall continue the appointment of Goldberg Weprin Finkel Goldstein LLP to act as Disbursing Agent to perform the following functions:

(i)    To assist local counsel (John Hayko, Esq.) in consummating the sale of the Remaining Homes and Vacant Lots;

(ii)    To maintain and disburse the Confirmation Fund;

(iii)    To review, settle, compromise, negotiate or otherwise resolve all Claims in dispute as of the Claim Objection Deadline;

(iv)     To implement and effectuate the provisions of this Plan, including rejection and termination of the purchase agreements relating to 9 Jane Stret and 6 Katie Lane; and

(v)     To move for entry of a Final Decree closing the Chapter 11 case.

**4.**     **Preservation of Causes of Action**.  Except as otherwise provided in the Plan, all pre-petition and post-petition claims and causes of action arising under federal or state law belonging, accruing or held by the Debtor as of the Effective Date shall vest in the Reorganized Debtor and may be enforced by the Reorganized Debtor following the Effective Date in connection with the State Court Litigations.

**E.  Treatment Of Executory Contracts**

The Debtor and Reorganized Debtor intend to negotiate to terminate the contracts to sell 6 Katie Lane and 9 Jane Street  and return all deposits.  If terminations of these agreement cannot be obtained voluntarily, the Debtor reserves the right to reject these agreements under 11 U.S.C. §365 as burdensome to the Debtor's estate.

**F.  No Discharge And No Third Party Releases**

**Binding Effect**.  On the Effective Date, the terms of this Plan shall be effective and enforceable and shall bind all holders of Claims against or interests in and against the Debtor, whether or not such holders voted to accept the Plan.

**No Discharge**.  Pursuant to Section 1141(d)(3) of the Bankruptcy Code, neither the Plan nor confirmation thereof shall discharge any Claim against the Debtor, except that receipt of a distribution shall constitute a valid and binding settlement of all outstanding claims and liabilities held by creditors.  All claims by and against Insiders shall not be affected by the Plan.  Thus, Insiders retain all legal rights and remedies against each other.

**Injunction.**   Except as otherwise provided herein, all creditors (except the DIP Lender) which have held, currently hold, or may hold Claims, Liens, Equity Interests or Causes of Action

16

against or in the Debtor are permanently enjoined from taking any of the following actions:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the Debtor's assets, on account of or in connection with or with respect to any such Claim, Lien, Equity Interest, or Cause of Action other than as contemplated by the Plan; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree or order against the Debtor's assets on account of or in connection with or with respect to any such Claim, Lien, Equity Interest or Cause of Action; and (iii) asserting any set-off, right of subrogation or recoupment of any kind directly or indirectly against the Debtor's assets on account of or in connection with or with respect to any such Claim, Lien, Equity Interest, or Cause of Action.

**No Third-Party Releases.**  Nothing contained in this Plan shall constitute a release of any third parties with respect to any guaranties, liabilities or debts arising out of or in connection with the Debtor or the Project.  Specifically, all existing personal guaranties of the pre-petition loans held by BSNB and assigned to the DIP Lender shall continue post-confirmation as may be enforced in state court after the Effective Date without restriction or limitation.  Accordingly, neither the DIP Lender nor any of the Debtor's Members are restricted, stayed or precluded from continuing or commencing legal action in the State Courts, including continuation of pending claims against the Estate of Howard Blitman in the Supreme Court, Suffolk County (Index No. 611885-2020).  The Bankruptcy Court shall not exercise any post-confirmation jurisdiction over third-party claims involving Debtor's members and guarantors of the BSNB debt.  The provisions of the DIP Financing Order relating to allocation of loan payments shall not be operative following the Effective Date.

G.      **Retention Of Jurisdiction.**  The Bankruptcy Court shall retain post-confirmation jurisdiction, pending the entry of a Final Decree, relating to the following matters: (i) Resolve all matters arising under or relating to the enforcement and implementation of the Plan, including any disputes regarding completion of site work and infrastructure relating to Phases I – V and the letters of credit securing the same; (ii) Resolve all matters or dispute that may arise in connection with the sale of the Remaining Homes and Vacant Lots; (iii) Allow, disallow, determine, liquidate, classify or establish the priority of any Claim or Interest; (iv) Grant or deny final applications for allowance of Professional Fees and Expenses; (v) Decide all applications, motions, adversary proceedings, contested or litigated matters, and any other matters involving the Debtors that may be pending on the Effective Date; (vi) Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments and other agreements or documents created in connection with the Plan; and (vii) Enter an Order and Final Decree closing the Chapter 11 case.

