**Hearing Date and Time: 05/09/2023 at 1:00 p.m.**

WHITEFORD, TAYLOR & PRESTON LLP
444 Madison Avenue, 4th Floor
New York, NY 10022
(914) 761-8400
klewis@whitefordlaw.com
Kenneth M. Lewis

*Attorneys for Robin Winter, as Executor of the Estate of Howard N. Blitman*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| BLITMAN SARATOGA LLC, | ) | Case No. 20-23177-shl |
| Debtor. | ) | |

**OBJECTION OF ROBIN WINTER, AS EXECUTOR OF THE ESTATE OF HOWARD N. BLITMAN, TO DEBTOR'S MOTION FOR ORDER (A) APPROVING DISCLOSURE STATEMENT; AND (B) SCHEDULING A HEARING TO CONSIDER CONFIRMATION OF THE PLAN**

Robin Winter, as Executor of the Estate of Howard N. Blitman, by her attorneys, Whiteford, Taylor & Preston LLP, respectfully submits this Objection to Debtor's Motion [see Doc. Nos. 168 and 169], for entry of an order approving *Debtor's Disclosure Statement*, which was filed on April 10, 2023 [Doc. No. 167], with respect to Debtor's *Revised Plan of Reorganization* [Doc. No. 165], which was filed on March 7, 2023.

1. As the Revised Plan is not confirmable, the Disclosure Statement should not be approved.

2. The current Plan completely undermines any progress made in this case between the Gorens and Mr. Blitman's estate by reversing course and seeking to utilize the Plan, as well

as this case and this Court, to advance the Gorens' - - and not the Debtor's - - interests. Rather than keeping separate Debtor's restructuring issues and the internal disputes between the Gorens and Mr. Blitman's estate, Debtor seeks to leverage the bankruptcy plan process to benefit the Gorens to the detriment of Mr. Blitman's estate and its affiliates. And by doing so, the Plan violates not just the *Interim Order Approving and Authorizing the Debtor to Obtain Replacement and New Postpetition Financing Pursuant to 11 U.S.C. §§362 and 364(c)* (the "Interim Order") [Doc. No. 21] and *Final Order Authorizing the Debtor to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§362 and 364(c)* [Doc. No. 38] (the "Final Order, and, collectively with the Interim Order, the "DIP Orders") (as well as subsequent sale orders that incorporate the DIP Orders), but also §§ 502, 1122, 1129(a)(1), (a)(2), (a)(3), (a)(7), (a)(8), and 1129(b), among other Bankruptcy Code provisions.

3. Before discussing specific Plan provisions at issue, including §§ 3.1, 3.6, 4.1, 4.2, 4.3, 4.4 and 7.4, some further background is in order to provide greater context, particularly where, as here, Debtor continues to both ignore prior filings in this case, and engage in revisionist history.

4. Pursuant to Debtor's operating agreement, Howard Blitman was Debtor's designated managing member. Pursuant to a resolution dated June 25, 2020, Mr. Blitman was removed as managing member. Mr. Blitman passed away on January 3, 2021. Scott Varley, a member of the Debtor, served as the sales manager for the Saratoga project since its inception, initially through Realty USA and then through Keller Williams, and was appointed as managing member following Mr. Blitman's removal. Following Mr. Varley's resignation, Thomas P. Keaney, who was the project manager from in or about July 2015, until he resigned on June 17, 2020, became Debtor's managing member, and currently serves in that capacity, as well as

Debtor's project manager.

5. Gary Peresiper, another member of the Debtor, performed the chief financial officer function of the Debtor, as well as acted in his capacity as Debtor's *de facto* managing member until April 30, 2020. In his role as *de facto* managing member, Mr. Peresiper oversaw the entire Blitman Saratoga project, and was solely and exclusively responsible for handling and managing the financial, organizational and administrative business affairs and operations of the Debtor, including, without limitation (i) going to the site on a regular basis and meeting with Mr. Keaney and Mr. Varley and the sales team, (ii) providing financial and accounting services to the Debtor, including administering accounts payable and accounts receivable, (iii) addressing insurance and banking issues, including direct communications and negotiations with institutional lenders, including Ballston Spa National Bank, to secure financing for the Debtor, (iv) preparing projections and reports for Mr. Blitman and the Gorens, and (v) addressing other financial related matters. Mr. Peresiper's role as Debtor's *de facto* managing member is confirmed by his execution of numerous documents in his stated capacity as "managing member" or "managing partner."

