UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re:                                              Chapter 11

Blitman Saratoga LLC,                               Case No. 20-23177 (SHL)

                            Debtor.

--------------------------------------------------------x

## DEBTOR'S FIRST REVISED DISCLOSURE STATEMENT

The Debtor herein, Blitman Saratoga LLC (the "Debtor"), submits this First Revised Disclosure Statement pursuant to 11 U.S.C. §1125 (the "Disclosure Statement") in support of the Debtor's accompanying Second Revised Plan of Reorganization (as it may be further amended, revised or supplemented, the "Plan")[1] (ECF No. 190). The Disclosure Statement is being submitted to all known holders of Claims against, or Interests in, the Debtor in order to adequately disclose information deemed to be material, important and necessary for creditors to make a reasonably informed decision whether to accept or reject the Plan. Insofar as the Class 2 general unsecured creditors are concerned, the Plan provides a *pro rata* distribution equal to approximately fifty (50%) percent of allowed Class 2 claims. The *pro rata* distribution shall be paid from an existing confirmation fund of $600,000 (the "Confirmation Fund") which is being held in escrow by the Debtor's counsel as disbursing agent. The specific amount of the *pro rata* distribution to Class 2 Unsecured Creditors will depend on the final amount of allowed administrative and priority claims but should be in that range.

## I.      INTRODUCTION

The Debtor is engaged in real estate development and filed for Chapter 11 relief in November 2020 with the goal of completing a residential development project known as "Beaver

---

[1] Capitalized and defined terms used in the Plan shall have the same meanings for purposes of this Disclosure Statement.

Pond Village" in Saratoga Springs, NY (the "Project").  At the time of the bankruptcy filing, the Debtor had already built and sold 56 homes and was a party to eight (8) pending purchase and sale agreements for the remaining homes then under construction.  Additionally, the Debtor retained residual rights to sell the model home, plus owned thirteen (13) vacant lots that can be sold or developed.

By November 2020, however, construction on the Project had come to a standstill.  The Debtor had exhausted its borrowing eligibility under various pre-petition loans with Ballston Spa National Bank ("BSNB").  The decision was made by the Goren family to seek Chapter 11 relief as a means to address the liquidity and financing issues facing the Debtor, with a goal of obtaining approval of DIP financing to be provided by an affiliate of the Goren Family or their partnership, or limited liability company known as Saratoga Funding LLC (the "DIP Lender").

In bankruptcy, the Debtor obtained interim and final authorization to borrow up to the sum of $3,100,000 (the "DIP Loans"). The DIP Loans were used to replace and refinance the pre-petition secured debts owed BSNB in the total sum of $1,893,438.92 (as of November 27, 2020) via an assignment of all secured claims and guarantees to the DIP Lender.  Additionally, the DIP Loans provided additional working capital loans of approximately $1.2 million (the "Note") to resume construction in despite the great challenges presented by the ongoing Covid-19 pandemic.

During the Chapter 11 case, the Debtor managed to complete and close on four (4) homes and sold the model home.  From the sale of the homes at 47 Jane Street and 49 Jane Street, the Debtor established the Confirmation Fund of $600,000 earmarked to pay administrative and priority claims with the balance to fund *pro rata* cash dividend of approximately 50% to the holders of allowed Class 2 unsecured claims which consist of vendors, service providers and

contractors. The exact amount of the *pro rata* dividend will depend on the final allowed administrative and priority claims.  The Plan also provides that the pre-petition and post-petition mortgage debt owed to the DIP Lender as the Class 1 Secured Creditor (defined as the Secured Debt) shall be paid on a post-confirmation basis from the proceeds generated from the sale of the Remaining Homes and Vacant Lots in accordance with the Financing Orders.  Payments to the DIP Lender on account of the DIP Loans, however, shall not begin until re-payment of the contemplated Additional Exit Financing in full, plus the establishment of the Additional Infrastructure Reserve defined below of approximately $500,000.

No distributions shall be made on account of Insider Claims from the Confirmation Fund under the Plan.  Instead, all Insider Claims are hereby preserved and any actions to recover on such Claims shall be pursued against the Debtor (or others) in any applicable non-bankruptcy forum of competent jurisdiction, particularly the Supreme Court, Suffolk County, where the State Court Litigation is pending.

In recent months, issues with the City of Saratoga Springs ("City") have gained prominence relating to outstanding infrastructure required for the Project.  The infrastructure requirements relate mainly to paving the streets with a top coating, and installing streetlights and sidewalks, plus related landscaping for Phases I-V of the Project.  From the sale of 57 Jane Street, the Debtor has also established a separate escrow in the sum of $375,000 to address infrastructure requirements and the Debtor intends to establish a second infrastructure reserve with respect to Phases VI and VII and any incomplete site word relating to Phases I-V.  The Debtor has been working cooperatively with local officials on a timeline for the completion of all infrastructure.  To date, the Debtor has expended the total sum of $319,913 from the

infrastructure reserve to complete the work as reflected in the schedule annexed hereto as <u>Exhibit</u> "A".

