UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
In re:                                                                                    Chapter 11

Blitman Saratoga LLC,                                                        Case No. 20-23177 (SHL)

                                            Debtor.
---------------------------------------------------------------x

**DEBTOR'S MOTION PURSUANT TO 11 U.S.C. § 364 FOR AN ORDER
AUTHORIZING DEBTOR TO OBTAIN POST-CONFIRMATION EXIT FINANCING**

The debtor herein, Blitman Saratoga LLC (the "Debtor"), by and through its counsel, submits this motion (the "Motion"), pursuant Section 364(c) and (d) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), to be heard in conjunction with the confirmation of the Debtor's Second Revised Plan of Reorganization [ECF No. 190] (the "Plan") for the entry of an order authorizing the Debtor to borrow up to the total sum of $1,683,325 (the "Additional Exit Financing")[1] from Saratoga Funding LLC (the "DIP Lender") on a rolling basis pursuant to 11 U.S.C. §364(c) and (d) for the purposes of completing construction of the Remaining Homes and completing the remaining infrastructure for half of Phase II and Phases VI and VII at the Debtor's Beaver Pond Village Residential development. In support of this Motion, the Debtor represents as follows:

**Preliminary Statement**

1.      The adage that "no good deed goes unpunished" forms the backdrop for this Motion. Leading up to the confirmation hearing, the Debtor arduously attempted to head-off potential objections to the Plan and accepted a number of comments from Robin Winter ("Ms. Winter"), as executor of the estate of Howard Blitman (the "HB Estate"), relating to the disposition of the DIP Lender's claims and the deferral of payments under the Plan pending post-

---
[1] All capitalized terms shall have the same meaning ascribed in the Plan.

1

confirmation sales of the Remaining Homes and Vacant Lots. Simply put, without a deferral by the DIP Lender, there would have been no possibility to confirm the Plan, particularly since the deferrals resulted in the all-important $600,000 Confirmation Fund on hand to pay administration and a *pro rata* dividend to general creditors.

2. Moreover, the Plan was revised with full disclosure of the urgent need for Additional Exit Financing in order to complete the construction of the four Remaining Homes and related infrastructure for half of Phase II and Phases VI and VII. The completion of the infrastructure became a hot button issue in bankruptcy for the City of Saratoga Springs ("City") and the Homeowners Association ("HOA"), each independently represented by separate counsel. In fact, objections to confirmation have been filed by two members of the HOA contending that the proposed infrastructure reserve is not enough (*See,* ECF No. 198). While the Debtor believes the reserve, which will be increased to $543,000, will be sufficient to cover the anticipated costs, the filing of the objections certainly crystalizes the need for Additional Exit Financing.

3. Any market-driven lender coming onto the scene to fund completion of the Remaining Homes and remaining infrastructure for half of Phase II and Phases VI and VII would invariably insist that this "new money" be repaid first. While the Debtor cannot realistically obtain institutional financing, the prospect of a mortgage subordinate to the DIP Loans is virtually impossible to even contemplate. Thus, the treatment of Additional Exit Funding to be repaid first under the Plan is entirely consistent with reasonable market expectations.

4. The reality is that the HB Estate has not contributed a single cent to the completion of the project since the start of bankruptcy, even though Howard Blitman was the developer and left the project sorely incomplete. The financial investors inherited the ensuing mess and have done their level best to see the project to completion at great personal expense.

Yet, the sole purpose of the Objection is for the HB Estate to position itself with respect to potentially reducing its guaranty of liability under the pre-petition bank debt originally held by Ballston Spa National Bank ("BSNB") while forsaking the interests of all other creditors.

5.    The Plan has the support of the Committee and has been unanimously accepted by the general unsecured creditors who cast ballots.  Nevertheless, in light of the Objection to confirmation now filed by Ms. Winter [ECF No. 196], the Debtor is submitting this separate motion for approval of the Additional Exit Financing to address head-on any efforts by Ms. Winter to derail confirmation of the Plan.

