UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re:                                              Chapter 11

Blitman Saratoga LLC,                               Case No. 20-23177 (SHL)

                              Debtor.

-----------------------------------------------------------------x

**APPLICATION OF GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP
SEEKING FINAL COMPENSATION AND REIMBURSEMENT OF EXPENSES
FOR SERVICES RENDERED AS COUNSEL TO THE DEBTOR**

Goldberg Weprin Finkel Goldstein LLP (hereafter the "Applicant" or "GWFG") hereby submits this Application seeking final compensation in the net sum of $210,000[1] (net of the unapplied $7,000 pre-petition retainer plus a voluntary reduction of $33,271.75) for legal services rendered on behalf of Blitman Saratoga LLC (the "Debtor"), together with reimbursement of expenses in the amount of $2,568.77.  In support of the Application, GWFG respectfully states and alleges as follow:

**PRELIMINARY STATEMENT**

1.      This case was certain challenging from an both operational and legal standpoint. The Debtor sought Chapter 11 relief in November 2020 with the goal of completing its residential home development in Saratoga Springs (the "City") in the midst of the growing Covid-19 pandemic.  With Applicant's assistance, the Debtor was able to obtain badly needed DIP financing to resume construction and refinance pre-petition mortgage debt, and ultimately sold five homes during the Chapter 11 case, from which a confirmation fund of $600,000 was established to pay a *pro rata* dividend to creditors after paying professionals.  Over the last year or so, Applicant also assisted the Debtor in addressing the growing concerns of homeowners and

---

[1] The total post-petition legal fees amount to $250,271.75 before application of the $7,000 unapplied retainer and a voluntary reduction of $33,271.75, for a total net final request of $210,000 plus expenses.

1

the City of Saratoga Springs relating to the completion of infrastructure.  Applicant overcame all of these challenges and fought off the resistance of the Estate of Howard Blitman (the "Blitman Estate") resulting the confirmation of a second revised plan of reorganization (the "Plan").   The key to achieving confirmation was Applicant's efforts in obtaining Bankruptcy Court approval of exit financing, which was also accomplished over the objection of the Blitman Estate.

2.       Throughout the case, Applicant worked diligently to address the concerns of multiple parties including home buyers, city officials and the DIP Lender who, although affiliated, was represented by separate counsel.  Moreover, Applicant maintained good relations with counsel for the Creditors' Committee and was able to reach agreement for the establishment of a confirmation fund in the sum of $600,000.

3.       With the Plan now confirmed and funds available to pay administrative expenses, Applicant is seeking final Bankruptcy Court approval of its professional fees through the date of this Application.  Applicant is agreeable to a voluntary reduction in its compensation to stay close to projections, although with intense litigation surrounding confirmation matters, the requested reduced fees are slightly higher than initial projections ($210,000 vs. $195,000) even with a voluntary reduction.

**APPLICANT'S BACKGROUND AND BILLING PRACTICES**

4.       Applicant is the successor to Finkel Goldstein Rosenbloom & Nash, LLP which was engaged in the practice of bankruptcy and insolvency law for a period of more than eighty (80) years.  Various members of Applicant's firm have represented the full gamut of debtors, creditors, lenders and committee in hundreds of bankruptcy proceedings before the New York Bankruptcy Courts.  Additionally, members of Applicant's firm have also lectured extensively to credit groups, bar associations and continuing education classes.  By reason of this vast

2

experience, Applicant is recognized and respected as being highly proficient in the field of insolvency law involving small to mid-size companies.

5.      This reorganization case consumed a relatively significant amount of legal services over the last three years.  For the sake of brevity, Applicant will not detail all of the specific tasks performed, but will instead highlight the major areas of concentration.

6.      Applicant maintains time logs showing the daily services rendered by Applicant's Members and Associates.  Applicant's time logs are attached hereto as Exhibit "A".  These time logs provide a detailed record of the specific legal services rendered on a day-to-day basis.

7.      In evaluating Applicant's services, this Court is respectfully requested to consider the following core criteria: (1) the complexity and necessity of the legal services rendered; (2) the time necessarily and actually expended by Applicant during a condensed period; (3) the efficiency of Applicant's services; and (4) the overall results achieved culminating in a confirmed Plan.

## BACKGROUND

8.      The Debtor is a real estate developer and filed for Chapter 11 relief in November 2020 with the goal of completing a residential development project known as "Beaver Pond Village" in Saratoga Springs, NY.  At the time of the bankruptcy filing, the Debtor had already built and sold 56 homes and was a party to eight (8) pending purchase and sale agreements for the remaining homes then under construction.  Additionally, the Debtor retained residual rights to sell the model home, plus owned thirteen (13) vacant lots that can be sold or developed.