## V.

### KEY LEGAL REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129

A.      **Votes Necessary to Confirm the Plan**

The Bankruptcy Court cannot confirm the Plan unless at least one Impaired Class of Creditors has accepted the Plan. A Class of Claims accepts the Plan if both of the following occur: (a) the Holders of more than one-half (1/2) of the Allowed Claims in the Class, who vote, cast their votes to accept the Plan, and (b) the Holders of at least two-thirds (2/3) in dollar amount of the Allowed Claims in the Class, who vote, cast their votes to accept the Plan. **The Holders of Claims in Classes 1 and 2 are Impaired and entitled to vote to accept or reject the Plan.  Classes 3 and 4 are Insiders.**

**B.**    <u>**Feasibility**</u>

The Bankruptcy Court must also find that confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor, unless such liquidation or reorganization is proposed in the Plan.

The amounts necessary to consummate the Plan are already held in escrow to pay the following:

| | |
|---|---|
| Infrastructure Reserve | $375,000 |
| Administrative Claims – Professional Fees (estimated) | $225,000 |
| Administrative Claims – UST Fees | $5,000 |
| Priority Tax Claims | To be paid from future sales |
| Class 1 – Allowed – DIP Loan | To be paid from future sales |
| Class 2 – General Unsecured Creditors | $350,000 |

**C**.    <u>**Statutory Requirements for Confirmation of the Plan**</u>

At the confirmation hearing, the Debtor will request that the Bankruptcy Court determine that the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code. The most germane requirements of Section 1129 of the Bankruptcy Code are as follows:

(a)    The Plan complies with the applicable provisions of the Bankruptcy Code;

(b)    The Debtor complies with the applicable provisions of the Bankruptcy Code;

(c)    The Plan has been proposed in good faith and not by any means forbidden by law;

(d)    Any payment made or promised to be made by the Debtor under the Plan for services in connection with the Chapter 11 case has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e)    The Debtor has disclosed the identity and affiliation of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor under the Plan.

(f)    <u>Feasibility and "Best Interest" Tests</u>:

The Bankruptcy Code requires that in order to confirm the Plan the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor (the "Feasibility Test").  For a Plan to meet the Feasibility Test, the Bankruptcy Court must find that the Debtor possesses the resources to meet its obligations under the Plan. The Plan here meets the Feasibility Test because the Infrastructure Reserve and Confirmation Fund are already in place.

The Bankruptcy Court must also determine that the values of the distributions to be made under the Plan to each Class will equal or exceed the values which would be allocated to such Class in a liquidation under Chapter 7 of the Bankruptcy Code, absent their consent to different treatment (the "Best Interest Test").  The Best Interest Test is easily satisfied in this case because the DIP Lender has agreed to defer repayments to fund the Confirmation Fund for the Class 2 General Unsecured Creditors even though the liquidation value of the Project is less than the outstanding debt owed to the DIP Lender. This is a major concession and enables the Debtor to satisfy the Best Interest Test.

**D.** **Tax Consequences of Confirmation**

Confirmation may have federal income tax consequences for the Debtor and holders of Claims and Interests. The Debtor has not obtained an opinion with respect to any tax matters. Creditors and holders of Interest are urged to consult their own tax advisors as to the tax consequences of the Plan.

Dated: New York, New York
         April 10, 2022

Blitman Saratoga LLC

Goldberg Weprin Finkel Goldstein LLP
Attorneys for the Debtor
1501 Broadway 22nd Floor
New York, New York
(212) 221-5700

By:   /s/ Thomas Keaney
      Thomas Keaney
      Manager

By:   /s/ Kevin J. Nash
      Kevin J. Nash

W:\GWFG\New Data\Yen\Word\Blitman Saratoga, LLC\Disclosure Statement (REVISED) 04-10-23 v1.Doc