6. Contrary to Debtor's averments on page 1 of the Plan and page 2 of the Disclosure Statement, at no time did Robin Winter, Mr. Blitman's daughter, ever serve in any management role for the Debtor. Rather, from mid-2016 through March, 2018, and again from August, 2018 through May, 2019, Ms. Winter was engaged by Changebridge Construction Corp., Debtor's construction manager, on behalf of Debtor. In that capacity, Ms. Winter worked with Debtor's outside closing attorney on purchase agreements, on sales and marketing for the project, processed payroll, signed checks, and gathered information.

7. Ms. Winter had no further role or responsibilities with respect to the Saratoga

project until May 1, 2020, following Mr. Peresiper's departure. Upon reviewing Debtor's books and records at that time, Ms. Winter discovered a number of issues and discrepancies, including finding approximately $750,000 in accounts payable that were not previously accounted for or reported by Mr. Peresiper.

8. Upon these discoveries, Robin Winter contacted James and Alex Goren (holders of a 50% membership interest in Debtor) to address those issues, and raised with the Gorens various proposals to fund the Saratoga project to completion. Those proposals incorporated the capital call provisions of Section 3.8 of the Blitman Saratoga Operating Agreement, which is the mechanism by which the Debtor can obtain needed capital from its members without incurring borrowing costs, including interest.

9. The proposals also recommended installing a new management team to ensure the same mistakes would not be repeated.

10. The Gorens rejected them all, insisting that, pursuant to an alleged longstanding oral "umbrella" agreement spanning several real estate projects, Mr. Blitman was liable for fifty percent (50%) of the losses incurred and that he should fund 50% of any cash requirements (notwithstanding that under the Operating Agreement, he was only required to fund 15%), and a scorched-earth strategy, implemented by aggressive lawyering, was launched. Those tactics resulted in not just costly litigation, but the Ballston Spa National Bank loans being called, and the commencement of this chapter 11 case. Despite the fact that he was a member of the Debtor, Mr. Blitman was not even consulted about the bankruptcy, and only learned about it when Ms. Winter was contacted by the real estate advisor (who she previously consulted with, and recommended that the Gorens meet with) concerning the case. In June, 2020, Ms. Winter and James Goren had a telephone conference with the real estate advisor to discuss issues

surrounding the project.

11. Stage one of the scorched-earth strategy included falsely accusing Ms. Winter of withholding books and records. A more detailed discussion is provided in Mr. Blitman's *Objection to Debtor's Motion, Pursuant to §§ 362, 364 and 507, For an Order Authorizing Debtor to Obtain Replacement and New Postpetition DIP Financing* [Doc. No. 11], and is incorporated in this Objection.

12. Next, on August 28, 2020, Mr. Russ, on behalf of Debtor and the Gorens, filed a complaint in New York Supreme Court, Suffolk County, against Mr. Blitman and Ms. Winter titled *Blitman Saratoga, LLC, Alex Goren and James Goren, et al. v. Howard N. Blitman and Robin Winter*, Supreme Court of the State of New York, County of Suffolk, Index No. 611885/2020 (the "State Court Action"). In that action, the Gorens asserted claims of purported mismanagement, misappropriation, breaches of fiduciary duties, as well as breach of the alleged oral "umbrella" agreement.

13. Next, in a letter to BSNB's Board of Directors in September 2020, Mr. Russ appears to have threatened and tried to bully Ballston Spa National Bank into selling to the Gorens the Bank's loans made to Debtor, which include the personal guarantees of members of the Debtor, including Mr. Blitman.

14. The Ballston Spa National Bank loans were *never* in default, nor was there any threat of them going into default, until (i) Mr. Peresiper asked the Bank to call a loan default, and, after it refused, (ii) the Debtor, under Thomas P. Keaney's management, failed to pay the September, October and November interest payments.