## II.      THE CONFIRMATION PROCESS

### A.      The Scope of this Disclosure Statement and Committee Support

This Disclosure Statement has been prepared by the Debtor in consultation with its attorneys, Goldberg Weprin Finkel Goldstein LLP.  As noted above, the purpose of this Disclosure Statement is to provide creditors and other parties-in-interest with relevant information regarding the Debtor's current financial affairs to allow creditors to make an informed decision on whether to vote in favor of the Plan.

The Disclosure Statement has been approved by the Bankruptcy Court as containing adequate information within the meaning of 11 U.S.C. §1125.  The Bankruptcy Court's approval of the Disclosure Statement, however, does not constitute an endorsement of the Plan.  Instead, creditors are urged to review the Plan in its entirety before voting.  Creditors may consult with the undersigned as counsel for the Debtor, Thomas Keaney as the managing member of the Debtor, or Frank Brennan as counsel for the Official Committee of Unsecured Creditors (the "<u>Committee</u>"), with any questions.   The Committee supports the Plan and joins with the Debtor in urging acceptance of the Plan by all impaired classes of creditors.  Mr. Brennan's firm, Nolan Heller Kaufman LLP was retained as the Committee's counsel pursuant to Order dated June 1, 2021.

### B.      The Confirmation Hearing

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan on September 27, 2023 at 10:00 a.m., prevailing New York Time.  The hearing will be conducted by

the Honorable Sean Lane, at the United States Bankruptcy Court in White Plains, New York via the Court's eCourt Appearance through the Court's website at:

https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.

At the hearing, the Bankruptcy Court will determine whether the requirements of Section 1129(a) or (b) of the Bankruptcy Code have been satisfied in order to permit confirmation and Bankruptcy Court approval of the Plan. Bankruptcy Court approval and confirmation of the Plan makes the Plan binding upon the Debtor and all of the Debtor's creditors and other parties-in-interest.

The Bankruptcy Court has entered an Order (the "Scheduling Order") scheduling the confirmation hearing and directing that objections, if any, shall be served upon counsel to the Debtor, Goldberg Weprin Finkel Goldstein LLP, 1501 Broadway, 22nd Floor, New York, New York 10036, Attn: Kevin J. Nash, knash@gwfglaw.com; counsel to the Official Committee of Unsecured Creditors, Nolan Heller Kauffman LLP, 80 State Street, 11th Floor, Albany, NY 12207, Attn: Francis J. Brennan, Esq., fbrennan@nhkllp.com; and the Office of the United States Trustee, New York, NY, Greg Zipes, Esq., greg.zipes@usdoj.gov. The Scheduling Order accompanies the Plan and Disclosure Statement, and creditors are advised to review the dates and deadlines contained therein for voting and objections.

**C.     Voting**

For the Plan to be accepted on a consensual basis, all impaired classes of creditors must vote to accept the Plan or be deemed to accept the Plan as a matter of law. Acceptance of the Plan is based upon the actual votes cast by each class of creditors holding at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims of those creditors in the particular class

5

who actually vote on the Plan.  Even if the Plan is not approved by all voting classes of impaired claims, the Debtor can still confirm the Plan under the cramdown provisions of 11 U.S.C. §1129(b).

In this case, Class 1, the secured DIP Claim of Saratoga Funding LLC as the DIP Lender is impaired.  Additionally, the Class 2 claims of all unsecured creditors consisting of contractors, vendors and suppliers is also impaired and eligible to vote on the Plan.  A ballot for acceptance or rejection of the Plan accompanies the Plan.  The Ballot and should be completed by each creditor and returned before the voting deadline by either overnight mail or email to Goldberg Weprin Finkel Goldstein LLP, Attn: Kevin J. Nash, 125 Park Avenue, 12th Floor, New York, New York 10017.  Facsimile: (212) 422-6836.  E-mail: KNash@GWFGlaw.com.  In order to be counted, a ballot must be actually received on or before September 15, 2023 at 5:00 pm. (the "Voting Deadline").  Only timely submitted ballots will be counted towards confirmation of the Plan.

**D.      Nature of the Representations**

NO REPRESENTATION CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS CONTRARY TO THE DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY CREDITORS.  THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT ALTHOUGH GREAT EFFORTS HAVE BEEN MADE BY THE DEBTOR AND ITS COUNSEL TO PROVIDE CREDITORS WITH ACCURATE AND UPDATED INFORMATION.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN.  WHILE THE DEBTOR BELIEVES THAT THE SUMMARY IS FAIR AND ACCURATE, SUCH SUMMARY IS QUALIFIED TO THE EXTENT THAT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN.  **IF ANY INCONSISTENCIES EXIST BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL.**