**Current Cash Availability**

6.    The Debtor's counsel is holding $600,000 in escrow to cover administrative expenses, priority claims and fund a dividend to general creditors under the Plan.  Outside of the Confirmation Fund and proposed Exit Financing, the Debtor does not have any meaningful liquidity left to complete construction or complete remaining infrastructure.  The prior reserve of $375,000 (set aside by the DIP Lender) was and will be used to complete infrastructure with respect to Phases I through V, as detailed in the Disclosure Statement and summarized in the attached updated schedule with a corresponding site plan, all annexed hereto as Exhibit "A". This infrastructure is being done in a manner acceptable to the City as depicted in the attached photographs collectively annexed hereto as Exhibit "B"

7.    In her objection to confirmation of the Plan, Ms. Winter continues to ignore the critical differences in circumstances relating to the need for Additional Exit Financing and argues that exit financing should be treated the same as the DIP Loans.  Ms. Winter is simply wrong in this regard, as the respective loans serve different purposes and functions. Furthermore, the terms of the Financing Orders do not additional borrowings under a separate or

3

new credit facility. At any rate, the proposed exit financing creates no additional liability for the HB Estate since the HB Estate is not being asked to guarantee the exit financing. If the HB Estate feels aggrieved, it has an open-ended invitation to participate equally in the funding of the exit financing and share *pari passu* in repayment.

## The Additional Exit Financing

8. The terms of the Additional Exit Financing are highly favorable. The DIP Lender will provide up to $1,683,325 on a rolling basis, to be expended pursuant to an approved budget (*See,* Exhibit "C"). Re-payment will be deferred until the time the sales occur, with repayments to be made on a rolling basis. Interest will accrue at a very favorable rate of 5% per annum, which is lower than the one-year treasury (currently 5.458%) and about 60% of the current Prime Rate of 8.5%. The Additional Exit Financing will be secured by a senior mortgage lien on the Remaining Homes and Vacant Lots with the consent of the DIP Lender.

9. The need for the Additional Exit Financing is manifest, as there is no other available source of funding. At present, there are four (4) Remaining Homes under purchase contracts which require financing to complete construction, located at 8 Katie Lane (50% complete), 6 Katie Lane (40% complete), 9 Jane Street (30% complete) and 11 Jane Street (5% complete), as well as thirteen (13) Vacant Lots. The pre-petition contracts for 6 Katie Lane and 9 Jane Street have been voluntarily terminated, such that construction can begin immediately to complete these homes.

10. The Debtor projects that, once completed, the four Remaining Homes can be sold for approximately $2.8 million in the aggregate. The Debtor also projects that it requires another $543,000 to complete the remaining portion of Phase II ($209,000) and the Phase VI and VII

4

infrastructure ($334,000), following which the Vacant Lots can be sold for approximately $1,950,000 (13 x $150,000) for a total potential recovery of $4,750,000.

11.    To reemphasize, the first $543,000 of the net sale proceeds will be used to create the Additional Infrastructure Reserve for half of Phase II and Phases VI and VII. This is designed to meet the requirements of the City and HOA. The next $1,685,000 in sale proceeds will be used to repay the Additional Exit Financing, with the balance of almost $600,000 (assuming no further infrastructure costs) to be used to pay down the approximately $1,400,000 still owed on the BSNB mortgage loan. This aspect is consistent with the Financing Orders and redounds to the benefit of the HB Blitman Estate since the guaranty liability is reduced in kind.

### Legal Analysis

12.    Bankruptcy Code Section 364(c) and (d) provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code Section 503(b)(1), the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in Bankruptcy Code section 503(b) or 507(b); (ii) secured by a lien on property of the estate that is not otherwise subject to a lien; or (iii) secured by a junior or senior lien on property of the estate that is subject to a lien.

13.    The statutory requirement for obtaining post-petition credit under Section 364(c) is a finding, made after notice and hearing, that the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See also In re Crouse Group Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987). Courts have applied the following three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code:

  (i) the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim;
  (ii) the credit transaction is necessary to preserve the assets of the estate; and
  (iii) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*Crouse Group*, 71 B.R. at 549. As discussed below, each of these elements is satisfied.

  14. The Debtor has no independent cash reserves to resume construction or remaining infrastructure. Under these undeniable circumstances, it is axiomatic that the Debtor cannot possibly qualify for unsecured credit. In fact, the estate is truly fortunate that the DIP Lender has stepped into the breach to provide exit financing which is absolutely critical for confirmation. The same cannot be said of the HB Estate.