9.      By November 2020, however, construction on the Project had come to a standstill.  The Debtor had exhausted its borrowing eligibility under various pre-petition loans with Ballston Spa National Bank ("BSNB"), and disputes had arisen between Howard Blitman,

3

the originator of the Project, and his investors, primarily the Goren Family.  The decision was made by the Goren family to remove Howard Blitman from control and seek Chapter 11 relief as a means to address the liquidity and financing issues facing the Debtor, with a goal of obtaining approval of DIP financing to be provided by an affiliate of the Goren Family or their partnership, or limited liability company known as Saratoga Funding LLC (the "DIP Lender").

**A.      The DIP Loan**

10.      The initial focus of the Chapter 11 case was to obtain Bankruptcy Court approval of the proposed $3.1 million DIP Loans needed to refinance the existing BSNB pre-petition debt and resume construction.  Without such approval, the Chapter 11 case would have been "DOA – dead on arrival".  Applicant prepared a detailed motion and supporting application which were filed on November 19, 2022 (ECF No. 6).

11.      Mr. Blitman immediately filed an objection to the motion (ECF No. 11).  The Debtor believed that it was important that a portion of the DIP Loan be used to take out BSNB, so as to relieve outside pressure, while Mr. Blitman was concerned that the portion of mortgage securing the DIP Loan taken by assignment from BSNB be repaid first, since he had personally guaranteed that debt.  To resolve Mr. Blitman's objections, Applicant negotiated provisions in the Financing Orders that repayments of the BSNB Loans and the DIP Loans shall be applied first to the satisfaction of all obligations under the BSNB Loans; and that the obligations under the BSNB Loans and the DIP Loans shall not become due until the Revised Maturity Date, which is defined as thirty (30) days after the sale of the last home and all vacant lots.

12.      Applicant then prepared and obtained entry of both the Interim Order Approving and Authorizing the Debtor to Obtain Replacement and New Postpetition Financing Pursuant to 11 U.S.C. §§362 and 364(c), on December 8, 2020 (the "Interim Order") (ECF No. 21) and the

Final Order Authorizing the Debtor to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§362 and 364(c), on February 5, 2021 (ECF No. 38) (the "Final Order, and, collectively with the Interim Order, the "Financing Orders"). Applicant worked with the DIP Lender's counsel to close with BSNB on the assignment of the BSNB loans and fund the balance of the DIP Loans for construction.

**B.** **Sale of Homes**

13. During the course of the Chapter 11 case, the Debtor completed the sales of the several homes. Applicant negotiated with the pre-petition buyers. In certain instances, where the buyers were no longer interested in closing because of the delays, Applicant arranged for a release of the contract and a negotiated settlement of the cash deposits. Applicant filed motions relating to disposition of several homes (discussed below) plus the model home at 4 Pamela Court. Applicant also worked with various counsel on the closing of the sales, summarized as follows:

   a. Model home at 4 Pamela Court sold to Robert McGhee for $725,000, less payment of $145,000 to purchase the land from Scott Varley.
   b. 59 Jane Street sold to Frank Colone for $586,910, less credits and prepayments ($145,175).
   c. 47 Jane Street sold to the Bennice family for $473,328, including extras.
   d. 49 Jane Street sold to the Colella family for $691,000, less Eastin family settlement ($113,650).
   e. 57 Jane Street sold to the Guiffre family for $538,000, less credits ($11,000).

14. The net proceeds realized from the initial sales of the homes were used to pay down the BSNB loans in compliance with the Financing Orders. However, with respect to the later sales, Applicant negotiated an agreement with the DIP Lender and the Committee whereby the DIP Lender agreed to defer payments so as to enable the Debtor to establish the Confirmation Fund of $600,000 and Infrastructure Reserve of $375,000. This agreement proved very important later on, as it not only created protected monies for creditors and completion of infrastructure, but helped gain support from the Committee in future disputes with the Blitman Estate, which continued to oppose the Debtor's efforts while refusing to assist with any of the financing.

5

C.      **Infrastructure**

15.     While the City of Saratoga did not formally file a proof of claim in the Chapter 11 case, the City retains various rights in connection with completion of required site work and infrastructure for the Project.  Prior to bankruptcy, the Debtor established four letters of credit totaling $950,000 to secure completion of the site work for all seven phases of the Project. Phases I–V primarily involved installation of street lighting, road paving and top coating, sidewalks and related landscaping.  The last two phases of the Project (Phase VI and VII) also require completion of certain site work, which will be done after the Remaining Homes are completed and sold.  In order to address infrastructure concerns, as noted, Applicant traveled to Saratoga, met with the City's department heads and legal counsel, and negotiated the creation of a reserve account totaling $375,000 (the "Infrastructure Reserve"), which was funded from the proceeds of the sale of 57 Jane Street and was dedicated solely to pay for infrastructure costs.