15. As reflected in the September 30 letter from Peter Burgess, counsel to Ballston Spa National Bank, to Mr. Russ' demand, apparently Mr. Peresiper "*told the BSNB relationship*

*manager that the Goren Brothers wanted BSNB to call (i.e., default) the loans.*" A copy of Mr. Burgess' Letter is annexed as Exhibit "B" to Mr. Blitman's Objection to the DIP Financing Motion [Doc. No. 11-2]. Mr. Burgess further observed that "*I have practiced in loan workout and litigation for more than 25 years and this is the first time a borrower of my client has asked for a loan default – the request is that unusual.*" Mr. Burgess' Letter, p. 2. Following further observations of a lack of candor, Mr. Burgess stated that "*This confirms the now transparent effort of the Goren Brothers to purchase the BSNB loans for the purpose of having another claim against Mr. Blitman.*"

16. On or about November 18, 2020, Debtor filed its *Motion, Pursuant to §§ 362, 364 and 507, For an Order Authorizing Debtor to Obtain Replacement and New Postpetition DIP Financing* [Docket No. 6]. The motion provided, among other things, for approval of the Gorens' purchase of the BSNB bank loans and advancing up to $1.2 million in loans, through Saratoga Funding, which the Gorens created to purchase the loans and loan money to Debtor.

17. Mr. Blitman filed an objection to the DIP Financing Motion, asserting, among other things, that the Ballston Spa National Bank loans could be reinstated, and working capital could be provided to the Debtor by its members without incurring borrowing costs, including interest, in accordance with the Operating Agreement.

18. Mr. Blitman also objected to the extent that any net sale proceeds would be used to fund the balance of construction expenses before paying down the BSNB loans. Mr. Blitman also sought clarification that in paying down the loans, the sale proceeds would be used first to pay down the "assigned" Ballston Spa National Bank first lien indebtedness prior to repaying the Gorens under their new loans. Mr. Blitman (as well as other members of the Debtor), provided a partial guaranty of the bank loans.

19. To resolve, in part, Mr. Blitman's objections, the Court entered the DIP Orders that provide, *inter alia*, that the personal guarantees shall relate only to the BSNB Loans and not to the DIP Loans, and that repayments of the BSNB Loans and the DIP Loans shall be applied first to the satisfaction of all obligations under the BSNB Loans. As provided in the second decretal paragraph of the Interim Order: "Notwithstanding anything to the contrary in this Interim Order and the DIP Financing Motion, (i) the Note shall not be consolidated with the existing BSNB Loans but instead shall constitute a separate note for the construction-related advances subject to a subordinated lien, and other super priority rights and carve-outs, (ii) the personal guarantees held by BSNB and being assigned to the DIP Lender shall relate only to the BSNB Loans and not to the Note, (iii) repayments of the BSNB Loans and the DIP Loans shall be applied first to the satisfaction of all obligations under the BSNB Loans being assigned and as modified pursuant to this Interim Order, and (iv) the obligations under the BSNB Loans and the DIP Loans shall not become due until the Revised Maturity Date defined below in Section 11(B) (items (i), (ii), (iii) and (iv), collectively the "Clarifications")."

20. Similarly, the second decretal paragraph of the Final Order provides: "The Interim Order, including, but not limited to any and all modifications to the DIP Financing Motion, the DIP Loans, the Note, the BSNB Loans and the BSNB Loan Documents contained therein, including, but not limited to the Clarifications (as defined in the Interim Order), shall continue in full force and effect, and all Clarifications shall also apply with respect to any and all borrowings or advances authorized under this Final Order. Notwithstanding anything to the contrary in this Final Order and the DIP Financing Motion: (i) the Note shall not be consolidated with the existing BSNB Loans but instead shall constitute a separate note for the construction-related advances subject to a subordinated lien, and other super priority rights and carve-outs; (ii) the

personal guarantees held by BSNB and now assigned to the DIP Lender shall relate only to the BSNB Loans and not to the Note; (iii) repayments of the BSNB Loans and the DIP Loans shall be applied first to the satisfaction of all obligations under the BSNB Loans previously assigned and as modified pursuant to the Interim Order; and (iv) the obligations under the BSNB Loans and the DIP Loans shall not become due until the Revised Maturity Date, as defined in this Final Order (items (i), (ii), (iii) and (iv), collectively the "Clarifications", as previously defined in the Interim Order and as restated, as modified, in this Final Order)."

21. Remarkably, pursuant to section 7.4 of the Plan, Debtor is attempting to alter the paydown provisions mandated by the DIP Orders. Section 7.4 of the Plan provides that "[t]he provisions of the DIP Financing Order relating to the allocation of loan payments shall not be operative following the Effective Date."