### III.      RELEVANT BACKGROUND INFORMATION

**A.      Significant Events Leading to Chapter 11 Filing and the State Court Litigation**

As indicated above, the commencement of the Chapter 11 case was precipitated by the Debtor's lack of cash liquidity.  Historically, the Debtor was a party to two separate credit facilities

with BSNB. By November 2020, the credit facilities had reached their limits. Following disagreements between Howard Blitman and the Gorens over various issues concerning the Debtor, on August 28, 2020, the Debtor and the Gorens filed a complaint in New York Supreme Court, Suffolk County, against Mr. Blitman and Ms. Winter titled Blitman Saratoga, LLC, et al. v. Robin Winter, individually, and as Executor of the Estate of Howard N. Blitman, et al., Supreme Court of the State of New York, County of Suffolk, Index No. 611885/2020 (the "State Court Litigation"). In that action, the plaintiffs have asserted purported claims against Mr. Blitman and Ms. Winter for, *inter alia*, breach of fiduciary duty, faithless servant, breach of an alleged oral "umbrella" agreement, tortious interference with that oral "umbrella" agreement, and an accounting. Mr. Blitman's estate and Ms. Winter dispute the claims asserted in the State Court Litigation, and have also asserted a cross-claim against Gary Peresiper.

The Plan provides that any claims and cross-claims asserted in the State Court Litigation will continue in state court. The DIP Lender may also pursue claims, if any, against the estate of Howard Blitman to recover under his guarantee of the BSNB debt, subject to the Financing Orders, and Mr. Blitman's estate may also pursue claims against other persons or entities, including other guarantors and insiders, for contribution and other claims, in addition to claims it has already asserted in the State Court Litigation against Gary Peresiper. For purposes of the Plan, all filed claims of all insiders (*i.e.*, the claims filed by Robin Winter, as executor or by or on behalf of the estate of Howard N. Blitman, as well as by the estate's affiliates, Changebridge Construction Corp. and Blitman Development Corp., and the Claims of Goren Cousins I LLC and Goren Brothers Limited Partnership) shall not receive any distributions from the Confirmation Fund. Instead, any and all such claims are preserved and any actions to recover on such Claims may be pursued against the Debtor (or others) in any applicable non-bankruptcy forum of competent jurisdiction.

7

**B.**      **Major Post-Petition Events**

**DIP Financing.**  The initial focus of the Chapter 11 case was to obtain Bankruptcy Court approval of the proposed $3.1 million DIP Loans needed to refinance the existing BSNB pre-petition debt and resume construction.  Without such approval, the Chapter 11 case would have been "DOA – dead on arrival".  A detailed motion and supporting application were filed on November 19, 2022 (ECF No. 6).

Mr. Blitman filed an objection to the motion (ECF No. 11).  To resolve, in part, Mr. Blitman's objections, the Court entered the Interim Order Approving and Authorizing the Debtor to Obtain Replacement and New Postpetition Financing Pursuant to 11 U.S.C. §§362 and 364(c), on December 8, 2020 (the "Interim Order") (ECF No. 21) and the Final Order Authorizing the Debtor to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§362 and 364(c), on February 5, 2021 (ECF No. 38) (the "Final Order, and, collectively with the Interim Order, the "Financing Orders").  The Financing Orders provide, *inter alia*, that repayments of the BSNB Loans and the DIP Loans shall be applied first to the satisfaction of all obligations under the BSNB Loans; and the obligations under the BSNB Loans and the DIP Loans shall not become due until the Revised Maturity Date, which is defined as thirty (30) days after the sale of the last home and all vacant lots.

The DIP Lender closed with BSNB on the assignment of the BSNB Loans and has funded the balance of the DIP Loans for construction.  As of August 14, 2023, the DIP Lender is owed the sum of $2,673,636, of which $1,256,874 is due under the BSNB Loans (principal balance and interest of $139,113) and the entire sum $1.2 million Note for postpetition working capital advances for construction remains unpaid, plus accrued interest of $86,849 as of July 31, 2023) (collectively, the "Secured Debt").

**C.      Sale of Homes**

During the course of the Chapter 11 case, the Debtor completed the sales of the following homes:

a.      Model home at 4 Pamela Court sold to Robert McGhee for $725,000, less payment of $145,000 to purchase the land from Scott Varley.

b.      59 Jane Street sold to Frank Colone for $586,910, less credits and prepayments ($145,175).

c.      47 Jane Street sold to the Bennice family for $473,328, including extras.

d.      49 Jane Street sold to the Colella family for $691,000, less Eastin family settlement ($113,650).

e.      57 Jane Street sold to the Guiffre family for $538,000, less credits ($11,000).

The net proceeds realized from the initial sales of the homes were used to pay down the BSNB Loans.  However, with respect to the later sales, the DIP Lender agreed to defer payments so as to enable the Debtor to establish the Confirmation Fund of $600,000 and Infrastructure Reserve of $375,000.