  15. Thus, the Debtor faces a substantial risk of irreparable damage based upon a failed project absent approval of the Additional Exit Financing. *See In re Sun Healthcare Group, Inc.*, 245 B.R. 779, 781 (Bankr. D. Del. 2000) (noting that the court had approved debtor-in-possession financing to "permit the Debtors to continue to operate to preserve their estates").

  16. As this Court has previously recognized, the decision to obtain financing, including exit financing, is committed to the Debtor's business judgment. *In re Republic Airways Holdings Inc.*, No. 16-10429(SHL), 2016 WL 2616717, at *12 (Bankr. S.D.N.Y. May 4, 2016). However, where, as here, the proposed lender is an insider, the transaction is "subject to rigorous scrutiny by the court, with the insider bearing the burden of showing the "entire fairness" of the transaction at issue." *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020).

6

17. Here, even under the higher standard employed in *Latam Airlines*, the Additional Exit Financing is clearly in the best interest of the Debtor, its creditors and the public at large. Despite these clear and obvious benefits, the HB Estate still objects despite its limited standing.

18. To begin with, the HB Estate is not a secured creditor in its own right nor a participant in the DIP Loans. All claims by and against the HB Estate will be determined in the state court litigation. Thus, the guaranty of the BSNB pre-petition debt cannot legitimately form the basis to resist post-confirmation exit financing, partially since there is nothing contained in the Financing Orders that precludes additional financing or requires that any such additional financing be subordinate to the DIP Loans.

19. In this regard, it has been held that a DIP lien can be subordinated in favor of exit financing over the objection of the DIP lender. *In re Aspen Club & Spa LLC*, 2020 WL 4251761 (10th Cir. BAP. 2020).

20. In the objection to confirmation, the HB Estate attempts to distinguish *Aspen* on two grounds. First, it argues that the Court in Aspen relied on the fact that the loans were over secured, which may or may not be the case here. In any event, there is nothing in *Aspen* which indicates that the Court would have denied the motion had the loans been undersecured.

21. Second, the HB Estate argues that the Plan violates Section 1129(b)(2)(A)(iii), citing to the Second Circuit decision in *Murel Holding Corp.*, 75 F.2d 941 (2d Cir. 1935) "where the Second Circuit reversed denial of relief from the stay where a creditor proposed to subordinate a first mortgagee's lien to a second mortgagee's loan", and contending that "the subordinated creditor must be provided with the indubitable equivalent of its claim, which means that subordinating the lien 'does not increase the creditor's exposure to risk.'" However, confirmation is being sought under Section 1129(a), and the requirements of the absolute priority

7

rule do not apply. Even at that, the HB Estate is not a lender and has no standing to object to accommodations made by the DIP Lender to facilitate completion of the project.

22.    Most importantly, the HB Estate offers no alternative and continues to keep its hands in its own pockets. Given the lack of alternatives, it is the Debtor's business judgment that entry into the DIP Facility is in its best interests. Even under the heightened scrutiny imposed by *Latam Airlines, supra,* Courts grant a debtor considerable deference on financing issues. *See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994), *rev'd on other grounds* by 134 F.3d 188 (3d Cir. 1998) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers, or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *see also Funding Sys. Asset Mgmt. Corp. v. Key Capital Corp. (In re Funding Sys. Asset Mgmt. Corp.)*, 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

23.    In sum, the Debtor has satisfied the requirements of 11 U.S.C. § 364(c) and (d) since credit for construction on more favorable terms does not exist in today's environment. Accordingly, the request for Additional Exit Financing should be approved to facilitate confirmation of the Plan and a successful conclusion of the Chapter 11 case irrespective of whether the HB Estate has to defend its guaranty liability in state court.

**WHEREFORE**, the Debtor respectfully requests approval of the Additional Exit Financing, together with such other and further relief as the Court deems appropriate.

Dated: New York, NY
      September 22, 2023

                                                  Goldberg Weprin Finkel Goldstein LLP
                                                  Attorneys for the Debtor
                                                  125 Park Avenue, 12th Floor
                                                  New York, New York 10017
                                                  (212) 221-5700

                                                  By:    /s/ Kevin J. Nash, Esq.