16.     Applicant monitored both the construction on infrastructure and the release of the escrow funds, reviewing every invoice and preparing every check to cover the costs.  The Debtor completed the infrastructure items relating to Phases I through V, within the established budget.

17.     Applicant then negotiated with the City for the creation of a second escrow fund of approximately $500,000 to be created under the Plan from the sale of the Remaining Homes to fund the balance of the infrastructure and site work for Phases VI and VII and any unfinished work relating to Phases I through V.

**D.**     **The Plan Process**

18.     Once an agreement was reached with the Creditors' Committee on the confirmation fund Applicant began its work on a proposed plan of reorganization.  The Plan was revised and updated on a number of occasions to address evolving events and to respond to objections and concerns lodged by the Blitman Estate, certain home buyers and the City. Likewise, Applicant prepared a comprehensive disclosure statement which was also amended on multiple occasions.  It suffices to say that significant effort was made to obtain agreement from all of the stakeholders to the language of the disclosure statement, which was ultimately approved by the Bankruptcy Court on August 22, 2032.

19.     In connection with proceedings to confirm the Plan. Applicant also separately moved for approval of badly needed exit financing to provide the Debtor with the liquidity to complete the Remaining Homes plus create a separate reserve of approximately $536,000 from the sale of the Remaining Homes to pay the costs of remaining infrastructure and site work for Phases VI and VII.

20.     The Debtor projected that the costs for completion of the Remaining Homes at 8 Katie Lane (50% complete), 6 Katie Lane (40% complete), 9 Jane Street (30% complete) and 11 Jane Street (5% complete) would aggregate approximately $1,683,325.  Applicant worked with the Debtor to prepare a detailed completion budget, and then negotiated for exit financing to be provided by the DIP Lender.

21.     In  addition to preparing the motion for approval of the exit financing, Applicant prepared the necessary paperwork to obtain consensual rejection of existing contracts with respect to 6 Katie Lane (Lesiak) and 9 Jane Street (Lyeth).

22.     Since the Debtor projected that the four Remaining Homes can be sold for approximately $2.8 million or more in the aggregate, Applicant's efforts to arrange for exit financing resulted in a substantial financial gain for the Debtor.

23.     Not surprisingly, the Blitman Estate objected to the motion for exit financing because it provided for payment of the exit financing ahead of the DIP Loans.  Applicant prepared supporting declarations, a memorandum of law and supplemental opposition in support of confirmation and to address the objections.  Applicant argued that the proposed exit financing was on far better terms than any comparable financing, while the Plan was the culmination of years of efforts that was unanimously accepted by all voting unsecured creditors.  The Debtor was gratified that the Bankruptcy Court overruled all objections.  Thus, due in part to Applicant's efforts during the contested confirmation hearing, the Debtor confirmed the Plan and obtained approval of the exit financing, bringing the case to a successful conclusion.

### LEGAL STANDARDS FOR THE AWARD
### OF COMPENSATION IN BANKRUPTCY

24.     Applicant is cognizant of the analysis involved in awarding bankruptcy compensation under the so-called "Johnson" factors (*Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974)), developed for determining reasonable compensation under a lodestar, measured by the hours reasonably expended times a reasonable hourly rate, including:

a) The time and labor required and spent;
b) The novelty and difficulty of the questions;
c) The skill requisite to perform the legal services properly;
d) The preclusion of other employment by the attorney due to acceptance of the case;
e) The customary fees;
f) Whether the fee is fixed or contingent;
g) Time limitations imposed by the client or other circumstances;
h) The amount involved and the results obtained;
i) The experience, reputation and ability of the attorneys;

8

j)   The undesirability of the case;
k)   The nature and length of the professional relationship with the client; and
l)   Awards in similar cases.

25.   Applicant submits that it meets all of these criteria, as Applicant successfully navigated a number of challenges to confirm the Plan and maximize the recovery for creditors.

26.   Based on actual time logs attached hereto, Applicant has provided more than 440 hours in legal services to the Debtor with a total value of $250,271.75 in recorded time. After applying the unused balance of $7,000 from the pre-petition retainer and factoring a voluntary discount of another $33,271.75 (slightly more than 13%), Applicant seeks final net compensation of $210,000.00, together with reimbursement of expenses in the amount of $2,568.77, likewise itemized on Exhibit "A".

27.   Applicant submits that our billing rates are consistent with comparable firms of Applicant's experience and that we rendered beneficial services throughout the Chapter 11 case.

WHEREFORE, Applicant prays for an order awarding final compensation and reimbursement of expenses consistent with the foregoing.

Dated: New York, New York
       November 16, 2023

Goldberg Weprin Finkel Goldstein LLP
Attorneys for the Debtor
1501 Broadway, 22nd Floor
New York, NY 10036
(212) 221-5700

By:  /s/ Kevin J. Nash, Esq.