22. This language is not even included in any claim provision of the Plan. Instead, Debtor snuck it in the section titled "No Third-Party Releases." *See also* Disclosure Statement, p. 17. While the section title may not be clear, what is clear is that Debtor and the Gorens are attempting to not only collaterally attack and alter the terms by which the Court was willing to approve the DIP financing, including the allocation of the associated risks, which the Gorens agreed to, but to also force the Blitman estate to fund both the Debtor's operating expenses, and distributions under the Plan.

23. Section 4.1 of the Plan also violates the DIP Orders by failing to bifurcate the BSNB Loans and the DIP Loans, and to provide for the satisfaction of all obligations under the BSNB Loans prior to payment on account of the DIP Loans. To the extent that certain proceeds were previously applied to reduce the DIP Loans, as Debtor states on p. 8 of the Plan, rather than reducing the BSNB Loans, as required by the DIP Orders, Debtor has violated the DIP Orders, as

well as sale orders entered by the Court. *See* Order entered on March 16, 2022 [Doc. No. 108] ("the residual proceeds generated from the sale of the properties after payment of (i) all tax and mechanic liens (including any escrows for any disputed amounts), (ii) the reasonable closing costs and expenses, (iii) the reserve for the amount of requested brokers commission(s), and (iv) the Plan Escrow shall be paid over to the DIP Lender to reduce the BSNB Loans (as defined in the DIP Order) assigned by BSNB (as defined in the DIP Order)."). Moreover, the vote of Saratoga Funding, which is controlled by the Gorens, should not count in determining whether the Plan will be accepted by creditors.

24. Additionally, utilizing sale proceeds to fund Plan payments to holders of Administrative Expense Claims, including Professional Fees and Expenses, and Non-Insider Unsecured Claims, also violates the DIP Orders. At the time the Court approved Debtor's request to escrow the $600,000 "Confirmation Fund", Debtor projected there would be more than sufficient sale proceeds to satisfy the BSNB Loans, the DIP Loans, administrative claims and unsecured claims. However, if, as Debtor now claims, there will be insufficient sale proceeds to satisfy the BSNB Loans, among other claims, the Plan, which provides for distributions to administrative claims and unsecured claims, no distributions to insiders, and that members of the Debtor shall retain their interests, cannot be confirmed.

25. Next, the Plan provides for disparate treatment of insiders, as it provides favorable treatment to those insiders the Gorens favor, over those they do not. Under the Plan, Debtor proposes to pay, in full as an administrative expense claim, the brokerage commissions of Scott Varley's brokerage firm, which was never retained, nor could be retained as Debtor's real estate broker. *See* Plan, § 3.1. As Debtor has been repeatedly advised, both in informal communications and in limited objections filed with the Court, *see* Doc. Nos. 102 and 132, Scott Varley, who is

both a member of Debtor, and one of the guarantors of the BSNB Loans, is the associate real estate broker, whose license is held by Keller Williams Capital District. *See* The Scott Varley Team Real Estate web site https://www.scottvarley.com/meet-the-team/ It is therefore inappropriate to pay commissions to Mr. Varley or his firm or any salesperson in that firm in any transactions concerning Debtor.

26. Contrary to Debtor's averments on p. 9 of the Disclosure Statement, the Blitman estate only objected to brokerage commissions being paid to Mr. Varley or his brokerage firm, Keller Williams. In response to that objection, pursuant to an order entered on March 16, 2022 [Doc. No. 108], the Court directed that Debtor "establish an escrow with Debtor's counsel in an amount equal to all requested brokers' commissions (including direct brokers, sub-brokers and co-brokers) pending submission of an application or applications for allowance thereof under 11 U.S.C. § 330, which application(s) shall include a certification from the brokers involved as to the division of the respective commissions among them."[1] However, in the more than a year that has elapsed since the entry of that order, Debtor has neither filed any applications nor certifications in compliance with the Court's order. It was only this morning that Keller Williams Capital District filed an application for brokerage commissions. Thus, any delay with respect to the retention or payment of any brokers was caused entirely by Debtor or the brokers.