**D.      Residual Homes**

Currently, the Debtor is working on completing the remaining homes in Phase VI and VII located at 8 Katie Lane (50% complete), 6 Katie Lane (40% complete), 9 Jane Street (30% complete) and 11 Jane Street (5% complete).  The Debtor projects that the costs for completion of the Remaining Homes will aggregate approximately $1,683,325 (to be funded by James Goren under additional or exit financing) as per the attached budget analysis annexed hereto as Exhibit "B".  The request for Additional Exit Financing shall be made in connection with hearings to confirm the Plan.  The additional financing is dependent on the contracts with respect to 6 Katie Lane (Lesiak) and 9 Jane Street (Lyeth) being canceled. The Debtor projects that the four remaining homes (defined as the Remaining Homes under the Plan) can be sold for approximately $2.8 million or more in the aggregate.  In their current condition, the Remaining Homes on an "as-is" basis have an estimated average value of about $300,000. The Debtor also projects that once the infrastructure

is completed, vacant lots can be sold for approximately $150,000 a piece for a projected total amount of approximately $1,950,000. Conversely, until the infrastructure is completed, the vacant lots are not readily saleable and have an "as-is" value of around $100,000 per lot.

**E.      Infrastructure**

While the City did not formally file a proof of claim in the Chapter 11 case, the City retains various rights in connection with completion of required site work and infrastructure for the Project. Prior to bankruptcy, the Debtor established four letters of credit totaling $950,000 to secure completion of the site work for all seven phases of the Project. The immediate infrastructure needs relate to Phases I–V in which primarily involves installation of street lighting, road paving and top coating, sidewalks and related landscaping. The last two phases of the Project (Phase VI and VII) also require completion of certain site work, which will be done after the Remaining Homes are completed and sold. In order to address infrastructure concerns, the Debtor previously established a second reserve account totaling $375,000 (the "Infrastructure Reserve"). The Infrastructure Reserve was funded from the proceeds of the recent sale of 57 Jane Street and is dedicated solely to pay for infrastructure costs. The Debtor re-engaged Boswell Engineering to oversee the site work, which is now almost complete as per Exhibit "A". The Debtor completed the infrastructure items relating to Phases I through V, without the need to draw down on the letters of credit. The Letters of Credit themselves have been extended through May and June of 2024. The balance of the infrastructure work will be done within thirty (30) days. Upon completion of the infrastructure relating to Phases I -V, the Debtor shall seek cancellation of the letters of credit directly related to this work (excluding Phase II), while the letters of credit securing site work for Phases VI and VII shall be renewed by the Debtors until completion of this work. According to the City, once the infrastructure work relating to Phases I-V has been completed, the City Engineer shall review the status of the work

with the Debtor's representative.  If work performed is reasonably satisfactory to the City, the letters of credit directly related to that completed scope of work shall be cancelled.  The City will also insist that the letters of credit securing site work for the remaining Phases shall be renewed by the Debtors until completion of that scope of work as determined by the City Engineer.  Again, such determination shall not be unreasonably withheld by the City.  As noted above, Debtor intends to establish an additional infrastructure reserve of approximately $500,000 from the sale of the Remaining Homes to fund the balance of the infrastructure and site work for Phases VI and VII and any unfinished work relating to Phases I through V (the "Additional Infrastructure Reserve").

F.    **Brokers**

During the Chapter 11 case, there has been much controversy about paying the brokerage commissions of Scott Varley or his firm, Keller Williams Capital District.  Scott Varley, who is the associate real estate broker on the Debtor's sales, and whose license is allegedly held by Keller Williams Capital District, is one of the members of the Debtor and one of the guarantors of the BSNB Loans.  While the Debtor believed that payment of brokerage commissions constituted an ordinary course of business transaction, Mr. Blitman's estate objected to the brokerage commissions being paid to Mr. Varley or Keller Williams Capital District because Keller Williams, through its licensed broker, Scott Varley, allegedly holds an interest adverse to Debtor's estate.  In response to that objection, pursuant to an order entered on March 16, 2022 (ECF 108) (as well as a subsequent order entered on December 23, 2022 (ECF No. 153)), the Debtor established an escrow with Debtor's counsel relating to requested brokers' commissions (including direct brokers, sub-brokers and co-brokers but excluding Scott Varley) pending submission of an application or applications for allowance thereof under 11 U.S.C. § 330, which application(s) shall include a certification from the brokers involved as to the division of the respective commissions among them."  On April 28, 2023,

11

an application of the real estate brokers for payment of real estate brokerage commissions was filed, and pursuant to an order entered on June 1, 2023, the requested brokerage fees of approximately $70,000 were paid without further objection from Mr. Blitman's estate.

## IV.   THE PLAN

The Plan constitutes a binding contract between the Debtor and its creditors to address pre-petition claims and the DIP Loans.  Generally speaking, a Chapter 11 plan of reorganization must (i) divide Claims and Interests into separate categories and classes, (ii) specify the treatment that each category and class is to receive under such plan, and (iii) contain other provisions necessary to implement the reorganization of the Debtor. A Chapter 11 plan may specify that the legal, equitable, and contractual rights of the holders of Claims or Interest in certain classes are either to be altered and modified or remain unchanged. Classes of claims which are altered and modified are deemed impaired and are eligible to vote. Conversely, classes of claims which remain unchanged are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan.

A. **Classification and Treatment of Claims and Interests under the Plan**

The Claims and Interests as defined by the Plan hereunder are classified as follows:

<u>**Class 1**</u> – The Claim of the DIP Lender and assignee of BSNB.

<u>**Class 2**</u> – Allowed Claims of Non-Insider Unsecured Creditors.