27. The Plan also proposes to pay TPK Development Inc., which, upon information and belief, is either wholly owned or controlled by Thomas P. Keaney, Debtor's current managing member, 50% of its scheduled unsecured claim in the amount of $53,265.00. *See* Plan, § 4.2. As reflected in the General Ledger in Debtor's November operating report [Doc. No.

---

[1] Identical language was also provided in the Court's order entered on December 23, 2022 [Doc. No. 153] with respect to the sale of a different property.

163-1], TPK Development has been paid $171,250.00 in the first 11 months of 2022.[2] In 2021, TPK Development was paid $109,600.00.

28. Next, the Plan provides that Debtor's current members, including the Saratoga Goren Trust (which, according to the Operating Agreement, is not a member of Debtor), shall retain their interests in Debtor, *see* Plan, § 4.4, notwithstanding that Mr. Blitman's estate and its affiliates will receive no distributions on account of their claims. *See* Plan, § 4.3.

29. Those claims include Mr. Blitman's estate's claim in the principal amount of $1,009,600 for loans Mr. Blitman advanced to Debtor [*see* Claim Nos. 21 and 29]. Mr. Blitman's estate also filed a claim in an undetermined amount with respect to the indemnification and hold harmless provisions under the Operating Agreement [*see* Claim Nos. 23 and 31] and a claim in the amount of $1,893,438.92 with respect to guarantees on loans [Claim No. 30]. Additionally, Mr. Blitman's affiliates, Changebridge Construction Corp., filed a claim in an undetermined amount for reimbursement, indemnification and contribution [Claim No. 24], and Blitman Development Corp., filed a claim in the amount of $1,162,989.53 for unpaid management fees [Claim No. 25].

30. The Plan further provides that the allowance of Mr. Blitman's estate's claims, as well as its affiliates, will be resolved in State Court. *See* Plan, § 4.3. However, this provision not only violates § 502 of the Bankruptcy Code, but also ignores the procedures and protections provided under Rules 3007 and 9011 of the Federal Rules of Bankruptcy Procedure. Moreover, Jay Russ, Esq. of Russ and Russ, P.C., who is currently acting as Debtor's counsel in the State Court Action, was never authorized by this Court to be retained as Debtor's counsel, nor could he be retained, as he is irreconcilably conflicted. Despite appearing as counsel for Debtor in the

[2] While Debtor filed its monthly operating report for December, it did not include the general ledger.

State Court Action, Mr. Russ represents Saratoga Funding LLC in this Court. Mr. Russ also appeared for Saratoga Funding in another action he commenced on June 11, 2021, in New York Supreme Court, Saratoga County, against Mr. Blitman's estate, but against no other guarantors, with respect to the BSNB loans that Saratoga Funding purchased as part of the DIP facility. *Saratoga Funding, LLC v. Robin Winter, as Executor of the Estate of Howard N. Blitman*, Supreme Court of the State of New York, County of Saratoga, Index Number EF20211733.[3]

31. Mr. Blitman's estate was required to spend time and money to cause that action to be discontinued, as, pursuant to the DIP Orders, the maturity date of the BSNB Loans was extended until Debtor's last property is sold. Additionally, Mr. Russ has appeared as counsel for the estate representatives of Alexander M. Goren, James Goren, Goren Brothers, LP and Goren Cousins 1, LLC in the State Court Action. Also, Ira Levine, who is "Of Counsel" to Mr. Russ' firm, represents Mr. Peresiper in the State Court Action. By commencement of the premature action on behalf of Saratoga Funding LLC, Debtor's state court counsel, Jay Russ, Esq. clearly contemplated, and continues to contemplate, efforts to unilaterally seek recovery against Mr. Blitman's estate under the BSNB guaranties, despite the fact that all members are guarantors, with the exception of Thomas P. Keaney.[4]

---

[3] Mr. Russ also represents Goren Brothers Limited Partnership, Goren Cousins I, LLC, MAG Multi Corp., James Goren, Brooke W. Kroeger, Andrea Y. Goren, Mitchell Bredefeld, as Executors of the Estate of Alexander M. Goren, and Goren Brothers, in another action against Ms. Winter, The Howard N. Blitman Revocable Trust, and others, with respect to a different project. *See Goren Brothers Limited Partnership, Goren Cousins I, LLC, MAG Multi Corp., James Goren, Brooke W. Kroeger, Andrea Y. Goren, Mitchell Bredefeld, as Executors of the Estate of Alexander M. Goren, and Goren Brothers, a general partnership, v. Robin Winter, Pond View Partners, LLC, Beaver Brook Beacon Acquisition, LLC and Robin Winter, as Trustee of The Howard N. Blitman Revocable Trust,* Supreme Court of the State of New York, County of Suffolk, Index Number 601642/2021.