<u>**Class 3**</u> – Insider Claims.

<u>**Class 4**</u> – The Membership and Equity Interests in the Debtor.

**B. Unclassified Claims**

Pursuant to Section 1123(a) of the Bankruptcy Code, the Plan does not classify Administrative Expense Claims, Priority Tax Claims or U.S. Trustee Fees, all of which shall be paid in full as required by 11 U.S.C. §1129(a)(9).

**Administrative Expense Claims**.  Administrative Expense Claims consist primarily of Professional Fees and Expenses, plus the costs and expenses to complete construction and infrastructure requirements.  Except for Professional Fees, the holders of Administrative Expense Claims shall either be paid in the ordinary course of business or from the funds maintained in the Infrastructure Reserve.

**Professional Fees and Expenses**.  The requests for allowance of Professional Fees and Expenses by the Debtor's counsel and the Creditors' Committee Counsel shall be filed no later than thirty (30) days after the Effective Date and remain subject to Bankruptcy Court approval. After notice and a hearing, as applicable, the allowed Professional Fees and Expenses shall be paid from the Confirmation Fund pursuant to appropriate Orders awarding such fees and expenses.  The Debtor projects that professional fees and expenses in the Chapter 11 case will aggregate approximately $225,000 itemized as follows: (a) Goldberg Weprin Finkel Goldstein - $190,000; and (b) Nolan Heller Kaufman - $35,000.

**Priority Tax Claims**.  Any residual Priority Tax Claims relating to the Debtor shall be paid in full from the Confirmation Fund on the Effective Date or from the proceeds of the sale of the Remaining Homes and Vacant Lots.

**U.S. Trustee Fees**.  The Debtor shall pay all accrued and billed U.S. Trustee Fees, together with any interest thereon, until the Chapter 11 case is closed by entry of a Final Decree.

**C. Classification And Treatment of Claims**

13

The Plan classifies Claims and Interests against the Debtor consistent with the applicable provisions of the Bankruptcy Code.

**Summary**.  The categories listed below classify Claims and Interests against the Debtor for all purposes, including voting, confirmation and distribution pursuant to Sections 1122 and 1123(a)(l) of the Bankruptcy Code, as summarized below:

| Class | Designation | Impaired | Entitled to Vote |
|---|---|---|---|
| Class 1 | Allowed Secured Claim of the DIP Lender | Yes | Yes |
| Class 2 | Unsecured Claims | Yes | Yes |
| Class 3 | Insider Claims | N/A | N/A |
| Class 4 | Membership Interests | N/A | N/A |

**Class 1: The Allowed Claim of The DIP Lender**

**Classification** – Class 1 consists of the Allowed Secured Claim of the DIP Lender.

**Background** – The Debtor was a party to various mortgage loans made and issued by BSNB aggregating $1,893,438.92 as of November 27, 2020.  The Debtor sought and obtained authorization for the refinancing of the BSNB mortgages through assignment thereof as part of the overall DIP Loans and post-petition financing package approved by the Bankruptcy Court pursuant to the Financing Orders.  As noted above, after commencement of the Chapter 11 case, the Debtor paid down the BSNB Loans from prior sales.  As of August 14, 2023, the DIP Lender is owed the total sum of $2,673,636 of which $1,256,874 is due under the BSNB Loans (including interest of $139,113) and the entire $1.2 million Note for post-petition working capital remains unpaid, plus interest of $85,849 as of July 31, 2023 (previously defined collectively as the "Secured Debt").

**Treatment** – Following the Effective Date, the Debtor shall continue with construction of the Remaining Homes with the goal of selling these units together with Vacant Lots to pay down the Secured Debt owed on account of the DIP Loans until such time (if ever) that the Class

Secured Debt is paid in full including all principal, accrued interest, fees and expenses. Payment of the Secured Debt shall be deferred, however, pending repayment of the Additional Exit Financing in full to be provided by the DIP Lender pursuant to (i) a separate application; and (ii) the establishment of the Additional Infrastructure Reserve after repayment of the Additional Exit Facility.  The net Sale Proceeds shall then be paid to the DIP Lender on account of the Secured Debt (in whole or part) in accordance with the terms and allocation of the existing Financing Orders in the following order: first, to pay and satisfy in full the balance of the BSNB Loans including all principal, interest and any fees and expenses; and second, to pay and satisfy the Note, including all principal, interest and any fees and expenses.

**Class 2: Unsecured Claims**

**Classification** – Class 2 consists of the Allowed Unsecured Claims.

**Background** – All contractors, service providers and vendors which provided work, labor and services in connection with the Project are all being treated as Unsecured Creditors regardless of whether they previously filed mechanic's liens.  This treatment is premised upon the Debtor's view that the mechanics' liens are junior to the secured claims of the Class 1 DIP Lender making the mechanic's liens fully under-secured because the value of the Remaining Homes and Vacant Lots is less than the amount of the total Class 1 Secured Debt.  Callanan Industries, Inc. ("Callanan") is seeking full payment of its mechanics liens relating to 8 Katie Lane ($10,644.37 plus interest) and 11 Jane Street ($9,839.67 plus interest).  The Debtor has reached a settlement of all of Callanan's mechanics lien claims for a lump-sum payment of $18,000 on the Effective Date of the Plan as part of the Plan.