[4] In addition to seeking to alter the paydown provisions mandated by the DIP Orders, section 7.4 of the Plan also provides that "all existing personal guaranties of the pre-petition loans held by BSNB and assigned to the DIP Lender shall continue post-confirmation as may be enforced in

32. Thus, while Debtor claims that it is keeping Debtor's restructuring issues and the internal disputes between the Gorens and Mr. Blitman's estate separate, its actions are to the contrary, as Debtor seeks to leverage the bankruptcy plan process to benefit the Gorens to the detriment of Mr. Blitman's estate and its affiliates. In addition to the various Plan provisions that unquestionable personally benefit the Gorens, there are other examples of how the Gorens continue to use this case for their own personal gain.

33. As reflected in the monthly operating reports recently filed with the Court, Debtor continues to pay Bredefeld & Associates for accounting services. As reflected in the General Ledger in Debtor's November operating report [Doc. No. 163-1], Bredefeld was paid $23,605.50 in the first 11 months of 2022.[5] In 2021, Bredefeld was paid $15,495.00. However, Bredefeld & Associates is the Gorens' personal accountants. This could also explain why the loans purportedly made by the Gorens or their affiliates are included on Debtor's balance sheet and general ledger, while the loans made by Mr. Blitman are not. While these concerns have been raised at prior hearings, Debtor has still not addressed them.

34. Next, upon information and belief, James and Alex Goren guaranteed the four letters of credit totaling $950,000 to secure completion of the site work. *See* Plan, § 3.5. Yet, the Plan and Disclosure Statement fail to disclose these guarantees, or the fact that utilization of sale proceeds to fund infrastructure would result in the Gorens being released from their personal guarantees on the letters of credit.

---

state court after the Effective [sic] Date without restriction or limitation. Accordingly, neither the DIP Lender nor any of the Debtor's Members are restricted, stayed or precluded from continuing or commencing legal action in the State Courts, including continuation of pending claims against the Estate of Howard Blitman in the Supreme Court, Suffolk County (Index No. 611885-2020). The Bankruptcy Court shall not exercise any post-confirmation jurisdiction over third-party claims involving Debtor's members and guarantors of the BSNB debt."

[5] *See* footnote 2.

35. Debtor also failed to disclose that during the two-year period prior to the November 6, 2020 filing date, Goren affiliates (at the Gorens' insistence) were paid by Debtor $294,033.72 ($134,503.13 to Goren Cousins I, LLC and $159,530.59 to Goren Brothers LP) with respect to purported loans they made to Debtor.[6]

36. As we have advised the Debtor and the Court in prior pleadings and at hearings before the Court, Mr. Blitman's estate wishes to see the Saratoga project successfully completed or sold for the benefit of all stakeholders, including existing and prospective homeowners, contractors, and the City of Saratoga Springs. However, as long as Debtor and the Gorens continue to attempt to improperly use the bankruptcy plan process and this Court to gain an improper litigation advantage, any such plan cannot be approved.

37. Mr. Blitman's estate reserves all of its rights, including raising any and all further objections to the current or any further plan filed with the Court.

[Remainder of page intentional left blank.]

[6] During the same period, Debtor only paid Mr. Blitman $50,905.40 on account of the more than $1.0 million in loans he made to Debtor.

WHEREFORE, Robin Winter, as Executor of the Estate of Howard N. Blitman, respectfully requests that the Court sustain her Objection, deny Debtor's Motion to approve the Disclosure Statement, and grant Mr. Blitman's estate such other and further relief as this Court deems just and proper.

Dated: New York, New York
April 28, 2023

WHITEFORD, TAYLOR & PRESTON LLP

By: */s/ Kenneth M. Lewis*
Kenneth M. Lewis

444 Madison Avenue, 4th Floor
New York, NY 10022
(914) 761-8400
klewis@whitefordlaw.com

*Attorneys for Robin Winter, as Executor of the Estate of Howard N. Blitman*