**Treatment** – Excluding the claims of Callanan Industries, the holders of allowed Class 2 Non-Insider Unsecured Claims shall receive a cash distribution equal to approximately fifty

(50%) percent of their Allowed Claims from the Confirmation Fund, subject to the final adjustment.  The specific *pro rata* distribution shall be paid on the Effective Date in full satisfaction and settlement of all Class 2 Non-Insider Unsecured Claims and outstanding mechanic liens.  If a Class 2 Claim is subject to an objection filed on or before the Claim Objection Deadline, then a separate reserve shall be established with the Disbursing Agent in an amount sufficient to pay the allocable *pro rata* share of the disputed Class 2 Claim, should such Claim become an Allowed Claim pursuant to Final Order or agreement with the Debtor.  The Debtor estimates that the Allowed Class 2 Claims will aggregate around $750,000 with projected total dividends of approximately $361,900 as per the schedule annexed hereto as Exhibit "C".

**Class 3:  Insider Claims**

**Classification** – Class 3 consists of all Claims of Insiders, including the Claims filed by Robin Winter, as executor or on behalf of the estate of Howard N. Blitman (Claim Nos. 21, 22, 23, 29, 30 and 31), as well as the Claims of the estate's affiliates, Changebridge Construction Corp. (Claim No. 24) and Blitman Development Corp. (Claim No. 25), and the Claims of Goren Cousins I LLC (Claim No. 32) and Goren Brothers Limited Partnership (Claim No. 33) (collectively, the "Insider Claims").

**Treatment** – All Insider Claims are deemed subordinated to Class 2 Claims.  No distributions shall be made on account of Insider Claims from the Confirmation Funds in connection with the Plan.  Instead, all Insider Claims are hereby preserved and any actions to recover on such Claims may be pursued against the Debtor (or others) in any applicable non-bankruptcy forum of competent jurisdiction.

**Class 4:  Membership Interests**

**Classification** – Class 4 consists of the Equity Interests of the pre-petition members of the Debtor, as follows:

| | |
|---|---|
| Saratoga Goren Trust | 50% |
| Howard Blitman | 15% |
| Gary Peresiper | 15% |
| Scott Varley | 15% |
| Thomas P. Keaney | 5% |

**Treatment** – The respective rights and interests of members and Class 4 Interests shall continue post-confirmation in accordance with the Debtor's Amended and Restated Operating Agreement, except that no members shall be eligible to receive any distributions in connection with the Plan on account of their equity or membership interests.

### D. Provisions For Implementation of The Plan

**Distribution of Confirmation Fund and Additional Exit Financing**. The Plan shall be implemented in the first instance by the prompt distribution of the Confirmation Fund on the Effective Date.   These monies shall be used to pay all allowed claims of Administrative Expenses and Priority Claims and then fund approximately 50% *pro rata* distribution to Class 2 Non-Insider Unsecured Claims (as adjusted).  Insofar as the Class 1 Secured Claim of the DIP Lender is concerned, all liens and mortgages shall survive confirmation of the Plan in accordance with the Financing Orders.  Following the Effective Date, the Debtor is authorized to pursue complete construction and the sale of the Remaining Homes and Vacant Lots without the need for further Bankruptcy Court approval (the "Post-Effective Date Sales").  Based upon current projections, the Debtor will require additional exit financing of up to $1,683,325 (the "Additional Exit Financing") to complete construction of the Remaining Houses, with hard costs projected as follows: (a) 6 Katie Lane - $325,000; (b) 8 Katie Lane - $275,000; (c) 9 Jane Street - $325,000; and (d) 11 Jane Street - $425,000. The Debtor shall separately move for approval of the

17

Additional Exit Financing in conjunction with hearings to confirm the Plan. As a condition of Additional Exit Financing, the Debtor intends to terminate pending contracts with respect to 9 Jane Street (Lyeth family) and 6 Katie Lane (Lesiak family) voluntarily or pursuant to 11 U.S.C. §365.  All of the net Sale Proceeds (after closing costs and brokerage) generated from the Post-Effective Date Sales shall be paid to the DIP Lender at the closings thereon in the following order: first, to pay and satisfy in full the Additional Exit Financing with interest; second, to establish the Additional Infrastructure Reserve of approximately $500,000; and third, to pay and satisfy the secured debt owed in connection with the balance of the DIP Loans consistent with the terms and allocations set forth in the Financing Orders as follows: first, to satisfy, in full the BSNB Loans, including principal, interest and any fees and expenses; and second, to satisfy, in full, the Note, including principal, interest, and any fees and expenses.  The Reorganized Debtor shall retain full authority and discretion to market and sell the remaining Homes and Vacant Lots as the Debtor's current management believes appropriate to maximize value.

1.      **Sale Free and Clear of All Claims, Liens, Taxes and Interests.**  The Remaining Homes and Vacant Lots shall continue to be sold free and clear of all liens, claims, taxes and interests pursuant to 11 U.S.C. §§ 363(b) and (f) and 1123(a)(5), with the liens arising under the DIP Loans to attach to the net Sale Proceeds in accordance with the Financing Orders.

2.      **Transfer Taxes**.  The sale of each of the Remaining Homes and Vacant Lots (together with related Additional Exit Financing) constitutes the making or delivery of an instrument of transfer pursuant to or in connection with confirmation of the Plan.  Therefore, the Additional Exit Financing, as well as Post-Effective Date Sales, shall be exempt from the payment of any mortgage recording or local or state stamp, real estate transfer or other similar taxes pursuant to 11 U.S.C. §1146(a).

18

3.    **<u>Disbursing Agent</u>**.

The Confirmation Order shall continue the appointment of Goldberg Weprin Finkel Goldstein LLP to act as Disbursing Agent to perform the following functions:

(i)    To assist local counsel (John Hayko, Esq.) in consummating the sale of the Remaining Homes and Vacant Lots;

(ii)    To maintain and disburse the Confirmation Fund;

(iii)    To review, settle, compromise, negotiate or otherwise resolve all Claims in dispute as of the Claim Objection Deadline;

(iv)    To implement and effectuate the provisions of this Plan, including rejection and termination of the purchase agreements relating to 9 Jane Stret and 6 Katie Lane; and

(v)    To move for entry of a Final Decree closing the Chapter 11 case.

4.    **<u>Preservation of Causes of Action</u>**.  Except as otherwise provided in the Plan, all pre-petition and post-petition claims and causes of action arising under federal or state law belonging, accruing or held by the Debtor as of the Effective Date shall vest in the Reorganized Debtor and may be enforced by the Reorganized Debtor following the Effective Date in connection with the State Court Litigation.

**E.  Treatment Of Executory Contracts**

The Debtor and Reorganized Debtor intend to negotiate to terminate the contracts to sell 6 Katie Lane and 9 Jane Street and return all deposits.  If terminations of these agreement cannot be obtained voluntarily, the Debtor reserves the right to reject these agreements under 11 U.S.C. §365 as burdensome to the Debtor's estate.

**F.  No Discharge and No Third-Party Releases**

**Binding Effect**.   On the Effective Date, the terms of this Plan shall be effective and enforceable and shall bind all holders of Claims against or interests in and against the Debtor, whether or not such holders voted to accept the Plan.

**No Discharge**.   Pursuant to Section 1141(d)(3) of the Bankruptcy Code, neither the Plan nor confirmation thereof shall discharge any Claim against the Debtor, except that receipt of a distribution under the Plan on account of such Claim shall constitute a valid and binding settlement of such Claim.   All claims by and against Insiders shall not be affected by the Plan. Thus, Insiders shall retain all legal rights and remedies against the Debtor and each other, subject to the Financing Orders.

**Injunction.**   Except as otherwise provided in the Plan, all creditors (except the DIP Lender and Insiders or holders of Insider Claims) which have held, currently hold, or may hold Claims, Liens, Interests or causes of action against or in the Debtor or the Project are permanently enjoined from taking any of the following actions:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the Debtor or the Project on account of or in connection with or with respect to any such Claim, Lien, Interest, or cause of action other than as permitted or contemplated by the Plan; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree or order against the Debtor or the Project on account of or in connection with or with respect to any such Claim, Lien, Interest or cause of action; and (iii) asserting any set-off, right of subrogation or recoupment of any kind directly or indirectly against the Debtor's assets on account of or in connection with or with respect to any such Claim, Lien, Interest, or cause of action.   Notwithstanding anything

20

contained in the Plan to the contrary, the Debtor may be a party to or in any suit, action or other proceeding concerning Insiders, and any holders of Insider Claims may pursue or prosecute any actions or claims to recover on Insider Claims against the Debtor (or any other person, entity or party) following the Effective Date, with any such action or claim having deemed to have been filed or commenced on the Petition Date, provided, however, that any action seeking a recovery against the Debtor or its property concerning an Insider Claim shall be deemed further tolled until payment, in full, of the Secured Debt.

**No Third-Party Releases.** Nothing contained in the Plan shall constitute a release of any third parties with respect to any guarantees, liabilities or debts arising out of or in connection with the Debtor or the Project. All existing personal guarantees of the pre-petition loans held by BSNB and assigned to the DIP Lender shall continue post-confirmation as may be enforced in state court or other non-bankruptcy forum of competent jurisdiction after the Effective Date, subject to the Financing Orders. Moreover, neither the DIP Lender, the estate of Howard N. Blitman, Robin Winter, any of the Debtor's members, any guarantors of the BSNB Loans, nor any other party in the State Court Litigation, or any of their representatives, are restricted, stayed or precluded from prosecuting or defending any claims, cross-claims or counterclaims, or commencing or continuing any actions in state court or in any other non-bankruptcy forum of competent jurisdiction, including the State Court Litigation. The Bankruptcy Court shall not exercise any post-confirmation jurisdiction over such third-party claims involving Debtor's members and guarantors of the BSNB Loans, provided, however, that the Bankruptcy Court shall retain jurisdiction with respect to its orders, including the enforcement and interpretation of such orders, including the Financing Orders.

**G.      Retention Of Jurisdiction.** The Bankruptcy Court shall retain post-confirmation

21

jurisdiction, pending the entry of a Final Decree, relating to the following matters: (i) Resolve all matters arising under or relating to the enforcement and implementation of the Plan, including any disputes regarding completion of site work and infrastructure relating to Phases I – V and the letters of credit securing the same; (ii) Resolve all matters or dispute that may arise in connection with the sale of the Remaining Homes and Vacant Lots; (iii) Allow, disallow, determine, liquidate, classify or establish the priority of any Claim or Interest; (iv) Grant or deny final applications for allowance of Professional Fees and Expenses; (v) Decide all applications, motions, adversary proceedings, contested or litigated matters, and any other matters involving the Debtors that may be pending on the Effective Date; (vi) Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments and other agreements or documents created in connection with the Plan; and (vii) Enter an Order and Final Decree closing the Chapter 11 case.

## V.

### KEY LEGAL REQUIREMENTS FOR CONFIRMATION
### UNDER SECTION 1129

A.    **Votes Necessary to Confirm the Plan**

The Bankruptcy Court cannot confirm the Plan unless at least one Impaired Class of Creditors has accepted the Plan. A Class of Claims accepts the Plan if both of the following occur: (a) the Holders of more than one-half (1/2) of the Allowed Claims in the Class, who vote, cast their votes to accept the Plan, and (b) the Holders of at least two-thirds (2/3) in dollar amount of the Allowed Claims in the Class, who vote, cast their votes to accept the Plan. **The Holders of Claims in Classes 1 and 2 are Impaired and entitled to vote to accept or reject the Plan.  Classes 3 and 4 are Insiders.**

B.    **Feasibility**

The Bankruptcy Court must also find that confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor, unless such liquidation or reorganization is proposed in the Plan.

The amounts necessary to consummate the Plan are already held in escrow to pay the following:

| | |
|---|---|
| Infrastructure Reserve | $375,000 |
| Administrative Claims – Professional Fees (estimated) | $225,000 |
| Administrative Claims – UST Fees | $5,000 |
| Priority Tax Claims | To be paid from future sales |
| Class 1 – Allowed – DIP Loans | To be paid from future sales |
| Class 2 – General Unsecured Creditors | $350,000 |

### C.    **Statutory Requirements for Confirmation of the Plan**

At the confirmation hearing, the Debtor will request that the Bankruptcy Court determine that the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code. The most germane requirements of Section 1129 of the Bankruptcy Code are as follows:

(a)    The Plan complies with the applicable provisions of the Bankruptcy Code;

(b)    The Debtor complies with the applicable provisions of the Bankruptcy Code;

(c)    The Plan has been proposed in good faith and not by any means forbidden by law;

(d)    Any payment made or promised to be made by the Debtor under the Plan for services in connection with the Chapter 11 case has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e)    The Debtor has disclosed the identity and affiliation of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor under the Plan.

(f)    Feasibility and "Best Interest" Tests:

23

The Bankruptcy Code requires that in order to confirm the Plan the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor (the "Feasibility Test").  For a Plan to meet the Feasibility Test, the Bankruptcy Court must find that the Debtor possesses the resources to meet its obligations under the Plan. The Plan here meets the Feasibility Test because the Infrastructure Reserve and Confirmation Fund are already in place.

The Bankruptcy Court must also determine that the values of the distributions to be made under the Plan to each Class will equal or exceed the values which would be allocated to such Class in a liquidation under Chapter 7 of the Bankruptcy Code, absent their consent to different treatment (the "Best Interest Test").  The Best Interest Test is easily satisfied in this case because the DIP Lender has agreed to defer repayments to fund the Confirmation Fund for the Class 2 General Unsecured Creditors even though the liquidation value of the Project is less than the outstanding debt owed to the DIP Lender. This is a major concession and enables the Debtor to satisfy the Best Interest Test.

The Plan also meets the Absolute Priority Rule because all Class 2 Unsecured Creditors are expected to consent.  If this is a dissenting vote in Class 2, then the Debtor will establish a basis for equity holders to retain their interests.

24

**E.**     **Tax Consequences of Confirmation**

Confirmation may have federal income tax consequences for the Debtor and holders of

Claims and Interests.   The Debtor has not obtained an opinion with respect to any tax matters.

Creditors and holders of Interest are urged to consult their own tax advisors as to the tax

consequences of the Plan.

Dated: New York, New York
       August 15, 2023

Blitman Saratoga LLC                          Goldberg Weprin Finkel Goldstein LLP
                                              Attorneys for the Debtor
                                              125 Park Avenue, 12th Floor
                                              New York, New York 10017
                                              (212) 221-5700


By:  /s/ Thomas Keaney                        By:   /s/ Kevin J. Nash
     Thomas Keaney                                  Kevin J. Nash
     Manager

25